UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

NATIVE FISH SOCIETY and
MCKENZIE FLYFISHERS,

        Plaintiffs,

        v.

NATIONAL MARINE FISHERIES
SERVICE; REBECCA BLANK, Acting
Secretary of the Department of Commerce;
WILLIAM STELLE, Regional
Administrator, NMFS; OREGON
DEPARTMENT OF FISH AND WILDLIFE;
BRUCE MCINTOSH, Assistant Fish
Division Administrator, ODFW; CHRIS
WHEATON, Northwest Region Manager,
ODFW; and ROY ELICKER, Director,
ODFW,

        Defendants.

Case No. 3:12-cv-00431-HA

OPINION AND ORDER

_____

HAGGERTY, District Judge:

        Plaintiffs, the Native Fish Society and McKenzie Flyfishers, filed this action for

declaratory and injunctive relief against the National Marine Fisheries Service (NMFS); William

Stelle, Regional Administrator, NMFS; Rebecca Blank, Acting Secretary of the Department of

Commerce (collectively "federal defendants" or "NMFS"); the Oregon Department of Fish and

Wildlife (ODFW); Bruce McIntosh, Assistant Fish Division Administrator, ODFW; Chris

1 - OPINION AND ORDER

Wheaton, Northwest Region Manager, ODFW; and Roy Elicker, Director, ODFW (collectively

"state defendants" or "ODFW"). Plaintiffs seek to compel defendants to comply with the

Endangered Species Act (ESA), 16 U.S.C. § 1531 *et seq.*, the National Environmental Policy Act

(NEPA), 42 U.S.C. § 4321 *et seq.*, and the Administrative Procedure Act (APA), 5 U.S.C. § 551

*et seq.*, in authorizing, funding, and managing the Sandy Hatchery, and to enjoin defendants from

allegedly causing unlawful "take" of threatened steelhead and salmon in violation of the ESA. 16

U.S.C. § 1538(a)(1)(B). Plaintiffs filed a Motion for Temporary Restraining Order/Preliminary

Injunction [58] seeking to prevent the release of hatchery salmonids from the Sandy Hatchery.

State defendants filed two Motions to Strike [86 and 107] exhibits attached to plaintiffs'

Memorandum in Support [59] and the Declaration of Mark Sherwood [101]. The Association of

Northwest Steelheaders, the Northwest Sportfishing Association, and the Northwest Guides and

Anglers Association filed an *amicus* brief in opposition to plaintiffs' Motion for TRO/PI. On

March 20, 2013, this court held oral argument and on March 21, 2013, this court entered an

Order [111] denying plaintiffs' Motion for Temporary Restraining Order/Preliminary Injunction.

This Opinion now issues to explain the court's reasoning.

## BACKGROUND

Plaintiff Native Fish Society is an environmental nonprofit organization dedicated to the

conservation of native, wild fish in the Pacific Northwest. Plaintiff McKenzie Flyfishers[1] is a

non-profit, membership-based, fishing conservation group located in Eugene, Oregon. Plaintiffs

advance five claims for relief alleging that state defendants' operation of the Sandy Hatchery

---

[1] Plaintiff McKenzie Flyfishers did not join this lawsuit until plaintiffs filed the First Amended Complaint on October 22, 2012. For ease of reference, the court refers to "plaintiffs" throughout this memorandum.

causes "take" of threatened fish species in violation of § 9 of the ESA, and that NMFS' approval

and funding of the Sandy Hatchery's operations violates the ESA, NEPA, and the APA.

A.      Overview of the Endangered Species Act

The purpose of the ESA is "to provide a means whereby the ecosystems upon which

endangered species and threatened species depend may be conserved, [and] to provide a program

for the conservation" of such species. 16 U.S.C. § 1531(b) (2006). The Secretary of the Interior

must list species that are endangered or threatened with extinction. *Id.* § 1533(a).

The ESA empowers private citizens to enforce many of its provisions. However, a

plaintiff must give both the alleged violator and the Secretary of Commerce sixty-days written

notice prior to filing suit in federal court. 16 U.S.C. § 1540(g)(2)(A)(i).

Section 9 of the ESA prohibits the "take" of any species listed as "endangered" under the

ESA. 16 U.S.C. § 1538(a)(1). The ESA defines "take" to mean "harass, harm, pursue, hunt,

shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." *Id.* §

1532(19). The ESA's implementing regulations further define "harm" as an "act which actually

kills or injures wildlife" and "may include significant habitat modification or degradation where

it actually kills or injures wildlife by significantly impairing essential behavioral patterns,

including breeding, feeding or sheltering." 50 C.F.R. § 17.3; *Babbitt v. Sweet Home Chapter of*

*Cmtys. for a Great Or.*, 515 U.S. 687, 696-700 (1995) (upholding the regulatory definition of

"harm").

Section 9, on its face, does not provide a blanket protection from take to "threatened"

species. However, § 4(d) of the ESA provides that NMFS shall "issue such regulations . . .

necessary and advisable to provide for the conservation of such [threatened] species." 16 U.S.C.

3 - OPINION AND ORDER

§ 1533(d).  Pursuant to § 4(d), § 9's take prohibition has been extended to threatened anadromous

fish, including the species at issue in this case.  Endangered and Threatened Species; Final Rule

Governing Take of 14 Threatened Salmon and Steelhead Evolutionarily Significant Units, 65

Fed. Reg. 42,422, 47,475–81 (July 10, 2000); 70 Fed. Reg. at 37,194 (amending 2000 rule)

(codified at 50 C.F.R. § 223.203).

    As a part of the 4(d) rule, NMFS established exceptions to § 9's take prohibition known

as "4(d) Limits."  Id.  Limit 5 creates an exemption from § 9's take prohibition for otherwise

unlawful take of anadromous fish caused by a hatchery's artificial propagation program so long as

the hatchery is operated pursuant to a hatchery genetic management plan (HGMP) approved by

NMFS.  50 C.F.R. § 223.203(b)(5).  Among other things, a HGMP must have "clearly stated

goals, performance objectives, and performance indicators that indicate the purpose of the

program, its intended results, and measurements of its performance in meeting those results."  Id.

at  § 223.203(b)(5)(A).  An approved HGMP must evaluate, minimize, and account "for the

propagation program's genetic and ecological effects on natural populations, including disease

transfer, competition, predation, and genetic introgression caused by the straying of hatchery

fish."  Id. at  § 223.203(b)(5)(E).

    Section 7 of the ESA imposes affirmative duties on federal administrative agencies to

conserve listed species and to prevent violations of § 9.  Section 7(a)(2) of the ESA requires

federal agencies to "insure that any action authorized, funded, or carried out by such agency . . .

is not likely to jeopardize the continued existence of any endangered or threatened species or

result in the destruction or adverse modification" of such species' critical habitat.  16 U.S.C. §

1536(a)(2).  Whenever a federal agency determines that a proposed action "may affect listed

4 - OPINION AND ORDER

species or critical habitat," that agency must prepare a biological assessment on the effects of the action. 50 C.F.R. § 402.14(a); 16 U.S.C. § 1536(c). If the agency determines that the proposed action is likely to adversely affect a listed species or critical habitat, the agency must consult with a consultation agency (NMFS or the Fish and Wildlife Service) to determine whether the agency action is likely to jeopardize that species or adversely modify its critical habitat. *Id.*; 16 U.S.C. § 1536(c). In this case, NMFS is both the action agency and the consultation agency.

Once formal consultation is initiated, NMFS must review all relevant information and formulate a biological opinion (BiOp) regarding whether the action is likely to result in jeopardy to a listed species. 50 C.F.R. § 402.14(g). NMFS "shall use the best scientific and commercial data available" in determining whether an agency action is likely to result in jeopardy to a listed species. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(a). If NMFS determines that an agency action is likely to jeopardize the continued existence of a listed species, NMFS must suggest reasonable and prudent alternatives to the proposed action, if any exist, that would not result in such jeopardy. *Id.* § 1536(b)(3).

If NMFS concludes that a proposed action is not likely to jeopardize the continued existence of a listed species or result in the destruction or adverse modification of critical habitat, but determines that the action will nevertheless result in the take of listed species, NMFS must issue an incidental take statement (ITS). 16 U.S.C. § 1536(b)(4). An ITS authorizes the limited take of listed species that would otherwise violate § 9's "take" prohibition. *Id.*; 50 C.F.R. § 402.14(i). The ITS must specify measures to limit and measure take. *Id.* If during the course of the subject action, the conditions of the ITS are exceeded, the action agency must reinitiate formal consultation pursuant to § 7(a)(2). 50 C.F.R. § 402.16(a).

5 - OPINION AND ORDER

**B.     Overview of the National Environmental Policy Act**

NEPA requires federal agencies to prepare a "detailed statement on . . . the environmental impact" of "major Federal action significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C)(i); *see also* 40 C.F.R. § 1500.2. The purpose of NEPA is: (1) to ensure the agency "will have available, and will carefully consider, detailed information concerning significant environmental impacts" of its decisions; and (2) to guarantee that this information will be available to the public. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989). NEPA is a procedural statute that does not mandate particular results, but simply proscribes the process by which decisions affecting the environment must be made. *Sierra Club v. Espy*, 38 F.3d 792, 796 (5th Cir. 1994).

An agency must "integrate the NEPA process with other planning at the earliest possible time to insure that planning and decisions reflect environmental values." 40 C.F.R. § 1501.2; *Andrus v. Sierra Club*, 442 U.S. 347, 351 (1979). The agency must prepare a detailed environmental impact statement (EIS), "[i]f there is a substantial question whether an action may have a significant effect on the environment." *Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1185 (9th Cir. 2008) (quotation marks omitted). To determine whether an EIS must be prepared, the agency may prepare an environmental assessment (EA). 40 C.F.R. § 1501.4(b). An EA is a concise public document that briefly describes the need for the proposed action, and examines the environmental impacts of the proposed action and alternatives to that action. 40 C.F.R. § 1508.9. If the agency makes a finding of no significant impact ("FONSI") after completing the EA, then an EIS is not required. *Salmon River Concerned Citizens v. Robertson*, 32 F.3d 1346, 1356 (9th Cir. 1994).

6 - OPINION AND ORDER

C.      **Factual Background**

The Sandy River flows from its headwaters on the west side of Mt. Hood to the Columbia River east of Portland, Oregon.  The Sandy River's watershed encompasses approximately 508 square miles and includes the Bull Run River, the Salmon River, the Little Sandy River, and the Zigzag River among its tributaries.  In 2007 and 2008, the Marmot Dam on the Sandy River and the Little Sandy Dam on the Little Sandy River were removed.  Prior to their removal, they served as artificial barriers to normal fish migration and spawning for nearly 100 years.  The Sandy River Basin is divided between upper and lower basins delineated at the former site of the Marmot Dam.  The upper Sandy River Basin has been designated as a wild fish sanctuary.

In 2005 and 2006, NMFS issued final listing decisions designating four fish species that use the Sandy River Basin as threatened: the Lower Columbia River Chinook Evolutionary Significant Unit (ESU), Lower Columbia River coho ESU, Columbia River chum ESU, and Lower Columbia River steelhead Distinct Population Segment (DPS).[2]  Endangered and Threatened Species; Final Listing Determinations for 16 ESUs of West Coast Salmon, 70 Fed. Reg. 37,160 (June 28, 2005); Endangered and Threatened Species; Final Listing Determinations for 10 Distinct Population Segments of West Coast Steelhead, 71 Fed. Reg. 834 (Jan. 5, 2006). Each of these fish species is at a moderate to very high risk of extinction.

The Sandy Hatchery utilizes an artificial fish propagation program and releases hatchery-bred smolts into the Sandy River Basin.  The operations of the Hatchery are funded in part

_____

[2]  The ESA defines species to include subspecies and DPSs of species.  16 U.S.C. § 1532(16).  NMFS considers a Pacific salmonid subspecies to be a DPS if it is an ESU and the term "ESU" is used in place of "DPS" for those species.  Policy on Applying the Definition of Species Under the [ESA] to Pacific Salmon, 56 Fed. Reg. 58, 612 (Nov. 20, 1991).

through Mitchell Act funds from NMFS. Despite genetic differences, NMFS may include

hatchery-bred and wild fish in the same designated ESU. However, NMFS treats hatchery fish

and wild fish disparately for purposes of the ESA. 70 Fed. Reg. 37,160; *Trout Unlimited v.*

*Lohn*, 559 F.3d 946; (9th Cir. 2009); 50 C.F.R. § 223.203 (noting that § 9 only applies to listed

fish with an intact adipose fin (hatchery fish have their adipose fins clipped before they are

released)).

Plaintiffs allege that the operation of the Sandy Hatchery causes "take" of Lower

Columbia River Chinook, Lower Columbia River coho, Columbia River chum, and Lower

Columbia River steelhead in violation of § 9. Plaintiffs allege that take results through a number

of vectors, including competition from hatchery fish, introduction of disease, genetic

introgression, and the use of native fish to supplement the Hatchery's genetic pool.

Historically, the Sandy River Basin supported sizeable runs of native wild salmonids with

as many as 15,000 coho, 20,000 winter steelhead, 10,000 fall Chinook, and 10,000 spring

Chinook. AR032391. In 2010, there were an estimated 1,330 spring Chinook, 901 coho, and

969 winter steelhead spawners. AR016561. The Sandy Hatchery, which has been in operation

since 1951, is operated with "harvest" rather than "conservation" goals in mind. AR000681.

There is very little evidence to suggest a hatchery can restore a wild population of fish and the

Sandy Hatchery is generally not intended to achieve any recovery goals. Rather, it is undisputed

that hatchery operations can pose a host of risks to wild fish. *See generally*, AR016947-56

(describing factors impacting wild fish populations including interactions between hatchery fish

and wild fish that can result in hatchery fish out-competing wild fish and may alter behavioral

patterns, genetic introgression, and the installation and operation of weirs[3]).  Of particular

concern to plaintiffs are the impacts caused by the use of weirs and genetic introgression, which

results from spawning between hatchery fish and wild fish.

In 2008, in connection with litigation in a separate matter, Edward Bowles, the Fish

Division Director for ODFW, has stated that "threats to wild populations caused by stray

hatchery fish are well documented in the scientific literature." Am. Decl. of Edward Bowles at ¶

127, *Nat'l Wildlife Fed'n v. NMFS*, 839 F. Supp. 2d 1117 (D. Or. 2011 (Case No. 3:01-cv-00640-

SI) (ECF No. 1633).  "Among the impacts are substantial genetic risks that affect the fitness,

productivity, and genetic diversity of wild populations." *Id.* (references omitted).  Hatchery

programs "also pose ecological risks to wild populations that can further decrease abundance."

*Id.*  These risks increase "when the proportion of the adult population that is hatchery fish

increases over 5%" and risks "have been demonstrated when the proportion that is hatchery fish

is over 10%." *Id.* (references omitted).  The proportion of hatchery-origin spawners (pHOS or

"stray rate") is a key metric in determining the effects of a hatchery's operations on wild

populations.  "Stray rates as low as one to two percent for a large, segregated harvest program

may pose unacceptable risks to natural populations." AR021266.  However, evidence suggests

---

[3] A weir is a fish trap that is installed and operated to collect broodstock and to prevent
hatchery fish from spawning naturally.  Ideally, hatchery fish would not travel into the upper
reaches of the Sandy Basin where spawning conditions are favorable, but would instead "home"
to specific stream and river reaches where wild fish are less likely to spawn.  Weirs are supposed
to operate in such a way as to limit the number of hatchery fish reaching spawning grounds.  Fish
swim into the trap where they are sorted by ODFW personnel.  Wild fish are released above the
weir, while hatchery fish are typically collected for broodstock or are euthanized.  The physical
presence and operation of weirs can cause a host of problems for wild fish including causing a
delay in upstream migration, possibly inducing fish to spawn in less than ideal conditions below
the weir, injuring fish that attempt to escape the weir, and harming fish as they are handled and
released from the weir.  AR016954.

that higher stray rates are acceptable where a hatchery's broodstock is derived from local natural populations, as it is for all species released by the Sandy Hatchery except summer steelhead. AR016958.

The removal of the Marmot Dam in 2007 and 2008 opened the upper Sandy River Basin to both wild and hatchery fish. Since the removal of the Marmot Dam, the pHOS for Chinook salmon has dramatically exceeded the 10% threshold with 45% in 2008, 52% in 2009, 77% in 2010, and 60% in 2011. AR031745, 48. In 2010, ODFW estimated the stray rate for winter steelhead to be 52%. AR017334. In 2009, the pHOS for coho was 10.4% and in 2010 it was 24.2%. AR015626.

For nearly all of its existence, the Sandy Hatchery has operated without an approved HGMP. In April 2011, plaintiffs gave defendants notice of its intent to sue for violations of the ESA caused by operations at the Sandy Hatchery. In May 2011, the ODFW submitted draft HGMPs to NMFS for review. On March 9, 2012, plaintiffs filed the Complaint in this action. At that time, the sole claim pleaded against state defendants was that "[w]ithout the protection provided by an [incidental take statement], [incidental take permit], or approved HGMP, ODFW's take of wild native listed steelhead and salmon violates Section 9 of the ESA." Compl. ¶ 90. On May 9, 2012, NMFS submitted the draft HGMPs for public review along with a draft EA. In light of the timing of NMFS' review of the proposed HGMPs, plaintiffs agreed to a stay in litigation against federal defendants on June 28, 2012. State defendants requested that the litigation against them also be stayed pending final approval of the HGMPs. Because "[a]pproval of the HGMPs by NMFS would moot plaintiff's existing claim against state defendants though it would not necessarily forestall a different § 9 claim," this court entered a stay in this matter until

NMFS took final action regarding the HGMPs or until September 26, 2012, whichever date was earlier. Order [38] at 6.

On August 16, 2012, plaintiffs provided defendants with "Notice of Intent to Supplement and Amend Complaint for Violations of the [ESA]." First Am. Compl. Ex. 2. In the supplemental notice of intent to sue, plaintiffs asserted that "[e]ven if NMFS approves the HGMPs for the Sandy Hatchery, ODFW and its officials will not be able to comply with the terms of the HGMPs and avoid unlawful take of threatened fish." Id. On September 26, 2012, NMFS issued its final EA and made a FONSI regarding the proposed HGMPs. AR0166661-68. Therefore NMFS did not prepare an EIS. On September 28, 2012, NMFS issued its BiOp concluding that issuance of the HMGPs would not result in jeopardy to the continued existence of the listed species. AR016905-92. At the same time, NMFS issued an ITS for operation of the Sandy Hatchery and formal approval of the HGMPs. AR016969-74; 017007-13.

The HGMPs provide for the release of approximately 1,000,000 smolts into the Sandy Basin each year: 300,000 spring Chinook, 500,000 coho, 160,000 winter steelhead, and 75,000 summer steelhead[4]. AR016535-50. The HGMPs contain binding implementation terms and the § 4(d) decision approving the HGMPs requires among other things, that the Sandy Hatchery ensure that the pHOS is less than 10% annually for spring Chinook, coho, and winter steelhead, and less than 5% for summer steelhead; that the Hatchery conduct spawning ground surveys; monitor and report on the effects of fish handling at weirs; and remove all hatchery fish returning

---

[4] The summer steelhead run in the Sandy River Basin is made up entirely of non-local broodstock as summer run steelhead are not indigenous in the Basin. AR016550. Because of that, the Sandy Hatchery uses genetic stock sourced from outside the Basin for summer steelhead, whereas the broodstock for the remainder of the hatchery smolts at issue in this case was, at some point, taken from wild fish in the Basin.

to the hatchery or caught in a weir unless recycled. AR017010-11. In concluding that the HGMPs would not result in jeopardy to the species at issue, NMFS took into account terms and conditions for implementation by ODFW including increased acclimation periods for smolts before release that are expected to improve "homing" by returning spawners, and monitoring efforts to gauge the impact of the Hatchery's operations. The ITS issued with the NMFS' BiOp concluded that take of listed species was likely to result from: "(1) broodstock collection; (2) interactions on the spawning grounds; (3) interactions in juvenile rearing areas; (4) construction, operation, and maintenance of hatchery facilities (e.g. weirs); and (5) [research monitoring and evaluation]." AR016969. For each of these forms of take, NMFS set limits for that take and metrics designed to measure the take. AR016969-71. In the event the limits in the ITS are exceeded, NMFS would be required to reinitiate consultation.

On February 19, 2013, plaintiffs filed the Motion for TRO/PI and on February 26, 2013, plaintiffs provided defendants with second supplemental notice of intent to sue detailing the ways in which plaintiffs believe defendants are in violation of the ESA now that the HMGPs have been approved.

## STANDARDS

The issuance of a preliminary injunction is an "extraordinary remedy." *Monsanto Co. v. Geertson Seed Farms*, 130 S. Ct. 2743, 2761 (2010). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. NRDC*, 555 U.S. 7, 20 (2008); *see also Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134-35 (9th Cir. 2011) (holding that a

plaintiff need not establish likelihood of success on the merits if the plaintiff can demonstrate "serious questions" going to the merits combined with a balance of hardships that tips strongly in their favor). Where injury to the environment is "sufficiently likely . . . the balance of harms will usually favor the issuance of an injunction to protect the environment." *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987).

In cases involving the ESA, the balance of hardships is skewed in favor of injunctive relief even further than in other matters involving environmental harm. *Nat'l Wildlife Fed'n v. Burlington N. R.R., Inc.*, 23 F.3d 1508, 1510-11 (9th Cir. 1994). "In cases involving the ESA, Congress removed from the courts their traditional equitable discretion in injunction proceedings of balancing the parties' competing interests." *Id.* at 1511(citations omitted). "In Congress's view, projects that jeopardize the continued existence of endangered species threaten incalculable harm; accordingly, it decided that the balance of hardships and the public interest tip heavily in favor of endangered species" and this court "may not use equity's scales to strike a different balance." *Sierra Club v. Marsh*, 816 F.2d 1376, 1383 (9th Cir. 1987). However, mere allegations of ESA violations are insufficient and a plaintiff must make a showing that such violations are likely. *Nat'l Wildlife Fed'n*, 23 F.3d at 1511.

Plaintiffs' claims falling under § 7 of the ESA and NEPA are governed by the APA's "arbitrary and capricious" standard. 5 U.S.C. § 706(2)(A) (2006). Under this standard of review, the court may set aside an agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

To determine whether an agency decision is arbitrary and capricious, the court should "consider whether the decision was based on a consideration of the relevant factors and whether

13 - OPINION AND ORDER

there has been a clear error of judgment." *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 378

(1989). After considering the relevant factors, the agency must articulate a satisfactory

explanation for its action, including a rational connection between the facts found and the

agency's conclusions. *Ctr. for Biological Diversity*, 538 F.3d at 1193. Review under this

standard is narrow, and the court may not substitute its judgment for the judgment of the agency.

*Lands Council v. McNair*, 629 F.3d 1070, 1074 (9th Cir. 2011). For these claims, the scope of

review is limited to the administrative record before NMFS at the time the challenged decisions

were made. *Citizens to Pres. Overton Park v. Volpe*, 401 U.S. 402, 419 (1971).

   Plaintiffs' § 9 claims do not arise under the APA but under the citizen suit provisions of

the ESA, which provide "an express, adequate remedy." *See Wash. Toxics Coal. v. EPA*, 413

F.3d 1024, 1034 (9th Cir. 2005) (holding that the APA's record review provisions do not apply to

claims brought pursuant to "the substantive provisions of the ESA"); 16 U.S.C. § 1540(g);

*Defenders of Wildlife v. Martin*, 454 F. Supp. 2d 1085, 1094 (E.D. Wash. 2006). Accordingly, §

9 claims are reviewed *de novo* and parties are permitted to submit extra record evidence.

## MOTIONS TO STRIKE

   State defendants advanced two motions to strike prior to oral argument. Both motions

attacked draft Forest Service notes, reports, and tables regarding redd (fish nest) distribution in

the Sandy Hatchery submitted by plaintiffs as exhibits in support of their request for injunctive

relief. While the draft documents may not be admissible at trial, and are certainly not the most

reliable evidence in the record, the court utilizes relaxed evidentiary standards when considering

a preliminary injunction and this "court may give even inadmissible evidence some weight, when

to do so serves the purpose of preventing irreparable harm." *Flynt Distributing Co., Inc. v.*

*Harvey*, 734 F.2d 1389, 1394 (9th Cir. 1984). In its consideration of plaintiffs' Motion for Temporary Restraining Order/Preliminary Injunction, the court exercised its discretion to afford these documents some weight. Accordingly, state defendants' motions to strike [86 and 107] are denied.

## DISCUSSION

Plaintiffs assert that both state defendants and federal defendants are in violation of § 9 of the ESA, that NMFS' BiOp violates § 7(a)(2) of the ESA, and that NMFS violated NEPA by approving the HGMPs and by failing to prepare an EIS. Plaintiffs contend that these violations will result in irreparable harm to the listed species at issue.

### A.    Section 9 claims

Plaintiffs allege that state defendants, by operating the Sandy Hatchery, and NMFS, by funding and authorizing Hatchery operations, are in violation of § 9 of the ESA by causing take of listed species. Defendants respond that this court lacks subject matter jurisdiction to consider plaintiffs' § 9 claims and that the Hatchery's operations fall within a valid exception to § 9's take pursuant to the HGMPs authorized by the 4(d) rule.

#### 1.    Citizen suit notice and jurisdiction

The ESA empowers "any person" to "commence a civil suit on his own behalf -- (A) to enjoin any person, including the United States and any other governmental instrumentality or agency . . . who is alleged to be in violation of any provision of this chapter or regulation issued under the authority thereof." 16 U.S.C. § 1540(g)(1). However, "[n]o action may be commenced under subparagraph (1)(A) of this section -- (i) prior to sixty days after written notice of the violation has been given to the Secretary, and to any alleged violator of any such provision or

15 - OPINION AND ORDER

regulation." *Id.* at § 1540(g)(2)(A).  The "sixty day notice requirement is jurisdictional" and "failure to strictly comply with the notice requirement acts as an absolute bar to bringing suit under the ESA." *Sw. Ctr. for Biological Diversity v. U.S. Bureau of Reclamation*, 143 F.3d 515, 520 (9th Cir. 1998) (citations omitted).  The purpose of the notice requirement is to give agencies "an opportunity to review their actions and take corrective measures" and to provide "an opportunity for settlement or other resolution of a dispute without litigation." *Id.* (quoting *Forest Conservation Council v. Espy*, 835 F. Supp. 1202, 1210 (D. Id. 1993), *aff'd,* 42 F.3d 1399 (9th Cir. 1994)).

In this case, three notice letters were sent to defendants.  The first was sent in April of 2011, well over sixty days prior to commencement of litigation in May 2012.  This court then entered a stay in litigation on July 19, 2012 in light of the fact that defendants believed approval of the HGMPs would take place in September and would alter the nature of the litigation. Plaintiffs sent the second notice in August 2012 and notified defendants that even if the HGMPs were approved, plaintiffs believed that the Sandy Hatchery's operations would not comply with the terms of the conditions of the HGMPs and would result in take in violation of § 9.  Plaintiffs sent the third notice on February 26, 2013, after filing the Motion for PI/TRO.

Defendants contend that the approval of the HGMPs and the issuance of the ITS mooted plaintiffs' initial § 9 claim, that the August 2012 notice was premature as the HGMPs had not yet been approved, and that the final notice was untimely for purposes of plaintiffs' Motion for PI/TRO.  Accordingly, defendants contend that this court lacks jurisdiction to consider plaintiffs' § 9 claims.

As an initial matter, it is clear that the second two notice letters were deficient, at least for

purposes of plaintiffs' Motion for PI/TRO. The August 2012 notice was premature as it

challenged HGMPs that had not been approved and the February 26, 2013 was untimely.

Therefore, the court evaluates the sufficiency of the initial notice letter.

The April 2011 notice letter alerted defendants that plaintiffs intended to sue for

violations of § 9 of the ESA. Plaintiffs alleged that "NMFS and ODFW are liable for direct and

indirect unlawful take of steelhead, chinook, chum, and coho in their respective funding and

operation of the Sandy Hatchery and associated in-stream and near-stream structures." Pls.'

Compl. Ex. 1 at 14. The letter describes the ways in which plaintiffs believe the Hatchery's

operations harm listed fish (i.e., broodstock collection, genetic introgression, and weirs). The

letter goes on to state that the Sandy Hatchery operations lack an ITS and an HGMP and that it

does not appear that "this hatchery is meeting – or even designed to meet – the recovery standard

required under the ESA." *Id.* at 15. Plaintiffs alleged that ODFW officials planned to install in-

stream or stream affecting facilities such as weirs and that "ODFW and its officials' operation

and/or construction of facilities and structures that increase the presence of hatchery fish or

decrease the presence of wild fish in the Sandy River Basin results and will continue to result in a

take of listed fish in violation of ESA § 9." *Id.* at 16.

Defendants cite *Oregon Wild v. Connor*, 6:09-cv-00185-AA, 2012 WL 3756327, *3 (D.

Or. Aug. 27, 2012) in support of their contention that this court lacks subject matter jurisdiction.

In that case, the plaintiff's initial claim was predicated on the fact that the defendant's actions

were not protected by an ITS. However, NMFS later issued an ITS to the defendant, and the

court concluded that the issuance of the ITS and BiOp rendered the plaintiff's claim moot. *Id.*

The plaintiff contended that the defendant would be unable to comply with the terms of the ITS,

however, the court did not allow the plaintiff to amend the complaint because plaintiff had not provided sixty days notice of the alleged violations. *Id.* at *4. "While a strict construction of the 60-day notice requirement may appear to be inequitable and a waste of judicial resources, . . . it is inescapable that, in this situation courts lack authority to consider the equities." *Id.* (quotation and citations omitted).

This court must evaluate jurisdiction and notice from the time the lawsuit is commenced and then analyze whether subsequent changes affect the validity of that notice for the present claims. *Natural Res. Def. Council v. Sw. Marine, Inc.*, 236 F.3d 985, 997 (9th Cir. 2000) (holding that "[s]ubject matter jurisdiction is established by providing a notice that is adequate on the date it is given to the defendant . . . later changes to its operations and plans may affect standing . . . or mootness. But such changes do not retroactively divest a district court of jurisdiction"[5]). Here, it is clear that plaintiffs' notice was sufficient at the time the lawsuit was commenced, conferring subject matter jurisdiction on this court. Next the court must evaluate whether plaintiffs' notice letter was sufficient to alert defendants to the present claims and whether issuance of the ITS and HGMPs render the claims discussed in the notice letter moot.

Plaintiffs' notice letter alleges unlawful take of listed species in violation of § 9 of the ESA. Plaintiffs also note that defendants lack HGMPs and ITSs that would allow otherwise unlawful take. However, the claims alleged are for unlawful take, not for failure to secure an ITS or an HGMP. This makes perfect sense as it is not a violation of the ESA to act without an ITS or HGMP unless that action results in take. It is not even a violation of the ESA to violate the

---

[5] *Southwest Marine* involved the notice provisions of the Clean Water Act, which, for purposes of analysis are not materially different from the ESA's notice provisions. 1540(g)(2); 33 U.S.C. § 1365(b)(1)(A).

terms and conditions of an ITS or HGMP. *Or. Natural Desert Ass'n v. Tidwell*, 716 F. Supp. 2d

982, 1005 (D. Or. 2010) (violating the conditions of an ITS abrogates the safe harbor provisions

of the ITS, however, proof of take is still required to establish a violation of § 9); 50 C.F.R. §

223.203(b)(5)(vi) (HGMP remains in place until revoked by NMFS). Rather, ITSs and HGMPs

serve as defenses to allegations of take. *See*, 50 C.F.R. § 402.14(i)(5) (take that occurs within the

conditions of an ITS is not unlawful and no other authorization or permit is required for the

take); 50 C.F.R. § 223.203(c) (HGMP is an affirmative defense to allegations of take that must

be pleaded and proven). However, take can be unlawful when an ITS (if take exceeds that

allowable by the ITS) or HGMP (if take occurs that is not contemplated or permitted by the

HGMP) is in place. Accordingly, the issuance of an ITS or HGMP can, but does not necessarily,

moot claims for violations of § 9.

A notice letter must be sufficiently adequate to allow the recipients to identify the basis

for the claims and to give them an opportunity to correct the alleged violations. *Cmty. Ass'n for

Restoration of the Env't v. Henry Bosma Dairy*, 305 F.3d 943, 951 (9th Cir. 2002). In this case,

the noticed claims were for violations of § 9 of the ESA, and while plaintiffs noted that the

Sandy Hatchery's operations were not protected by an ITS or HGMPs, it is clear from the notice

letter that plaintiffs did not anticipate the Hatchery could be operated in compliance with § 9

absent extraordinary changes to the Hatchery's operations. While defendants may have read the

notice letter to suggest that the procurement of an ITS or HGMP would alleviate plaintiffs'

concerns, it cannot be read to suggest that any ITS or HGMP, however deficient, would satisfy

plaintiffs. The letter plainly protests violations of § 9, not the lack of an ITS or HGMP. As this

court previously noted when granting state defendants' request for a stay in this matter, the new §

19 - OPINION AND ORDER

9 claims alleged are not the same claims initially pursued in this matter.  Indeed, the claims

pleaded in the Amended Complaint are not identical to those pleaded in the original Complaint.

However, they are a logical outgrowth of those claims, and the differences are, in some respects,

irrelevant so long as the notice letter was sufficient to put defendants on notice of both the

original and newly pleaded claims.  *See Sw. Ctr. for Biological Diversity v. U.S. Forest Serv.*,

307 F.3d 964, 975 (9th Cir. 2002), *withdrawn as moot*, 355 F.3d 1203 (9th Cir. 2002) (holding

that additional claims were not new claims requiring new notice as they were an outgrowth of the

original claims and the notice letter could not be construed as simply requiring consultation to

take place regardless of its legal sufficiency).

Because the April 2011 notice letter alerted defendants to the present claims (as did

plaintiffs briefing in opposition to the stay), the court turns to the question of mootness.  As

noted above, the issuance of an ITS or HGMP, can but does not necessarily render § 9 claims

moot.  "The mootness doctrine, embedded in Article III of the Constitution, requires that a case

or controversy exist at all stages of federal court proceedings."  *Mamigonian v. Biggs*, 710 F.3d

936, 942 (9th Cir. 2013) (citation omitted).  "If events subsequent to the filing of the case resolve

the parties' dispute" the court must dismiss the case as moot.  *Id.* (quotations and citation

omitted).  However, only when "subsequent events [make] it absolutely clear that the allegedly

wrongful behavior could not reasonably be expected to recur" should a case be dismissed as

moot.  *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 189 (2000) (quoting

*United States v. Concentrated Phosphate Export Assn.*, 393 U.S. 199, 203 (1968)).  The party

asserting mootness bears the heavy burden of demonstrating that the wrongful behavior cannot

be expected to recur.  *Id.*  In this case, the Sandy Hatchery's dreadful track record of reducing

stray rates and preventing harm to listed species makes that burden too heavy for defendants to carry. Additionally, as discussed below, it appears that a limited portion of the Sandy Hatchery's proposed operations may not be covered under the HGMPs. The state has the burden of raising and proving that their actions are allowed by the HGMPs in response to the allegations of take. To find that plaintiffs' notice letter and presently plead claims were mooted by the approval of the HGMPs would turn the ESA's statutory and regulatory framework on its head.[6]

        2.      Section 9 claim against state defendants

Plaintiffs contend that state defendants' operation of the Sandy Hatchery causes take of listed species in violation of § 9 of the ESA. To obtain relief on this claim, plaintiffs must prove by a preponderance of the evidence that the Sandy Hatchery's operations results in a violation of the ESA by causing take of listed species. *Defenders of Wildlife v. Bernal*, 204 F.3d 920, 925 (9th Cir. 2000); *Palila v. Hawaii Dept. of Land and Nat'l Resources,* 639 F.2d 495, 496 (9th Cir. 1981). Plaintiffs contend that state defendants have caused take in the past without the protection of an ITS, and are likely to cause unlawful take in the future by causing take in excess of that allowed under the HGMPs and the ITS. Plaintiffs contend that take has resulted from genetic introgression when stray rates have been excessively high, by the placement of weirs which harrass fish and have caused a increase in the proportion of redds downstream from weirs, and by taking wild fish and using them for broodstock. Additionally, given the excessively high stray rates over the past few years, plaintiffs contend that ODFW will be unable to maintain the stray

---

    [6] To a certain extent the court's ruling in this matter could be read to conflict with the court's ruling in *Oregon Wild v. Connor*, 2012 WL 3756327. This court has not had the opportunity to review the notice letter in that case, and has no trouble in conceiving of a situation in which the issuance of an ITS would moot a plaintiff's claims or allegations.

rates allowed under the HGMPs (10% per year except for summer steelhead in which case it is

5% per year).[7]

State defendants respond that the HGMP issued pursuant to 50 C.F.R. § 223.203(b)(5)

provides a complete defense to § 9 claims. Limit 5 provides that § 9's take prohibition does not

apply provided that:

> (i) A state or Federal [HGMP] has been approved by NMFS as meeting [eleven specified] criteria.

> (ii) The state monitors the amount of take of listed salmonids occurring in its hatchery program and provides to NMFS on a regular basis a report summarizing this information, and the implementation and effectiveness of the HGMP as defined in NMFS' letter of concurrence. The state shall provide NMFS with access to all data and reports prepared concerning the implementation and effectiveness of the HGMP.

> (iii) The state confers with NMFS on a regular basis regarding intended collections of listed broodstock to ensure congruity with the approved HGMP.

> (iv) Prior to final approval of an HGMP, NMFS will publish notification in the Federal Register announcing its availability for public review and comment for a period of at least 30 days.

> (v) NMFS' approval of a plan shall be a written approval by NMFS Southwest or Northwest Regional Administrator, as appropriate.

> (vi) On a regular basis, NMFS will evaluate the effectiveness of the HGMP in protecting and achieving a level of salmonid productivity commensurate with the conservation of the listed salmonids. If the HGMP is not effective, the NMFS will identify to the jurisdiction ways in which the program needs to be altered or strengthened. If the responsible agency does not make changes to respond

---

[7] The parties dispute whether plaintiffs must prove a likelihood of future take to prevail on their § 9 claims. This court has previously found that the ESA's citizen suit provision provides, in some circumstances, for injunctive relief in response to past, present, and future violations of § 9, and the court finds no reason to reconsider that ruling here. *Stout v. U.S. Forest Serv.*, 869 F. Supp. 2d 1271, 1280-81 (D. Or. 2012). However, the Eleventh Amendment only allows this court to grant prospective relief against the state in response to an ongoing violation of federal law. *Verizon Maryland, Inc. v. Pub. Serv. Com'n of Md.*, 535 U.S. 635, 645 (2002).

> adequately to the new information, NMFS will publish notification in the Federal
> Register announcing its intention to withdraw the limit on activities associated
> with that program. Such an announcement will provide for a comment period of
> no less than 30 days, after which NMFS will make a final determination whether
> to withdraw the limit so that take prohibitions, like all other activity not within a
> limit, would then apply to that program. A template for developing HGMPs is
> available from NMFS Northwest Region's website (www.nwr.noaa.gov).

50 C.F.R. § 223.203(b)(5); 50 C.F.R. § 223.203(c) (a person "shall have a defense where the

person can demonstrate that the limit is applicable and was in force, and that the person fully

complied with the limit at the time of the alleged violation . . . this defense will be an absolute

defense to liability under [§ 9]"). State defendants contend that once an HGMP is approved, § 9

liability does not apply until NMFS withdraws the Limit 5 authorization pursuant to the protocols

set forth in Limit 5(vi).

Plaintiffs respond that state defendants must prove that the Sandy Hatchery has "fully

complied with the limit at the time of the alleged violation" and that it does not appear the Sandy

Hatchery will be able to fully comply with the HGMPs. 50 C.F.R. § 223.203(c), *see* 16 U.S.C. §

1539(g) (placing burden on defendant to prove an exemption is valid and that defendant is in

compliance with it). Plaintiffs construe § 223.203(c) to mean that the Hatchery must achieve the

goals set forth in the HGMPs including limits on stray rates. While the court shares plaintiffs'

concerns regarding the Hatchery's ability to meet the HGMPs' goals, HGMPs provide immunity

from § 9 liability without such compliance. A plain reading of Limit 5 only requires that the

Hatchery adhere to the procedural requirements set forth in the Limit. If a Hatchery fails to meet

the goals of the HGMP, it is up to NMFS to work with the Hatchery to improve operations and

possibly to revoke the HGMPs. Because the HGMPs have been approved and are in effect, state

defendants are not liable for take at this time.

However, the HGMPs only immunize state defendants from liability for actions approved in the HGMPs. Because it does not appear that supplementation activities are contemplated by the HGMPs, state defendants court incur liability for planned steelhead supplementation on Spring Creek. However, at the time of the preliminary injunction hearing, the court had insufficient information regarding any possible supplementation or the timing of such supplementation to conclude that state defendants are in violation of § 9 at present.

       3.     Section 9 claim against federal defendants

The claim against federal defendants for § 9 liability rests on the fact that NMFS funds the Hatchery's operations through the Mitchell Act. To prove take in violation of § 9 of the ESA, plaintiffs would need to prove that NMFS' funding causes "take" beyond that allowed in the ITS. *Sweet Home*, 515 U.S. at 696 n.9 & 700 n.13 (noting "harm" is subject to "ordinary requirements of proximate causation and foreseeability").

At this time, plaintiffs have not met their burden of persuasion. The evidence is unclear regarding what aspects of the Hatchery's operations are funded by the Mitchell Act. It appears that most of the Hatchery's core functions are financed through the sale of licenses and tags to hunters and fishermen in Oregon, while Mitchell Act funding is used primarily for monitoring activities. Without more evidence, it does not appear plaintiffs will be able to prove that NMFS' funding of the Hatchery causes take in excess of that allowed by the ITS.

**B.**    **Section 7 claim against federal defendants**

Plaintiffs contend that NMFS' BiOp violates § 7 of the ESA because NMFS failed to consider important aspects of the problem by failing to consider impacts from weirs and

problems with stray rates, by relying on mitigation that is not reasonably certain to occur, and because the ITS is unlawful.

      1.      Important aspects of the problem

      In determining whether an agency decision is arbitrary and capricious, courts "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Marsh*, 490 U.S. at 378.  A decision is arbitrary and capricious if the agency:

> [H]as relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*O'Keeffe's, Inc. v. U.S. Consumer Product Safety Comm.*, 92 F.3d 940, 942 (9th Cir. 1996) (quoting *Motor Vehicle Mfrs. Ass'n. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

      In the context of the ESA, the "problem" is whether a proposed project will cause jeopardy to a listed species and "any effect that is likely to adversely affect the species is plainly an important aspect of this problem." *S. Yuba River Citizens League v. NMFS*, 723 F. Supp. 2d 1247, 1270 (E.D. Cal. 2010) (citing 50 C.F.R. §§ 402.13(a), 402.14(b)(1)).  Plaintiffs contend that the BiOp fails to consider the impacts to wild fish from weirs, that it does not take into account data regarding spring Chinook and winter steelhead, and that it fails to evaluate whether temporary weirs are effective.

      The BiOp discusses weirs and plainly acknowledges that there is uncertainty regarding their operation. *See, e.g.*, AR016953-54 (discussing adverse effects and best management

practices); AR016961 (discussing adverse effects caused by weirs, uncertainty, and learning curve for their use); AR01694 (discussing benefits of weirs). Although there is uncertainty associated with weir use, NMFS cannot be said to have ignored that uncertainty or the potential downsides to weir use.

The BiOp does not ignore stray rates and contains a table outlining the number of wild and hatchery spawners. AR016928 (providing numerical estimates of total vs. wild Chinook, coho, and steelhead from 1992-2011); AR 016835. However, the BiOp minimizes the Hatchery's terrible track record with respect to stray rates and makes little effort to address how or why NMFS expected a dramatic reduction in stray rates. Given some of the recent stray rates, one might have expected thorough analysis regarding the Hatchery's problems and the rationale behind why proposed solutions should work. The BiOp cites increased acclimation, but does not analyze why or how increased acclimation (some acclimation has been used in the past) would yield the needed improvements. AR031747 (ODFW scientist noting that effectiveness of acclimation and alternate release site would not be known for four to five years). During oral argument, NMFS counsel provided a cogent and reasoned explanation of this issue, but NMFS failed to provide the same analysis in the BiOp. Given the magnitude of this issue, and the scant attention it received in the BiOp, the court finds that it is likely plaintiffs' will succeed on this claim on the merits.

### 2.    Mitigation measures

NMFS may rely on mitigation or conservation measures in issuing a no jeopardy BiOp. However, those measures must be "reasonably specific, certain to occur, and capable of implementation; they must be subject to deadlines or otherwise-enforceable obligations; and

most important, they must address the threats to the species in a way that satisfies the jeopardy and adverse modification standards." *Ctr. for Biol. Diversity v. Rumsfeld*, 198 F. Supp. 2d 1139, 1152 (D. Ariz. 2002) (citing *Sierra Club v. Marsh*, 816 F.2d 1376, 1379-80 (9th Cir. 1987)); *see also Nat'l Wildlife Fed'n v. NMFS*, 524 F.3d 917, 936 (9th Cir. 2008) ("even a sincere general commitment to" implement conservation measures is insufficient "absent specific and binding plans").

In this matter, the mitigation measures can be roughly categorized into two categories: those that are almost certain to be implemented such as weirs and acclimatization periods and those that may be implemented if the goals set forth in the HGMPs are not met. This latter category of mitigation measures can be referred to as "adaptive management." Plaintiffs primarily take issue with the "adaptive management" approach taken by NMFS in the BiOp, whereby problems would be addressed as they arise. Plaintiffs contend that specific management responses should be tied to specific triggering criteria. *Greater Yellowstone Coal., Inc. v. Servheen*, 665 F.3d 1015, 1029 (9th Cir. 2011).

The court is concerned that the adaptive management contemplated in the BiOp is uncertain to occur and may be ineffective or untimely. In particular, as discussed below, the use of a three-year moving mean to measure stray rates could result in three years of inaction despite evidence of stray rates well in excess of those allowed under the HGMPs and ITS. At oral argument, counsel for NMFS represented that stray rates in year one that indicate the three-year average will not be met would result in immediate changes, however, the BiOp itself does not provide similar assurances. However, there is a regulation in place setting forth the manner in which NMFS must address deficiencies in a the performance of an HGMP. *See,* 50 C.F.R. §

223.203(b)(5)(vi) (providing that NMFS will evaluate effectiveness, identify deficiencies, and

possibly withdraw approval of HGMPs after providing notice and comment). This court is not

free to impose procedural requirements not found in the ESA or its regulations. *Lands Council v.*

*McNair*, 537 F.3d 981, 993-94 (9th Cir. 2008). Additionally, the ESA permits some flexibility in

planning for an uncertain future. *Center for Biological Diversity v. Kempthorne*, 588 F.3d 701,

712 (9th Cir. 2009) (agency predictions are entitled to "great deference" even where some

uncertainty exists); *Arizona Cattle Growers' Ass'n v. Salazar*, 606 F.3d 1160, 1164 (9th Cir.

2010). Accordingly, the court is unconvinced, at this time, that this uncertainty renders the BiOp

arbitrary or capricious on this basis.

            3.      Incidental Take Statement

        Section 9 of the ESA prohibits the "take" of listed species. 16 U.S.C. § 1538(a)(1)(B).

The term "take" means "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect,

or to attempt to engage in any such conduct." *Id.* § 1532(19). Where, as here, NMFS issues a "no

jeopardy" opinion for a proposed action that nevertheless may result in a "take" under the ESA,

NMFS must include an ITS specifying the amount or extent of anticipated take, reasonable and

prudent measures to minimize the impact of the take, and mandatory terms and conditions to

implement the reasonable and prudent measures. 50 C.F.R. § 402.14(i). The ITS provides an

exemption from liability for "take" under the ESA. 16 U.S.C. § 1536(o)(7). "Incidental take

statements set forth a 'trigger' that, when reached, results in an unacceptable level of incidental

take, invalidating the safe harbor provision [of the ESA], and requiring the parties to re-initiate

consultation." *Ariz. Cattle Growers' Ass'n v. FWS*, 273 F.3d 1229, 1249 (9th Cir. 2001); 50

C.F.R. § 402.16(a).

28 - OPINION AND ORDER

Although it is preferable to quantify take with a number of members of a listed species, NMFS may use a surrogate if it is not practicable to utilize such a number. *Ariz. Cattle Growers*, 273 F.3d at 1249-50; *Wild Fish Conservancy v. Salazar*, 628 F.3d 513, 531(9th Cir. 2010); 50 C.F.R. § 402.16(a). Where NMFS uses a non-numerical surrogate, it must "articulate a rational connection between the surrogate and the taking of the species." *Wild Fish Conservancy*, 628 F.3d at 531. The surrogate must "contain measurable guidelines to determine when incidental take would be exceeded," and "must not be so general that the applicant or the action agency cannot gauge its level of compliance." *Oregon Natural Resources Council ("ONRC") v. Allen*, 476 F.3d 1031, 1038-39 (9th Cir. 2007).

NMFS found five forms of take were likely to occur from the proposed action and created surrogates for each of those five forms of take. Plaintiffs take issue with two of the surrogates: the ten percent pHOS or stray rate and the twenty percent change in spawning distribution caused by operation of the weirs.

Plaintiffs' argument regarding the ten percent stray rate is two-fold. First, plaintiffs contend that the stray rate is too high and is unjustified by the science. Second, plaintiffs contend that there is an unexplained three-year delay before compliance with the stray rate will be calculated. Though it is not explained particularly well in the BiOp, there is sufficient evidence in the record, and cited in the BiOp, to support NMFS' determination that a ten percent stray rate is protective of the species given that the hatchery uses local origin broodstock. AR01696548; AR016958[8]. However, the use of a three-year moving average (which is bizarrely absent from

---

[8] The BiOp does not adequately explain why the stray rate should not decrease over time given that hatchery and wild populations will diverge genetically. This issue can be explored more thoroughly by the parties during summary judgment briefing.

29 - OPINION AND ORDER

the ITS itself) is considerably more questionable. Though counsel assured the court that NMFS would take immediate action if stray rates were measured in year one at a rate that precluded, or called into question, attainment of the three year average, the ITS does not appear to require such action. In addition, the BiOp fails to explain the consequences of one or two years of excessive stray rates given the life cycle of salmonids. These issues combined, and insufficiently explained, do not satisfy the court that the reinitiation trigger is adequately protective of the species or that the NMFS' decision in this respect was not arbitrary or capricious.

To account for take caused by changes in spawning distribution resulting from the use of weirs, the ITS uses a trigger of "any change greater than 20 percent in spawning distribution above and below the weirs and in pre-spawning mortality from what was measured during previous spawning ground survey prior to the installation and operation of the weirs in 2011." AR016971. This trigger has two fatal flaws. The first is that the use of a twenty percent trigger is entirely unexplained and appears to have been chosen at random. The second is that in briefing before this court, NMFS and ODFW presented conflicting accounts of how it should be calculated and measured. Without effective guidelines, or at least agreement, the twenty percent trigger becomes a moving target and "may be so indeterminate as to prevent the [ITS]" from serving as a reinitation trigger. *ONRC*, 476 F.3d at 1038-39.

C.    **NEPA Claims**

Plaintiffs contend that NMFS violated NEPA in approving the HGMPs by failing to consider a reasonable range of alternatives, by failing to prepare a full EIS, and by failing to properly analyze mitigation.

1.    Reasonable Range of Alternatives

NEPA requires NMFS to "study, develop, and describe" a reasonable range of alternatives to the proposed project. 42 U.S.C. § 4332(2)(E); 40 C.F.R. § 1502.14(d). This consideration must include consideration of a "no action" alternative. In reviewing a challenge under NEPA the court must determine whether the agency's "selection and discussion of alternatives fosters informed decision-making and informed public participation." *Westlands Water Dist. v. U.S. Dep't of Interior*, 376 F.3d 853, 872 (9th Cir. 2004) (citation omitted). "Although an agency's obligation to consider alternatives under an EA is a lesser one than under an EIS, . . . NEPA requires that alternatives . . . be given full and meaningful consideration, whether the agency prepares an EA or an EIS." *Ctr. for Biological Diversity*, 538 F.3d at 1217 (quotation and citation omitted).

Here, NMFS considered both the "preferred action" alternative and a "no action" alternative. No court has found an EA to be deficient when it has considered both a preferred action and no action alternatives. This court is not inclined to increase the burden on administrative agencies in considering projects that are found to be insignificant. However, as discussed below, the court concludes that NMFS should have prepared an EIS.

2.    Requirement to Prepare an EIS

Whether a proposed action requires the preparation of an EIS because it "may have a significant effect on the environment," depends on the "context and intensity" of the environmental impacts. *Ctr. for Biological Diversity*, 538 F.3d at 1220. Federal regulations set forth a number of factors that should be considered, including: the beneficial and adverse impacts of the action; unique characteristics of the geographic area such as ecologically critical areas; the

31 - OPINION AND ORDER

degree to which the effects are likely to be controversial; the degree of uncertainty associated

with the impacts or the degree to which the project has unknown risks; the cumulative effects of

the project; and whether the action "may adversely affect an endangered or threatened species or

its habitat that has been determined to be critical under the [ESA]." 40 C.F.R. § 1508.27. "An

action may be 'significant' if one of these factors is met." *Ctr. for Biological Diversity*, 538 F.3d

at 1220.

   An agency deciding not to prepare an EIS "must supply a convincing statement of reasons

to explain why a project's impacts are insignificant. The statement of reasons is crucial to

determining whether the agency took a 'hard look' at the potential environmental impact of a

project." *Ctr. for Biological Diversity*, 538 F.3d at 1220 (quotation marks and citation omitted).

The agency must have "adequately considered and elaborated the possible consequences of the

proposed agency action when concluding that it will have no significant impact on the

environment, and whether its determination that no EIS is required is a reasonable conclusion."

*Id*. at 1215. If a project raises "substantial questions" as to "whether a project *may* cause

significant degradation" of the environment, an EIS is required. *Id*. at 1219 (citation and

quotations omitted).

   Here, it was a clear error of judgment not to prepare an EIS. Though NMFS' counsel was

able to cite many cases where multiple "context and intensity" factors were *raised* and an EIS

was not required, the plaintiffs in this case have satisfied the court that multiple factors *exist* in

this case such that an EIS is warranted. The HGMPs are controversial, of uncertain effect,

involve a unique ecologically critical geographic area, and may adversely affect four listed

species. The uncertainty in particular is barely addressed in the EA. As discussed above, ODFW

32 - OPINION AND ORDER

has failed miserably at containing stray rates in the past and reducing them dramatically is far from certain, yet the EA treats the reductions almost as a given. In light of the fact that this uncertainty adversely affects four listed species, the decision not to prepare an EIS is somewhat baffling.

3.    Mitigation

Lastly, plaintiffs contend that because the effects of mitigation are uncertain in this case, an EIS was required. As discussed above, the court believes an EIS was required, and that the uncertain effects of the mitigation plays a critical role in the uncertainty of the projects as a whole. Accordingly, the court will not address this issue further.

**C.    Injunctive Relief**

Despite the apparent flaws in the BiOp and the EA, the court determined not to issue an injunction preventing the 2013 release of hatchery smolts. Because state defendants are not in violation of § 9 at this time, the court has no authority to issue injunctive relief against the state. Accordingly, the only injunctive relief this court could have afforded plaintiffs would have been directed at NMFS. The court could have required NMFS to cease disbursement of Mitchell Act funds to ODFW for the Sandy Hatchery, or the court could have required NMFS to withdraw its approval of the HGMPs.

Requiring NMFS to withold Mitchell Act funds would very likely not have resulted in any change in the number of smolts released. However, as it appears that Mitchell Act funds are used by the Hatchery primarily for monitoring, it is quite possible that restricting such funds would be counterproductive and could cause harm to listed species by crippling monitoring and

mitigation efforts. Given the uncertain consequences of restricting Mitchell Act funds, the court concluded that such an injunction might cause additional harm to listed species, would not be in the public interest, could possibly run counter to plaintiffs' interests, and that the balance of equities tipped decidedly against the issuance of such relief.

The court determined that requiring NMFS to withdraw its approval of the HGMPs would also have uncertain effect and was unwarranted at this time. Even if NMFS withdrew its approval of the HGMPs, it is possible that ODFW would have released the smolts anyway, as they have each year in the past without an HGMP. Alternatively, it is possible ODFW would decide not to release any smolts, but might also decide not to conduct monitoring and mitigation measures that are necessary to reduce take caused by returning hatchery fish. Given this uncertainty and the fact that ODFW voluntarily chose to reduce the number of Chinook released by one third (from an already reduced total), the court concluded that it was unclear whether the harm caused by the release of a reduced number of fish would be more or less harmful than the issuance of an injunction. Countervailing concerns, such as the use of mitigation measures and the interests of the fishing industry, led this court to conclude that this form of injunctive relief was not in the public interest and that the balance of equities militated against the revocation of the HGMPs.

## CONCLUSION

For the foregoing reasons, plaintiffs' Motion for Temporary Restraining Order/Preliminary Injunction [58] was denied and state defendants' motions to strike [86 and 107] are denied. Plaintiffs' Motion for Scheduling Order [119] is granted as follows: all existing

deadlines in this matter are hereby vacated.  The parties are ordered to confer and submit a

proposed case schedule by June 4, 2013.

IT IS SO ORDERED.

DATED this _16_ day of May, 2013

ANCER L. HAGGERTY

United States District Judge