S. AMANDA MARSHALL
United States Attorney
STEPHEN J. ODELL, OSB #90353
Assistant United States Attorney
District of Oregon
600 United States Courthouse
1000 S.W. Third Avenue
Portland, OR 97204-2902
Tel:  (503) 727-1000

ROBERT G. DREHER, Acting Assistant Attorney General
SETH M. BARSKY, Section Chief
COBY HOWELL, Senior Trial Attorney
ROMNEY PHILPOTT, Trial Attorney
Environment & Natural Resources Division
U.S. Department of Justice
c/o U.S. Attorney's Office
1000 SW Third Avenue
Portland, OR 97204-2902
(503) 727-1000 (Tel.); (503) 727-1117 (Fax)
Email:  Coby.Howell@usdoj.gov

*Attorneys for Federal Defendants*

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| **NATIVE FISH SOCIETY**, *et al.*,<br><br>      Plaintiffs,<br><br>                                  v.<br><br>**NATIONAL MARINE FISHERIES SERVICE**; **PENNY PRITZKER**, in her official capacity as Secretary of the Department of Commerce; **WILLIAM STELLE**, Regional Administrator – NMFS; **OREGON DEPARTMENT OF FISH & WILDLIFE**; **ED BOWLES**, Fish Division Director-ODFW; **SCOTT PATTERSON**, Fish Propagation Program Manager-ODFW; **TODD ALSBURY**, District Fish Biologist-ODFW; **KEN BOURNE**, Hatchery Manager-Sandy Hatchery-ODFW; **BRUCE MCINTOSH**, Assistant Fish Division Administrator-ODFW,<br><br>                              Defendants. | CASE NO. 3:12-cv-431-HA<br><br>**MEMORANDUM IN SUPPORT OF FEDERAL DEFENDANTS' CROSS MOTION FOR PARTIAL SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** |

## TABLE OF CONTENTS

I.     INTRODUCTION ..................................................................................................1

II.    STATUTORY AND REGULATORY BACKGROUND ......................................2

III.   FACTUAL BACKGROUND ................................................................................2

       A.    Sandy River Hatcheries....................................................................................2

       B.    Hatchery Genetic Management Plan Approvals.............................................4

       C.    NMFS' Biological Opinion and Incidental Take Statement.......................5

       D.    NMFS' Environmental Assessment and Finding of Significant
             Impact ..................................................................................................................6

IV.    STANDARD OF REVIEW ..................................................................................7

       A.    The Administrative Procedure Act ................................................................7

V.     ARGUMENT ........................................................................................................8

       A.    NEPA ...................................................................................................................8

             1.    NMFS Did Not Need to Prepare an EIS ...................................................8

                   a.    The Context Supports NMFS' Decision Not to Prepare
                         an EIS ...................................................................................................9

                   b.    The Intensity Factors Also Support NMFS' Decision.......................12

                         i.     The Geographic Area Does Not Have Unique
                                Characteristics....................................................................13

                         ii.    The Highly Uncertain and Highly Controversial
                                Factors Do not Weigh in Favor of an EIS.............................15

                         iii.   The Proposed Action is Not Likely to Adversely Affect
                                Listed Fish, nor Does it Threaten a Violation of the
                                ESA ........................................................................................20

             2.    NMFS Evaluated a Reasonable Range of Alternatives ................................20

             3.    NMFS Adequately Analyzed Mitigation Measures.......................................22

B.    NMFS's Biological Opinion Utilizes the Best Available Science and Warrants Deference ..........................................................................23

    1.    NMFS Considered All Relevant Factors in the Biological Opinion ................................................................................24

        a.    NMFS Reasonably Considered Acclimation Facilities and Weirs ..............................................................26

        b.    NMFS's Use of a 10% Stray Rate is Reasonable ...........................29

    2.    NMFS' Reliance on Mitigation is Reasonable ...............................31

    3.    NMFS' Incidental Take Statement is Reasonable and Employs the Best Available Science..............................................................33

C.    NMFS' Approval of ODFW's HGMPs is Not Arbitrary and Capricious ................35

D.    NMFS Did Not Violate ESA§ 7(a)(2) ......................................................39

IV.    CONCLUSION.......................................................................................40

# TABLE OF AUTHORITIES

## CASES

*Akiak Native Cmty. v. U.S. Postal Serv.*,
213 F.3d 1140 (9th Cir. 2000) ........................................................22

*Ariz. Cattle Growers' Ass'n v. Salazar*,
606 F.3d 1160 (9th Cir. 2010) ........................................................34

*Asarco v. U.S. EPA*,
616 F.2d 1153 (9th Cir. 1980) ........................................................20

*Barnes v. U.S. Dep't of Transp.*,
655 F.3d 1124 (9th Cir. 2011) ........................................................10

*Bering Strait Citizens for Responsible Res. Dev. v. U.S. Army Corps of Eng'rs*,
524 F.3d 938 (9th Cir. 2008) ........................................................12, 20

*Buckeye Forest Council v. U.S. Forest Serv.*,
378 F. Supp. 2d 835 (S.D. Ohio 2005) ........................................................13

*Center for Biological Diversity v. Marina Point Development Co.*,
566 F.3d 794 (9th Cir. 2009) ........................................................38

*Center for Biological Diversity v. NHTSA*,
538 F.3d 1172 (9th Cir. 2008) ........................................................9

*Center for Biological Diversity v. U.S. Bureau of Land Management*,
698 F.3d 1101 (9th Cir. 2012) ........................................................31

*Cold Mountain v. Garber*,
375 F.3d 884 (9th Cir. 2004) ........................................................18, 20

*Ctr. for Biological Diversity v. Kempthorne*,
588 F.3d 701 (9th Cir. 2009) ........................................................32

*Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*,
450 F.3d 930 (9th Cir. 2006) ........................................................33

*Defenders of Wildlife v. Tuggle*,
607 F. Supp. 2d 1095 (D. Ariz. 2009) ........................................................39

*County v. United States*,
732 F.2d 1462 (9th Cir. 1984) ........................................................4

*Earth Island Inst. V. USFS.*,
    442 F.3d 1147 (9th Cir. 2006) ...................................................................35

*Earth Island Inst. v. U.S. Forest Serv.*,
    697 F.3d 1010 (9th Cir. 2012) ..................................................................21

*Envtl. Prot. Info. Ctr. v. U.S. Forest Serv. ("EPIC")*,
    451 F.3d 1005 (9th Cir. 2006) .......................................................15, 21, 23

*Forest Guardians v. U.S. Forest Serv.*,
    329 F.3d 1089 (9th Cir.2003) ...................................................................16

*Friends of the Payette v. Horseshoe Bend Hydroelectric Co.*,
    988 F.2d 989 (9th Cir. 1993) ....................................................................22

*Grand Canyon Trust v. U.S. Bureau of Reclamation*,
    691 F.3d 1008 (9th Cir. 2012) ....................................................................8

*Greenpeace Action v. Franklin*,
    14 F.3d 1324 (9th Cir. 1992) .......................................................15, 17, 19

*Hapner v. Tidwell*,
    621 F.3d 1239 (9th Cir. 2010) ..................................................................23

*Hells Canyon Pres. Council v. Jacoby*,
    9 F. Supp. 2d 1216 (D. Or. 1998) .............................................................18

*Humane Soc'y v. Locke*,
    626 F.3d 1040 (9th Cir. 2010) ..................................................................16

*Jayne v. Sherman*,
    706 F.3d 994 (9th Cir. 2013) ....................................................................32

*Karuk Tribe of Cal. v. U.S. Forest Serv.*,
    681 F.3d 1006 (9th Cir. 2012) ....................................................................8

*Lands Council v. McNair*,
    537 F.3d 981 (9th Cir. 2008) .................................................................8, 34

*Lands Council v. Powell*,
    395 F.3d 1019 (9th Cir. 2005) ....................................................................9

*League of Wilderness Defenders v. Forest Service*,
    549 F.3d 1211 (9th Cir. 2008) .............................................................32, 37

*Marsh v. Or. Natural Res. Council*,
  490 U.S. 360 (1989)................................................................................9, 16

*N. Alaska Envtl. Ctr. v. Kempthorne*,
  457 F.3d 969 (9th Cir. 2006) ...............................................................30

*N. Idaho Comty Action Network v. U.S. Dep't of Transp.*,
  545 F.3d 1147 (9th Cir. 2008) ..............................................................21

*Navellier v. Sletten*,
  262 F.3d 923 (9th Cir. 2001) ................................................................36

*Nw. Ecosystem Alliance v. U.S. Fish & Wildlife Serv.*,
  475 F.3d 1136 (9th Cir. 2007) .................................................................8

*Nw. Envtl. Def, Ctr. v. NMFS*,
  647 F. Supp. 2d 1221 (D. Or. 2009) .....................................................34

*Nw. Envtl. Def. Ctr v. U.S. Army Corps of Engineers*,
  817 F. Supp. 2d 1290 (D. Or. 2011) .....................................................34

*Nw. Envtl. Def. Ctr. v. Wood*,
  947 F. Supp. 1371 (D. Or. 1996) .....................................................17, 19

*ONRC v. Allen*,
  476 F.3d 1031 (9th Cir. 2007) ..............................................................35

*Occidental Eng'g Co. v. INS*,
  753 F.2d 766 (9th Cir. 1985) ..................................................................9

*Ocean Mammal Inst. v. Gates*,
  546 F. Supp. 2d 960 (D. Haw. 2008)................................................14, 15

*Prairie Wood Prods. v. Glickman*,
  971 F. Supp. 457 (D. Or. 1997) ............................................................19

*Pres. Coal., Inc. v. Pierce*,
  667 F.2d 851 (9th Cir.1982) .................................................................22

*Presidio Golf Club v. Nat'l Park Serv.*,
  155 F.3d 1153 (9th Cir. 1998) ..............................................................15

*River Runners for Wilderness v. Martin*,
  593 F.3d 1064 (9th Cir. 2010) ................................................................8

*Selkirk Conversation Alliance v. Forsgren,*
    336 F.3d 944 (9th Cir. 2003) ........................................................32

*Soda Mountain Wilderness Council v. U.S. BLM,* ---,
    F. Supp. 2d -- 2013 WL 1975852 (D. Or. 2013) ......................16, 20

*Sw. Ctr. for Biological Diversity v. U.S. Forest Serv.,*
    100 F.3d 1443 (9th Cir. 1996) ....................................................24

*Trout Unlimited v. Lohn,*
    559 F.3d 946 (9th Cir. 2009) ................................................20, 24

*Umpqua Watersheds v. United States,*
    725 F. Supp. 2d 1232 (D. Or. 2010) ................................13, 14, 20

*United States v. Nixon,*
    418 U.S. 683 (1974).....................................................................39

*United States v. Washington,*
    759 F.2d 1353 (9th Cir. 1985) ....................................................40

*W. Watersheds Proj. v. BLM,*
    552 F. Supp. 2d 1113 (D. Nev. 2008) ........................................14

*W. Watersheds Project v. Abbey,*
    719 F.3d 1035 (9th Cir. 2013) ....................................................21

*Westlands Water Dist. v. U.S. Dep't of Interior,*
    376 F.3d 853 (9th Cir. 2004) ......................................................22

*Wetlands Action Network v. U.S. Army Corps of Eng'rs,*
    222 F.3d 1105 (9th Cir. 2000) ......................................................9

*Wild Fish Conservancy v. Salazar,*
    628 F.3d 513 (9th Cir. 2010) ................................................30, 37

*Winter v. NRDC,*
    555 U.S. 7 (2008)........................................................................33

## STATUTES

16 U.S.C. § 1533(d) .......................................................... 35, 38

28 U.S.C. § 2401(a) ...............................................................37

Or. Rev. Stat. § 197.405 .................................................................................................14

Or. Rev. Stat. § 537.730 .................................................................................................14

## REGULATIONS AND FEDERAL REGISTER NOTICES

36 C.F.R. § 800.4 ..........................................................................................................14

40 C.F.R. § 1508.27 ............................................................................................7, 13, 20

43 C.F.R. § 1610.7 ........................................................................................................14

50 C.F.R. § 223.102 ......................................................................................................28

50 C.F.R. § 223.203 ................................................................................................*Passim*

50 C.F.R. § 402.14 ..................................................................................................31, 34

50 C.F.R. § 402.15 ........................................................................................................31

50 C.F.R. § 402.16 ..........................................................................................23, 32, 34

50 C.F.R. § 424.12 ........................................................................................................14

51 Fed. Reg. 19926 ......................................................................................................32

65 Fed. Reg. 42422 ................................................................................................35, 37

65 Fed. Reg. 42423 ......................................................................................................38

65 Fed. Reg. 42430 ......................................................................................................36

65 Fed. Reg. 42445 ......................................................................................................38

71 Fed. Reg. 834 ..........................................................................................................29

## I.    INTRODUCTION

In this case two wild fish advocacy groups, Native Fish Society and McKenzie Flyfishers ("Plaintiffs"), challenge four hatchery programs located on the Sandy River in northern Oregon. Plaintiffs allege that the Oregon Department of Fish and Wildlife ("ODFW") and the National Marine Fisheries Service ("NMFS") violated the Endangered Species Act ("ESA"), National Environmental Policy Act ("NEPA"), and Administrative Procedure Act ("APA").  For the reasons discussed below, the Court should grant Federal Defendants' cross motion for partial summary judgment and deny Plaintiffs' motion for partial summary judgment.

The premise of Plaintiffs' case is straightforward: under their analysis, hatchery fish are a threat that must be eliminated and any related Federal decision is suspect.  There are a variety of problems with this premise.  First, while Plaintiffs paint a dire picture invoking an influx of large percentages of "straying" hatchery fish, the facts do not match their arguments. Plaintiffs ignore the long history of the presence of hatchery fish (including as spawners) throughout the entire Sandy River basin.  There have been hatchery fish in the mainstem Sandy and tributaries for well over one-hundred years.  The objective of NMFS' Hatchery and Genetic Management Plan ("HGMP") approval process is to minimize adverse impacts of existing hatchery operations, and Plaintiffs cannot realistically dispute that the hatchery operations, as approved under the HGMPs, will be significantly more protective of the resource than they were in the past. Second, hatchery fish, in this basin, are not inherently harmful.  NMFS, the specialist agency charged by Congress with the management of salmonids, determined that the hatchery and wild fish in the Sandy River are critical to the viability of each respective species and therefore both are listed under the ESA.  Thus, the Sandy River hatchery programs are managed with local broodstock, with the goal of *reducing* genetic divergence between hatchery and wild stocks.

Plaintiffs' case centers around their disagreement with NMFS's conclusion that

hatcheries in general (and the Sandy River hatchery in particular) can be operated without unacceptable impacts on wild salmonid populations.  While there is room for disagreement, such disagreement is not enough to establish a violation of the ESA or NEPA.  The inquiry for the agency in this case is relatively discrete – did ODFW's proposed HGMPs meet the regulatory criteria in Limit 5 of NMFS' ESA § 4(d) Rule.  In making the underlying decisions challenged in this litigation, NMFS addressed the relevant science and factors, Plaintiffs' concerns, and made determinations based on its technical expertise and informed predictions.  The Court should reject Plaintiffs' efforts to turn this case into a battle of the experts and, consistent with Ninth Circuit and Supreme Court law, defer to NMFS and its reasoned determinations.

## II.    STATUTORY AND REGULATORY BACKGROUND

Federal Defendants incorporate by reference their previous statutory and regulatory background discussion. ECF 77 (Federal Defendants' opposition to Plaintiffs' motion for temporary restraining order).

## III.    FACTUAL BACKGROUND

The Court is familiar with the procedural background in this case and it will not be repeated here.  *See* ECF 38 (July 19, 2012 Order) at 2-5.  Instead, Federal Defendants provide a brief synopsis of hatchery programs on the Sandy River and the relevant decision documents.

### A.  Sandy River Hatcheries

The first recorded hatchery on the Sandy River began in 1898, and ODFW's Sandy Hatchery began operations in 1951.  AR 049041. Over time, funding commitments were made by Portland General Electric ("PGE") to mitigate for lost fisheries due to habitat degradation and passage impairment from the operation of Marmot Dam and the diversion dam on the Little Sandy River.  Mitigation is also provided by the City of Portland for the loss of habitat from the continued operation of the Bull Run Hydroelectric Project. AR 11671-2 (obligation to annually

fund the production of 32,000 pounds of salmonids).

In 1998, during Federal Energy Regulatory Commission ("FERC") relicensing proceedings it was determined that PGE would need to provide protective juvenile fish passage facilities as a term of continued operation. PGE determined that this was not economical and chose to remove the dam and related facilities. To prepare, ODFW began releasing marked (clipping the adipose fin) spring Chinook salmon. AR 002948. Prior to 1999, there was no way readily differentiate between hatchery and wild fish, and both were passed above Marmot Dam allowing them to spawn in the upper tributaries. AR 016365.

In 1999, NMFS issued a Reasonable and Prudent Alternative ("RPA") for the hatchery programs in the Columbia River Basin restricting the use of non-local broodstock stock. AR 25089. Beginning in 2000, the Sandy winter steelhead program began using local origin adults for broodstock, and the Sandy spring Chinook salmon program began in 2002. AR 002977; AR 002790. In addition, in 2001 ODFW began removing hatchery fish through mark-selective fisheries and capture at Marmot Dam. AR 016365. When Marmot Dam was removed, stray rates increased because marked hatchery fish could no longer be removed at Marmot Dam, and while there were anticipated, elevated stray rates, based on rudimentary modifications made to juvenile releases in the late 2000s, more recent stray rates have already started trending downwards. Second Declaration of Richard Turner ("Turner Decl."), Ex. 4 at ¶¶ 7, 15, 17-18 (8.4% for coho, 3% for winter steelhead, 24.8% for spring Chinook in 2012).

Today, the operation and maintenance of these programs is much different and continues to evolve. In addition to the use of local broodstock, the most striking change is the reduction of juveniles that are being released by ODFW. For example, the average release for spring Chinook between 1993-2003 was roughly 450,000 juveniles. AR 002994. The local broodstock

program reduced the average release down to 300,000, and in 2013 only 133,000 were released. AR 051822. For coho, during the 2000s approximately 750,000 were released each year, and in 2013 only 300,174 were released.[1] *Id.*; AR 002637; AR 051822. These significant reductions in juvenile releases will translate into an absolute lower proportion of hatchery to wild adults within the Sandy River.

## B. Hatchery Genetic Management Plan Approvals.

In May 2011, ODFW requested that NMFS review and provide initial comments on four draft HGMPs for hatchery programs in the Sandy River basin. AR 016913. Under the HGMPs, smolts will be retained and released in a manner so that they leave the river en masse and "likely will spend only hours or days in the lower Sandy . . . ." AR 016959. Weirs will be utilized to aid in achieving the 10% or 5% thresholds for the remaining hatchery spawners. AR 016964. Use of acclimation facilities and new locations will promote less straying and improve homing to creeks that wild spawning adults avoid. *Id.* And these programs include substantial monitoring that will allow ODFW and NMFS to determine whether the criteria and thresholds are being achieved in accordance with the regulatory framework. AR 016916-20.

Based on NMFS' initial comments, ODFW made changes including "additional information on the proposed installation and operation of weirs to prevent hatchery-origin spring

---

[1] Although it is impossible to accurately predict the number of future returning adults (both hatchery and wild), NMFS can definitively say that based on the 2013 release numbers, the proportion of hatchery to wild fish has been significantly reduced. Hatchery operators typically assume 1% of the released juveniles will return as adults (which is almost three times better than what has been observed in the Sandy). Turner Decl. ¶ 29. Applying this factor to the 2013 spring Chinook salmon release, approximately 1,330 adults will likely survive. Harvest consistently takes approximately 50% of the returning adults, which means that 655 hatchery fish could return to spawn. *Id.* ¶ 30. In 2012, weirs captured 435 hatchery spring Chinook. *Id.* Based on these reduced releases and without factoring in any of the additional mitigation, like acclimation at Bull Run and new locations for weirs, only 2,300 wild adults would need to return to achieve a pHOS of 10%. *Id.* While Plaintiffs' proffered experts spend a great deal of time criticizing past stray rates, they entirely fail to address the result of the reduction in juvenile releases in 2013.

Chinook salmon, coho, winter steelhead, and summer steelhead from spawning naturally  . . . ." *Id.*  On May 9, 2012, NMFS provided ODFW's four HGMPs for public review and extended the comment period for an additional 30 days, largely at the request of Plaintiffs.  AR 017008. In response to these comments, ODFW again "made several adjustments to the proposed action and updated HGMPs were provided to NMFS . . . ." AR 016914.  At the conclusion of this process, NMFS engaged in its own independent review of ODFW's final proposed HGMPs, and found that the HGMPs met all of the requirements under Limit 5.  Accordingly, NMFS approved these programs for the "take" limitation in 50 C.F.R. § 223.203(b)(5).  AR 017007.

ODFW has since submitted revised HGMPs to NMFS for consideration.  Third Declaration of Robert Jones ("Jones Decl.") ¶ 4-5.

### C.  **NMFS' Biological Opinion and Incidental Take Statement**

As a separate, but related process, NMFS formally consulted on both its decision to approve the HGMPs, as well as its distribution of Mitchell Act funding to these hatchery programs.  AR 017066-69.  In its BiOp, NMFS described the proposed action, and for each evolutionarily significant unit ("ESU") and distinct population segment ("DPS"), evaluated the respective status of the species and designated critical habitat.  AR 016915-42.  The status of the species discussion evaluates the viability of the relevant Sandy River populations using the viable salmonid population ("VSP") parameters, *i.e.,* metrics that gauge how well each population is doing.  AR 016923.  In particular, NMFS considered the percentage of adult wild fish, as compared to the total number of returning adults.  AR 016928.  It found that although the respective ESUs and DPS were at high risk, the populations on the Sandy River demonstrated lesser degrees of risk when taking into account the VSP parameters. AR 016929-40.

NMFS candidly recognized that there are both beneficial and adverse effects from

hatchery propagation, which include considerations of genetics, competitive interactions on spawning grounds, and the effects from in-water activities such as weirs.  *See e.g.* AR 016948-55 (Table 8: classifying each effect).  With respect to genetics, NMFS explained that, although the spring Chinook, coho, and winter steelhead programs temporarily stopped using wild broodstock, the practice of using non-local stocks (fish from other rivers whose genetic makeup likely varies from Sandy stocks) was discontinued.  AR 016957.  Therefore the current broodstock is of local origin thereby reducing any adverse genetic effect.  AR 016959.  Because they use only local origin broodstock, NMFS determined that the percentage of hatchery origin spawners should not exceed 10% for Chinook, coho, and winter steelhead, and 5% for summer steelhead, which continues to use non-local broodstock (because there was no natural origin population).  AR 016958.[2]

Based on the totality of these circumstances and the proposed modifications, NMFS found that its distribution of funding for these programs and the approval of the HGMPs are not likely to jeopardize these listed species or adversely modify designated critical habitat.  AR 016969.  In addition, NMFS found that incidental take of listed species was likely, and accordingly issued an Incidental Take Statement ("ITS"). AR 016969-73.

After receiving new proposed HGMPs from ODFW and discussing modifications on September 4, 2013, NMFS has reinitiated consultation under ESA § 7(a)(2).  Jones Decl. ¶¶ 8-9.

### D.  NMFS' Environmental Assessment and Finding of No Significant Impact.

On May 9, 2012, NMFS made available for public review and comment a draft EA, addressing potential impacts of a determination that the four HGMPs satisfy the ESA Section

---

[2] These thresholds are calculated using a three-year average that begins in 2013. AR 16974 ("The test metric will be the three-year moving mean proportion of hatchery fish (pHOS) on the spawning grounds, beginning in 2013."). NMFS determined that this formula allows a reasonable opportunity for actions in ODFW's HGMPs to work, which is consistent with the regulatory framework. *Id.*

4(d) Rule under Limit 5 as well as use of Mitchell Act funds in the implementation of the

programs described in the HGMPs. AR 010367. After receiving substantial comments

following an extended public comment period, AR 016519-24, on September 26, 2012, NMFS

issued its final EA. AR 016519. The EA analyzed two alternatives in detail: (1) a no-action

alternative, under which NMFS would not approve the HGMPs under Limit 5 of the 4(d) Rule;

and (2) the proposed action alternative, under which NMFS would approve the HGMPs. AR

016534. In its analysis, NMFS provided detailed discussions of the HGMPs, the affected

environment (including details about water quality and quantity, the listed salmonid species,

other listed and non-listed species, the socioeconomic environment, etc.), and the potential

effects of the two alternatives on the environment. AR 016584. The final EA incorporated

revisions arising from the public comments and new information NMFS received, as well as

NMFS' responses to such comments. *See, e.g.,* AR 016525-26; AR 016669-891.

Concurrent with its issuance of the EA, on September 26, 2012, NMFS issued its Finding

of No Significant Impact ("FONSI"). AR 016661-68. In the FONSI, NMFS addressed the

significance of the proposed action under the context and intensity criteria listed in the Council

for Environmental Quality's ("CEQ") regulations, 40 C.F.R. § 1508.27. AR 016661. Based on

the information from the EA and the BiOp, NMFS determined that the action would not

significantly impact the quality of the environment, and that therefore no EIS was necessary. *Id.*

## IV.    STANDARD OF REVIEW

### A.    The Administrative Procedure Act

The claims against Federal Defendants are reviewed in accordance with the APA

standard of review. *Karuk Tribe of Cal. v. U.S. Forest Serv.*, 681 F.3d 1006, 1017 (9th Cir. 2012)

(*en banc*) ("An agency's compliance with the ESA is reviewed under the [APA]."); *see also*

*Grand Canyon Trust v. U.S. Bureau of Reclamation*, 691 F.3d 1008, 1016 (9th Cir. 2012) ("We review Reclamation and FWS's compliance with the ESA and with NEPA under the standard set forth in the APA.").

Under the APA, a plaintiff must satisfy a "high threshold" to establish that agency action is unlawful. *River Runners for Wilderness v. Martin*, 593 F.3d 1064, 1070 (9th Cir. 2010). In recent years, the Ninth Circuit has strongly affirmed the narrow and deferential nature of that APA standard. *See Lands Council v. McNair*, 537 F.3d 981, 988 (9th Cir. 2008) (overturning prior jurisprudence that had "shifted away from the appropriate standard of review"). The reviewing court's only "task is simply to ensure that the agency 'considered the relevant factors and articulated a rational connection between the facts found and the choices made.'" *Nw. Ecosystem Alliance v. U.S. Fish & Wildlife Serv*., 475 F.3d 1136, 1140 (9th Cir. 2007) (citations omitted).[3] Moreover, courts must not draw new conclusions from a "battle of the experts," rather than affording the underlying agency decision the proper level of deference. *Lands Council v. Powell*, 395 F.3d 1019, 1030 (9th Cir. 2005); *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 378 (1989).

## V.    ARGUMENT

### A.  NEPA

#### 1.    NMFS Did Not Need to Prepare an EIS

An agency must prepare an EIS "if 'substantial questions are raised as to whether a

---

[3]  Claims subject to the APA standard of review are decided based on the administrative record. *Occidental Eng'g Co. v. INS,* 753 F.2d 766, 769 (9th Cir. 1985); *see Camp v. Pitts*, 411 U.S. 138, 142 (1973) (the "focal point for judicial review" of an agency decision "should be the administrative record already in existence, not some new record made initially in the reviewing court"). Accordingly, the Court should limit its review to the administrative record. Federal Defendants acknowledge the Court's previous ruling, but note their objection here and move to strike Plaintiffs' introduction of extra-record material for the reasons set forth in previous briefing. *See* Defs.' Opp. Mot. Consider Mat'ls, ECF 157.

project ... may cause <u>significant degradation</u> of some human environmental factor.'" *Center for Biological Diversity v. NHTSA*, 538 F.3d 1172, 1219 (9th Cir. 2008) (emphasis added) (internal citation omitted).  "Whether there may be a significant effect on the environment requires consideration of two broad factors: 'context and intensity.'" *Id.* (quoting *Nat'l Parks & Conservation Ass'n v. Babbitt ("NPCA")*, 241 F.3d 722, 731 (9th Cir. 2001)).  The agency's determination under these factors is subject to considerable deference: the decision to not prepare an EIS "will only be overturned if the agency committed a 'clear error in judgment.'" *Wetlands Action Network v. U.S. Army Corps of Eng'rs*, 222 F.3d 1105, 1114-15 (9th Cir. 2000).  The context and the intensity factors show that NMFS did not need to prepare an EIS.

> a.    **The Context Supports NMFS' Decision Not to Prepare an EIS**

For purposes of NEPA, "'[c]ontext' is the setting in which the agency's action takes place." *Barnes v. U.S. Dep't of Transp.*, 655 F.3d 1124, 1132 (9th Cir. 2011) (citing *NPCA*, 241 F.3d at 731).  NEPA's implementing regulations emphasize that "[s]ignificance varies with the setting of the proposed action."  40 C.F.R § 1508.27(a).  Plaintiffs overlook the broader context of NMFS' approval of the HGMPs, and in doing so exaggerate the significance of the action.

Specifically, the significance of NMFS' action must be analyzed in light of the history of hatchery operations in the Sandy River basin.  The release of hatchery-raised salmonids into the Sandy River has been occurring for since 1898, long before the construction of the Sandy Hatchery in the 1950s.  AR 016253.  Indeed, hatchery-origin spring Chinook—from an out-of-basin genetic stock—were regularly released throughout the Sandy River basin from 1900 to 2003.  AR 016263.  *See also* AR 016352 ("[t]he present-day Sandy Hatchery started producing winter steelhead in 1955 and over the years released fish from a variety of stocks including Big Creek, Eagle Creek, Alsea and Sandy"); AR 016169 ("[t]he first year of adult broodstock

collection for the coho program [at the Sandy Fish Hatchery] was in 1952"); AR 01835

("Summer steelhead were first introduced into the Sandy River in 1975").

ODFW did not begin sorting and removing hatchery fish from the spawning population at

Marmot Dam until 1999.  AR 016365 ("[p]rior to 1999 wild and hatchery fish could not be

distinguished and all fish were passed upstream").  Even after ODFW began attempting to

remove hatchery-origin fish from the spawning population, its ability to do so was initially

limited: "[p]rior to 2002, [spring Chinook] adults trapped and sorted at Marmot Dam could not

be distinguished due to lack of mark on brood years prior to 1997."  AR 016267.  At previous

production levels, the estimated proportion of hatchery-origin adults reaching spawning grounds

from 1996 through 2010 fluctuated greatly—including a period of time when the proportion of

hatchery-origin spring Chinook salmon was over 70% for five consecutive years.  AR 016270;

*see also* AR 016367 (winter steelhead fluctuating from estimated proportion of hatchery fish of

0% to 32.6%).  Before this, some sources indicate that the proportion of hatchery origin fish was

even higher.  *See* AR 32435 (noting that "[f]rom the early 1980s to the early 1990s, the

percentage of natives in the Sandy's total winter steelhead run declined from 28 percent to 18

percent"); AR 032439 (1998 study noting that "hatchery-produced fish now make up a large

percentage of the [Sandy River] basin's winter steelhead, coho and spring chinook runs").

Plaintiffs ignore this long history of the presence of hatchery origin fish in the Sandy

River basin: to some extent, the wild fish central to their claims are descendants of hatchery

origin fish.  *See* AR 016270.  As NMFS explained, "the natural-origin spring Chinook salmon in

the Sandy River include descendants of Clackamas Hatchery spring Chinook salmon from prior

releases."  AR 016837; *see also* AR 029135 (noting that "[h]igh proportions of hatchery fish on

the spawning grounds have been common for decades in many Lower Columbia River salmon

and steelhead populations" and that "homogenization already has occurred in natural-origin coho salmon, which are now genetically indistinguishable from hatchery fish").

This long history of the presence of hatchery-origin salmonids gives context to Plaintiffs' claims of impending devastation resulting from hatchery operations under the HGMPs. Further, Plaintiffs ignore another critical piece of context: the HGMPs are part of NMFS' and ODFW's efforts to reverse this long-standing circumstance. *See* AR 016662 (FONSI emphasizing that the purpose of the HGMPs is to "minimize known impacts on listed fish and to monitor and evaluate uncertainties in impact levels for improved future management"); AR 016528 (noting that the HGMPs are designed to support fishing opportunities "while minimizing potential risks to natural-origin spring Chinook salmon, coho salmon, and winter steelhead populations . . ."). ODFW has operated the Sandy River hatcheries and released hatchery origin fish into the Sandy River basin for many years without approved HGMPs, and these operations support significant public interests.[4] Therefore, after receipt of the proposed HGMPs, NMFS worked with ODFW to develop HGMPs that would advance the trend of decreasing effects on the listed fish while, if possible, allowing the continued operation of the hatcheries given their local importance. As discussed above, the HGMPs were subject to back-and-forth between NMFS and ODFW, and changes resulting from public comments. *See also* AR 000904; AR 000019; AR 00760; AR 0001086-158; AR01159-248.

As a result of this process, operation of the Sandy River hatchery operations under the HGMPs will advance recent efforts to reduce any impacts on the listed populations. *See* AR

---

[4] The socioeconomic benefit of continuing hatchery operations is considerable. AR 016579. Cessation of the hatchery programs "would have relatively substantial effects on socioeconomics in the action because the lack of hatchery salmon and steelhead production would be expected to preclude recreational fishing opportunities for salmon and steelhead in the Sandy River Basin . . ." AR 016639.

016610; AR 017032 (Rule 4(d) determination noting that "[m]easures implemented to minimize

adverse genetic, ecological, and demographic effects on listed fish are included within each

section describing the fish production components of the proposed program"); AR 016896-97

(imposing implementation terms including pHOS, spawning ground surveys, weir and altered

spawning distribution monitoring and reporting requirement).  Thus, the relevant context—i.e.,

the proposed action entails evaluation and approval of HGMPs and beneficially addresses a

longstanding environmental issue and results in greater protections to the resource—provides

significant support for NMFS' decision to issue a FONSI.  *See Bering Strait Citizens for*

*Responsible Res. Dev. v. U.S. Army Corps of Eng'rs*, 524 F.3d 938, 957 (9th Cir. 2008)

(upholding FONSI and noting "[w]e cannot avoid perceiving that the project in its required

mitigation favorably affects parts of the Nome area that suffered environmental damage from

previously unconstrained resource development"); *Umpqua Watersheds v. United States*, 725

F.Supp.2d 1232, 1240-41 (D. Or. 2010) (finding that agency's determination that project "would

improve resources conditions rather than degrade resources" and subsequent issuance of FONSI

not arbitrary and capricious); *Buckeye Forest Council v. U.S. Forest Serv.*, 378 F. Supp. 2d 835,

846 (S.D. Ohio 2005) (upholding FONSI and noting that plan amendment "requires the Forest

Service to take more protective measures concerning the Indiana bat and its habitat while

implementing site specific projects than the Forest Service was previously required to do under

the Forest Plan in place").

### b.    The Intensity Factors Also Support NMFS' Decision

The second regulatory factor—the intensity of the proposed action—likewise supports

NMFS' decision not to prepare an EIS.  In its FONSI, NMFS explained why each of the ten

Section 1508.27 intensity factors did not indicate that an EIS was necessary, AR00961-63, but

only those challenged by Plaintiffs in their brief are discussed below.

i.    The Geographic Area Does Not Have Unique
Characteristics

Under 40 C.F.R. § 1508.27(b)(3), whether a proposed action will occur in a geographic

area with "[u]nique characteristics," such as "proximity to historic or cultural resources, park

lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas" is

relevant as to whether an EIS should be prepared.  Plaintiffs assert that ODFW's designation of

the upper Sandy River basin as a "wild fish sanctuary" satisfies this regulatory factor, but they

overstate the significance this "designation."  In fact, ODFW's labeling of an area as a "wild fish

sanctuary" appears to be a simple determination by ODFW to "not stock hatchery fish" into a

particular location.  *See* AR 017438-39; 017559-60.  Specific to the Sandy River, in 1999 ODFW

decided, while the Marmot Dam was in existence, not to release hatchery origin fish above the

dam, thereby treating it as a "wild fish sanctuary."  AR 000303.  Following the removal of the

dam, ODFW elected to continue this practice.  *See* AR 016246 (HGMP indicating that ODFW

would, "[d]espite the elimination of the fish sorting facility at Marmot Dam . . ., maintain the

upper Sandy Basin . . . as a wild fish sanctuary").  However, nothing in the record or in Oregon

law or regulation that indicates the "designation" of an area as a "wild fish sanctuary" involves

any other management activity, such as the imposition protections for habitat, restrictions of use,

etc.  *See* AR 016787.  Indeed, neither the term "wild fish sanctuary" nor any process for the

designation of areas as a "wild fish sanctuary" appears to be defined under Oregon regulations or

statute, unlike other types of areas contemplated by the regulation.[5]

---

[5] *Compare* 36 C.F.R. § 800.4 (process for identifying cultural/historic properties under National
Historic Preservation Act); 16 U.S.C. §§ 1274 & 1275 (designating "wild and scenic rivers" and
describing process for designating additional rivers); 43 C.F.R. § 1610.7-2 (describing process
for Bureau of Land Management ("BLM") designations of "Areas of Critical Environmental
Concern" ("ACECs"); 50 C.F.R. § 424.12(c) (defining method for designating "critical habitat");

As a result, ODFW's decision "not to stock hatchery fish" into the upper Sandy River watershed is not akin to the type of designations that typically invoke Section 1508.28(b)(3). *See NPCA*, 241 F.3d at 725 (action occurred in Glacier Bay National Park and Preserve, "a place of unrivaled scenic and geological values"); *Ocean Mammal Inst. v. Gates*, 546 F. Supp. 2d 960, 978 (D. Haw. 2008) (noting action's "proximity to the Hawaiian Islands Humpback Whale National Marine Sanctuary); *Umpqua Watersheds*, 725 F. Supp. 2d at 1234 (action occurred in Oregon Dunes National Recreation Area); *W. Watersheds Proj. v. BLM*, 552 F. Supp. 2d 1113, 1134 (D. Nev. 2008) (action occurred near two Wild and Scenic rivers and ACEC). Accordingly, NMFS reasonably determined that the Section 1508.27(b)(3) factor did not weigh in favor of preparation of an EIS. *See* AR 016666.

However, even if ODFW's reference to the upper Sandy River basin as a "wild fish sanctuary" does bring § 1508.27(b)(3) into play, an EIS is not warranted on this basis. *See Presidio Golf Club v. Nat'l Park Serv.*, 155 F.3d 1153, 1162 (9th Cir. 1998) (upholding EA which adequately took into account "the unique characteristics of the Presidio and its ecological resources"). The existence of even an "ecologically critical area" does not itself make an EIS necessary—rather, there must be a showing that the proposed action will have deleterious impacts to the area. *See Ocean Advocates*, 402 F.3d at 868; *Ocean Mammal Inst.*, 546 F. Supp. 2d at 978. NMFS' EA appropriately accounted for the upper Sandy River basin's use for wild fish spawning. AR 016542; AR 016547; AR 016562; AR 016566; AR 016569. Further, NMFS made a reasoned determination that the hatchery operations will not have a significant impact on the environment, including within the portions of the basin referred to as a wild fish sanctuary.

---

Oregon Rev. Stat. § 215.203 (authorizing zoning ordinances to zone designated areas of land as exclusive farm use zones); Or. Rev. Stat. § 537.730 (describing process for state commission to designate critical ground water areas); Or. Rev. Stat. § 197.405 (establishing process for recommendation of areas of "critical state concern").

*See* AR 016611; AR 016636-37; AR 016612; AR 016967; AR 016957.   Indeed, the primary

purpose of the Federal action – approval of the HGMPs – is entirely consistent with a

designation of this area as a wild fish sanctuary.  Accordingly, this factor does not weigh in favor

of NMFS preparing an EIS.

> ii.    The Highly Uncertain and Highly Controversial Factors Do
>        not Weigh in Favor of an EIS

Plaintiffs argue that given the uncertain and controversial nature of the HGMPs, an EIS is

required under Section 1508.27(b)(4) & (5).  However, NEPA's "regulations do not anticipate

the need for an EIS anytime there is some uncertainty, but only if the effects of the project are

'highly' uncertain."  *Envtl. Prot. Info. Ctr. v. U.S. Forest Serv. ("EPIC")*, 451 F.3d 1005, 1011

(9th Cir. 2006); *see also Greenpeace Action v. Franklin*, 14 F.3d 1324, 1334 n.11 (9th Cir. 1992)

(rejecting the argument that "the very existence of uncertainty mandates the preparation of an

[environmental] impact statement").  Similarly, effects of a proposed action are only "highly

controversial" for purposes of the CEQ regulations when "[a] *substantial dispute* exists," i.e.,

"when evidence . . . casts *serious doubt* upon the reasonableness of an agency's *conclusions*."

*Humane Soc'y v. Locke*, 626 F.3d 1040, 1057 (9th Cir. 2010) (emphases in original) (quoting

*NPCA*, 241 F.3d at 736).  Moreover, the fact that a plaintiff's experts disagree with agency

scientists does not make a proposed action controversial.  As this Court has recently emphasized:

> Mere disagreements about scientific matters within the purview of the agency do
> not make a project highly controversial. *Klamath–Siskiyou [Wildlands Ctr. v.
> BLM]*, 387 F.3d [989,] 993 [(9th Cir. 2004)]. Where resolution of an issue
> "requires a high level of technical expertise," it is "properly left to the informed
> discretion of the responsible federal agencies." *Kleppe [v. Sierra Club]*, 427 U.S.
> [390,] 412, 96 S.Ct. 2718 [(1976)]. Courts should be particularly deferential when
> the agency is "'making predictions, within its [area of] special expertise, at the
> frontiers of science.'" *Forest Guardians v. U.S. Forest Serv.*, 329 F.3d 1089, 1099
> (9th Cir.2003) (citations omitted). That is, "[w]hen specialists express conflicting
> views, an agency must have discretion to rely on the reasonable opinions of its
> own qualified experts even if, as an original matter, a court might find contrary

views more persuasive." *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 378,
109 S.Ct. 1851, 104 L.Ed.2d 377 (1989).

*Soda Mountain Wilderness Council v. U.S. BLM*, --- F. Supp. 2d ---, 2013 WL 1975852 at *18

(D. Or. 2013).

      NMFS explained in its FONSI why the uncertainty and controversy factors did not

warrant preparation of an EIS.  It explained that "[t]he effects  . . . are all known and minor

impacts. No unique or unknown risks have been identified after applying the results of research

conducted over several years in this action area on these and other species."  AR 01666; *see also*

AR 016665 (noting lack of controversy because the "effects are consistent with implementation

of the hatchery programs over prior years").  While NMFS recognized that "[t]here are

uncertainties involved in the on-going operation of hatchery programs," it emphasized the

Proposed Action's explicit steps to monitor and evaluate these uncertainties "in a manner that

allows timely adjustment to risks that might arise."  AR 01666. As a result, NMFS did all that

NEPA requires with respect to uncertainty.  *See Greenpeace Action*, 14 F.3d at 1333 (finding

that because "[t]he Service's conclusions are clearly based on substantial-though not dispositive-

scientific data, and not on mere speculation," it could not overturn the agency's FONSI without

giving more weight to plaintiffs' experts than the agency's); *Nw. Envtl. Def. Ctr. v. Wood*, 947 F.

Supp. 1371, 1385 (D. Or. 1996) (finding agency adequately addressed uncertainties because

"[t]here is a good understanding of the risks and uncertainties associated with this project, and

multiple preventive measures are being implemented to make these risks and uncertainties as

small as possible.")

      Plaintiffs challenge NMFS' determination, asserting, for instance, that NMFS "never

evaluated whether acclimation might succeed." Pls.' Mem., ECF No. 163, ("Pls.' Br.") at 17.[6]

To the contrary, NMFS discussed how "[t]he acclimation of salmon and steelhead has been

proven to increase homing to the release location." AR 016707 (citing studies). *See also* AR

021834-36 (HSRG report discussing efficacy of acclimation ponds). In fact, NMFS noted that

acclimation had already been shown to be successful in reducing the number of adults straying in

the upper Sandy River basin. AR 016707; AR 016873 (noting efficacy of acclimation of

hatchery fish prior to release was "illustrated by the very low numbers of hatchery coho salmon

observed at Marmot Dam prior to its removal"). Moreover, NMFS explained exactly why it

believed the new acclimation procedures for spring Chinook (i.e., including making all releases

from the temporary acclimation pond on the Bull Run River) would be effective. *See* AR

016615 (noting Bull Run River's favorable flows and cooler water temperatures would "attract

and hold the hatchery spring Chinook salmon, exposing them to greater harvest, and reducing

their inclination to migrate up into the natural spawning areas in the upper Sandy River Basin").

Plaintiffs belatedly question this conclusion through a post-decisional declaration

speculating that high water temperatures in the Bull Run River will prevent the acclimation

pond's success. Pls.' Br. at 17 (citing Third Frissell Decl.). Even were the Frissell Declaration

part of the administrative record, Plaintiffs could not rebut NMFS' expert determination with

their own. *Hells Canyon Pres. Council v. Jacoby*, 9 F.Supp.2d 1216, 1239 (D. Or. 1998) ("The

court is not empowered to decide that the views of the plaintiff's experts have more merit than

the agency's experts") (citation omitted). Further, Plaintiffs never raised this concern until now.

---

[6]Plaintiffs also appear to claim that the EA demonstrated uncertainty as to weir-caused mortality
and other effects. Pls.' Br. at 17 (citing AR 016612-13). The EA's language rebuts any assertion
that mortality resulting from weirs is "highly uncertain." *See* AR 016613 ("[t]he actual number
of mortalities from the operation of all the weirs under the Proposed Action, though unknown,
would be expected to be low . . .") (emphasis added); *see also* FN 12, *infra*.

*See Cold Mountain v. Garber*, 375 F.3d 884, 893 (9th Cir. 2004) ("a controversy cannot be established post hoc by evidence that was not before the agency at the time of its action.").

Ultimately, Plaintiffs rely primarily upon statements in the EA recognizing uncertainty as to whether the weirs would remove "enough of the hatchery spring Chinook salmon adults to meet the 10 percent goal."  AR 016538. But in focusing on this statement, Plaintiffs overlook the greater thrust of NMFS' analysis: NMFS opined that although there would be "an increased risk of genetic impacts from outbreeding effects due to the presence of naturally spawning hatchery adults, . . . these impacts are expected to be low."  AR 016662.  And NMFS expressly opined that it expected genetic impacts from naturally spawning hatchery spring Chinook salmon "to decrease as more of the hatchery spring Chinook salmon are removed at the weirs and more fish return to the Bull Run River."  AR 016618. [7]  Further, with respect to the weirs' efficacy, NMFS did what NEPA requires: it gathered and analyzed the available data relating to their use.  It analyzed data from actual weir operations in other areas, as well as the limited use of the weirs in the Sandy River basin itself in 2011.  AR 016832; AR 016836; AR 016961-64; AR 028789; AR 028978.  Based on this analysis, NMFS determined that weirs were generally successful in

---

[7] Plaintiffs' uncertainty/controversy argument focuses on spring Chinook and cannot support their challenges with respect to the other three HGMPs.  For instance, they do not argue that stray rates related to coho and winter steelhead show that an EIS was required.  *See* Pls.' Br. at 16-18.  And although elsewhere they argue that recent stray rates for these species exceed 5%, NMFS expressly recognized varying stray rates, and described how the risk of genetic effects remained low.  AR 016621.  Regarding coho, NMFS noted the highly variable pHOS rates, but explained that the "5 year average (2006-2010) for the proportion of hatchery coho salmon spawning naturally as estimated from spawning ground surveys was 6.3 percent, which achieves the Recovery Plan goal of less than 10 percent on the spawning grounds."  *Id.*  Similarly, while Plaintiffs attempt to refute NMFS' determination that "[r]ecent spawning ground survey data estimates that the proportion of hatchery steelhead spawning naturally is less than 5 percent," AR 016628, their inclusion of hatchery origin fish purposely passed upstream in one tributary to mitigate the negative effects posed by the limited number of wild spawners is not justified, and further, the circumstance will not be repeated. *See* Turner Decl., ¶ 43; discussion *infra* at p. 25.

"collecting and removing hatchery adults." AR 016614.[8]  Plaintiffs have not identified some

source of better data that was available to NMFS that it failed to analyze, nor have they pointed

to evidence in the record creating serious doubt on the validity of NMFS' conclusions.  Under

these circumstances, NMFS did all that NEPA requires with respect to uncertainty.  *See*

*Greenpeace Action*, 14 F.3d at 1333; *Nw. Envt. Def. Ctr.*, 947 F. Supp. at 1385.

        In summary, while properly recognizing and addressing some uncertainty as to specific

features of the HGMPs, NMFS predicted that the genetic impacts from the hatchery operations

under the HGMPs would ultimately be low, and it specifically opined that under the HGMPs

they would be reduced from "those that have been observed recently."  AR 016615.  Particularly

given the long-standing existence of hatchery origin fish in the basin discussed above, NMFS'

conclusion, that there were no highly uncertain effects, and that there would be no significant

impacts to the listed populations is not arbitrary and capricious.  *See Prairie Wood Prods. v.*

*Glickman*, 971 F. Supp. 457, 469 (D. Or. 1997) (upholding FONSI despite uncertain effects of

adopting interim timber management screening processes, relying upon agency's professional

interpretation of research and forest conditions, and determination that process would ultimately

result in "improvement or maintenance of current conditions."); *see also Bering Strait Citizens*,

524 F.3d at 957; *Umpqua Watersheds*, 725 F. Supp. 2d at 1240-41.[9]

---

[8] Indeed, NMFS has considerable experience and expertise in the operation of weirs, and has
published a technical manual, informed by numerous studies, describing appropriate
construction.  AR 029545, 029554-55; 029659-81.

[9] Elsewhere, Plaintiffs contradict their "uncertainty" argument, asserting that "[t]he certainty of
threats to wild fish leaves few questions as to whether the Hatchery operations will degrade wild
fish populations, rending the project highly controversial."  ECF 163 at 17-18 (emphasis added).
Nothing in the record demonstrates such "certainty of threats," and Plaintiffs cannot rely upon
their post-decisional declarations to create controversy for purposes of § 1508.27(b)(4).  *See*
Aug. 15, 2013 Order, ECF No. 161, at 7 (determining to consider declarations "only to the extent
that they provide  relevant information that plaintiffs may argue should have been considered by
NMFS, and in limited circumstances, to assist the court in understanding technical matters").

iii.    <u>The Proposed Action is not likely to adversely affect listed</u>
<u>fish, nor does it threaten a violation of the ESA.</u>

Plaintiffs next argue that the hatchery operations' impacts on the listed fish satisfy both

40 C.F.R. § 1508.27(b)(9) (risk to listed species) and § 1508.27(b)(10) (risk of violation of law

designed to protect environment).  Plaintiffs' argument is duplicative of its arguments that

NMFS failed to adequately address uncertainty and mitigation, and that NMFS was required to

reinitiate consultation, which are addressed at Section V.A.1.b.ii, *supra*, and Sections V.A.2, and

V.B, *infra*.  Moreover, Plaintiffs' assertion that NMFS has determined that all hatchery

operations adversely affect listed salmonids is wrong, *see Trout Unlimited v. Lohn*, 559 F.3d

946, 958 (9th Cir. 2009) (discussing NMFS' recognition that "[t]he presence of hatchery fish

within the ESU can positively affect the overall status of the ESU"), and is inconsistent with

NMFS' specific determination regarding the hatchery operations under the HGMPs.  AR

016661.  Indeed, in its BiOp NMFS determined that hatchery operations under the HGMPs were

not likely to jeopardize any of the four listed species.  *See EPIC*, 451 F.3d at 1012 (BiOp can

support FONSI).  Thus, this argument fails.

**2.    NMFS Evaluated a Reasonable Range of Alternatives**

Plaintiffs argue that NMFS violated NEPA by failing to consider a reasonable range of

alternatives, because it had a duty to consider "viable alternatives besides 'no action' and

'exactly what ODFW proposed.'"  ECF 163 at 20.  However, "an agency's obligation to consider

alternatives under an EA is a lesser one than under an EIS."  *Earth Island Inst. v. U.S. Forest*

*Serv.*, 697 F. 3d 1010, 1022 (9th Cir. 2012) (internal quotation omitted); *N. Idaho Comty Action*

*Network v. U.S. Dep't of Transp.*, 545 F.3d 1147, 1153 (9th Cir. 2008).  NEPA and its

---

*See also Cold Mountain*, 375 F.3d at 893; *Asarco v. U.S. EPA*, 616 F.2d 1153, 1160 (9th Cir.
1980); *Soda Mountain*, 2013 WL 1975852 at *18 (upholding FONSI and noting that "[w]hile the
studies submitted by plaintiffs offer different conclusions, the BLM is awarded considerable
deference on issues requiring high levels of technical expertise").

regulations impose no minimum number of alternatives, and "merely require an EA to include consideration of appropriate alternatives, including a 'no action alternative' and . . . a 'preferred alternative.'" *Earth Island Inst.*, 697 F.3d at 1022. Further, "it makes little sense to fault an agency for failing to consider more environmentally sound alternatives to a project which it has properly determined . . . will have no significant environmental effects anyway." *Id.* at 1023 (citation omitted). Thus, it is typically appropriate in an EA to consider only a no-action and preferred action alternative, which is what NMFS did. *See id.* at 1022.

Plaintiffs cite to a recent Ninth Circuit case in which the Court found that BLM's consideration of four alternatives in an EA addressing whether to issue a new grazing permit was inadequate. *See W. Watersheds Project v. Abbey*, 719 F.3d 1035, 1050 (9th Cir. 2013). There is a critical reason why the Ninth Circuit found BLM's alternative analysis defective: for each of the alternatives—including the no action alternative—the proposed action was identical for the central issue: the level of grazing that would be permitted. *Id.* Here, in contrast, the two alternatives NMFS evaluated allowed it to make a reasoned analysis of the potential effects. NMFS conservatively assumed that the no-action alternative would "result in the termination of all hatchery programs as described in the HGMPs," because discontinuation of all programs represented one end of the spectrum of potential effects—thereby allowing the broadest range of effects to evaluate, in comparison to the proposed action. AR 016534. This broad range of effects under the two alternatives eliminated any need to analyze other alternatives proposed by commenters. *See* AR 016552-53. For instance, NMFS did not review Plaintiffs' suggested alternatives imposing lower levels of hatchery production because doing so would not have allowed for meaningfully different analysis from that of the no-action alternative. AR 016553. Similarly, NMFS did not analyze in detail Plaintiffs' proposed "mandatory measures" option

because the impacts would be the same as those analyzed under the Proposed Action. AR

016838. Even in the context of an EIS, NMFS' reasoned decision not to evaluate in detail these

additional alternatives with substantially similar consequences would have been reasonable. *See*

*Westlands Water Dist. v. U.S. Dep't of Interior*, 376 F.3d 853, 868 (9th Cir. 2004).

### 3.    NMFS Adequately Analyzed Mitigation Measures

The Ninth Circuit considers "the effect of mitigation measures in determining whether

preparation of an EIS is necessary." *Friends of the Payette v. Horseshoe Bend Hydroelectric*

*Co*., 988 F.2d 989, 993 (9th Cir. 1993). "If significant measures are taken to 'mitigate the

project's effects,' they need not completely compensate for adverse environmental impacts." *Id*.

(emphasis omitted) (quoting *Pres. Coal., Inc. v. Pierce*, 667 F.2d 851, 860 (9th Cir.1982)).

Further, the mitigation measures need not be specific or self-executing. *See Akiak Native Cmty.*

*v. U.S. Postal Serv.*, 213 F.3d 1140, 1147 (9th Cir. 2000).

Plaintiffs generally assert that NMFS failed to demonstrate the effectiveness of the

proposed mitigation (given its alleged uncertainty), and that NMFS "does not address premature

spawning impacts at all." ECF 163 at 20. To the contrary, as discussed above, NMFS analyzed

the efficacy of the various measures (including the weirs), and determined that they would be

expected to be effective. Further, NMFS expressly addressed the potential risk of "displaced

spawning," AR 016589, and described best management practices ("BMPs") that would

minimize such risk. *See id*; AR 016612. Further, required monitoring "would be used to

determine if the presence of the weirs were causing natural-origin spring Chinook salmon to

spawn downstream of the weirs." AR 016613. Finally, NMFS made clear that if the required

monitoring showed that performance criteria were not met, additional actions (of which NMFS

gave specific examples) would be required from ODFW.  AR 016538.[10]

In *EPIC*, 451 F.3d 1005, the Ninth Circuit faced a similar challenge and upheld the

agency's mitigation analysis.  It noted that because the project as analyzed in the EA

"incorporates mitigation measures throughout the plan of action . . . , it cannot be said that the

EA fails to analyze the effects of the mitigation measures; instead, the EA analyzes the Project

under the enumerated constraints and concludes that any environmental impacts will not be

significant."  *Id.* at 1015.  The *EPIC* court also noted that the EA referred to BMPs, and

explained that there would be "concurrent monitoring of the implementation and effectiveness of

these BMPs to aid in timely identification of threats and the need for preventative measures or

project modifications."  *Id.*; s*ee also Hapner v. Tidwell*, 621 F.3d 1239, 1246 (9th Cir. 2010).

Here, as in *EPIC,* the mitigation measures, including the use of weirs and acclimation

pond are an inherent part of the HGMPs, and NMFS properly analyzed effects in light of these

measures, especially considering there is a specific regulatory framework under Limit 5 to ensure

compliance.  As in *EPIC*, the HGMPs incorporate applicable BMPs.  AR003768; 016534;

16588-89; 16592-95; 016615-16; 016622; 016628-29 016914-15; 016961; 016964-66.  Finally,

as in *EPIC*, the EA describes the extensive monitoring activities and ongoing evaluation of

impacts from the HGMPs.  AR 016538; AR 016545; AR 016615-18; AR 016622-24; AR

016628.  Thus, NMFS' analysis of mitigation fully complies with Ninth Circuit precedent.

**B.**  **NMFS' Biological Opinion Utilizes the Best Available Science and Warrants Deference.**

Plaintiffs have not, nor could they, demonstrate that NMFS' ESA conclusions are "so

*implausible* that [they] could not be ascribed to a difference in view or the product of agency

---

[10] Indeed, as discussed *infra*, NMFS' regulations contemplate that a failure by ODFW to remedy any failures will result in initiation of procedures to withdraw ODFW's exemption from the take prohibition. 50 C.F.R. § 223.203(b)(5)(K)(vi); see also 50 C.F.R. § 402.16; AR 016964.

expertise." *Sw. Ctr. for Biological Diversity v. U.S. Forest Serv.,* 100 F.3d 1443, 1448 (9th Cir.

1996) (emphasis added).  As this Circuit has stated: "It is not our role to ask whether we would

have given more or less weight to different evidence, were we the agency.  Assessing a species'

likelihood of extinction involves a great deal of predictive judgment.  Such judgments are

entitled to particularly deferential review."  *Lohn*, 559 F.3d at 959.  "[A]n agency must have

discretion to rely on the reasonable opinions of its own qualified experts even if ... a court might

find contrary views more persuasive."  *Marsh*, 490 U.S. at 378.

      **1.    NMFS Considered All Relevant Factors in the Biological Opinion.**

      Plaintiffs first argue that NMFS failed to disclose and analyze previous hatchery stray

rates in its analysis.  This is not true.  Table 3 in the BiOp demonstrates that NMFS was well-

aware of the percentage of wild fish on the spawning grounds, as compared to hatchery fish.  AR

016928 (providing numerical estimates of total vs. wild Chinook, coho, and steelhead from

1992-2011); AR 016835.  It also sought information from Oregon on the estimated percentage of

hatchery spawners, both before and after dam removal.  AR 05476; AR 05874 (2011 coho

spawners); AR 011925 (2011 spawning surveys in the Upper Sandy basin); AR 016835

(discussing concerns with discontinued non-local stocks).  The environmental baseline

discussion also references the Columbia River comprehensive analysis that details the adverse

effects associated with a high level of hatchery spawners.  AR 016945.  NMFS then carefully

explains how the existing science on the presence of hatchery spawners among wild fish,

including a discussion of out-breeding depression and decreasing intra-population genetic

variability (the two predominant concerns), applies to the Sandy.  AR 016949-57. NMFS had

more than an ample basis to compare how previous practices would compare to new hatchery

practices, and appropriately took these into consideration.

Plaintiffs also argue that NMFS failed to take into account a "drastic drop in winter steelhead abundance" and supplementation of winter steelhead into Cedar Creek.  ECF 163 at 22. This argument is misleading. *See* AR 016928.  Abundance numbers fluctuate significantly from year to year.  AR 16936-37 (discussing available data).  For example, in 2013 winter steelhead abundance was significantly above the long term average, yet Plaintiffs have entirely ignored this fact. Turner Decl. ¶¶ 41-43 (wild adults: 3,509; hatchery adults 238 -- for a pHOS of 6.4% in 2013).  Moreover, the perceived "drop" in 2012 is likely attributable to river conditions that prevented accurate surveying rather than an actual population fluctuation.  *Id.* ¶ 41 (discussing how the 2012 data is most likely a significant underestimate of actual abundance due to difficulties with observation).  Finally, NMFS did not have data from 2012 until January of 2013 (after the BiOp was issued).  *Id.*

In any event, one of the reasons NMFS included the possibility of supplementation in Cedar Creek was to address future low winter steelhead abundance. This hatchery program uses broodstock included in the Lower Columbia River steelhead DPS and therefore can contribute to abundance of the DPS. AR 016955 ("The pHOS standard for the winter steelhead program is also 0.10, unless natural-origin steelhead returns to Cedar Creek fall below critical thresholds triggering hatchery supplementation.  In this event, NMFS believes the demographic risk outweighs risks to population productivity and diversity posed by hatchery supplementation."). NMFS determined that avoiding extirpation by using supplementation is a scientifically sound and reasonable approach to address the possibility of low abundance.  While Plaintiffs may disagree with NMFS' precautionary approach, their argument that NMFS failed to disclose low abundance, cannot be reconciled with record and the reality that it created an express provision to address this very contingency.  *Id.*

Plaintiffs' argument regarding winter and summer steelhead introgression is similarly overstated. The "overwhelming" evidence Plaintiffs rely on is actually just one study from the Clackamas River that examined extremely high escapement from summer steelhead (approximately 70% total escapement) and found a decrease in productivity due to density dependence effects, *i.e.*, competition for food and shelter. AR 22526, 22538. However, in the Sandy very little natural production of summer steelhead occurs, and certainly not at a 70% threshold. Thus, this one paper is not directly applicable. AR 16936 (BiOp discussing this study); Turner Decl. ¶¶ 44-47. Moreover, Plaintiffs' reference to winter steelhead returning to spawn in November is misleading. ECF 163 at 30; AR 16935. This quote refers to all rivers throughout the *Pacific Northwest*, including coastal rivers where winter steelhead tend to arrive earlier. In contrast, Sandy winter steelhead begin to return in February and continue into May. Turner Decl. ¶ 46. Notably, Plaintiffs' proffered expert does not dispute that winter steelhead from the Sandy will start to return in February, nor does he state there is actual spawning between the species. Although there is the *possibility* of limited temporal overlap, Plaintiffs fail to demonstrate that there is actual spawning and gene flow between winter and summer steelhead.[11] *Id.* ¶ 46. The fact that Plaintiffs can speculate does not mean it is a relevant factor.

### a. NMFS Reasonably Considered Acclimation Facilities and Weirs.

Plaintiffs also contend that NMFS did not analyze the effect of acclimation facilities and

---

[11] Plaintiffs' concerns with the previous stray rate for spring Chinook in one tributary, Bull Run, among the eight other tributaries on the Sandy where spawning occurs, are significantly overstated. Prior to 2008, there was minimal spawning in Bull Run. This is because Bull Run has been scoured and is considered low-quality spawning habitat; thus wild Chinook are unlikely to successfully spawn in this tributary. Turner Decl., Ex. 4 ¶ 9. By couching their estimate as a percentage, Plaintiffs overstate the impact because very few adults spawn in this area and will have negligible impact on this population. Moreover, a weir was installed on Bull Run in 2013. *Id.* Finally, Plaintiffs are simply wrong that there is no data regarding Bull Run smolts. *See* AR 4853-7; 4870 (emigration dates and timing).

speculate that the Bull Run acclimation facility will not perform as anticipated. The use of acclimation facilities is well-established throughout the Pacific Northwest. *Supra* at pp. 17-18; Turner Decl. ¶¶ 16-19.  Before deciding to use Bull Run, ODFW specifically examined other possible acclimation cites throughout the Sandy basin.  AR 000753-55.  This evaluation found that Bull Run was particularly suitable for spring Chinook.  *Id.* at 000755 (finding that Bull Run met the criteria of >15cfs during the summer and that it will likely have >30cfs in most years as a result of the City of Portland's Habitat Conservation Plan, as well as suitable space for creating actual ponds).  NMFS explained: "The proportion of hatchery spring Chinook salmon will be monitored as proposed in the HGMP to determine if the acclimation at release at the Bull Run acclimation pond will reduce the tendency for the hatchery spring Chinook salmon to stray into the upper basin." AR 16873; AR 016890 ("In 2012, ODFW began to release all spring Chinook salmon from the Bull Run Acclimation pond because it had determined that the attraction flows in Cedar Creek during the summer were not adequate to keep hatchery spring Chinook salmon from straying into the upper basin."); AR 016891 ("more spring Chinook salmon home back to the Bull Run Acclimation ponds because the flows from the Bull Run River are expected to provide enough volume and cooler temperatures such that the hatchery spring Chinook salmon would hold longer in this part of the river . . . .").  While Plaintiffs may disagree with NMFS' conclusion, they cannot legitimately argue that NMFS "failed" to consider the water quantity and quality of Bull Run as an acclimation site.  AR 000747.

Plaintiffs also erroneously contend that NMFS ignored the effects of weirs and argue that they are not effective.  Throughout the BiOp, NMFS recognizes both the beneficial and adverse effects from weirs. AR 016964 (recognizing weirs minimize hatchery, wild interactions); AR 016953-54 (listing the adverse effects from weirs, and the best management practices to alleviate

these effects by "using trained personnel, removing debris, preventing poaching, holding fish for

the shortest time possible, and removing any fish not needed for broodstock to allow for recovery

and release."); AR 016956; AR 028789(evaluating the effects of weirs on natural origin adult

salmonids); AR 028978 (same).  In fact, the BiOp expressly discusses Plaintiffs' concerns:

> NMFS expects that effects associated with the weirs will include weir rejection,
> fallback, handling, and delay, but the associated impacts on the species – changes
> in spawning distribution and pre-spawning mortality – will occur at levels not
> meaningfully beyond background levels (e.g., with no weir). Weir technology has
> improved greatly over the previous couple of decades and the technology is now
> widely and effectively applied throughout the Pacific Northwest (NMFS 2010;
> NMFS 2011a). . . . ODFW will conduct spawning ground surveys to monitor
> effects on naturally spawning spring Chinook salmon to determine impacts from
> handling, and changes in spawning distribution due to weir rejection.

AR 016961.  NMFS acknowledged that there is uncertainty with weirs, but "analyzed the

possible impacts based on the best available information and determined that the growing

experience with use of weirs in the region shows them to be effective overall."  AR 016964.[12]

*Id.*  Plaintiffs may disagree with these conclusions, but they cannot contend that NMFS ignored

the effects from weirs in its analysis.  *See also* AR 016836 (discussing results of 2011 limited

weir use).

---

[12]  Plaintiffs state that that proportion of redds downstream of weirs "increased dramatically"
after installation in 2011.  ECF 163 at 24. As an initial matter, the weirs were not deployed for
the full season until 2012.  AR 011928.  Second, Plaintiffs' contentions are inaccurate.  For
example, in 2012, in the Zigzag mainstem, there were a total of 62 redds and Oregon estimated
59% of these were below the weir.  But this did not include Still Creek (291 redds) and Camp
Creek (22 redds), two of the most important tributaries in the Zigzag basin, both of which are
above the weir.  If these are included, and there is no plausible basis for their exclusion, 418
redds are above the weir, which means only 15% of spawning occurred below the weir.  Turner
Decl., Ex. 4 ¶ 24; *id.* ¶ 25 (explain the similar circumstances in the Salmon basin).  Moreover, it
appears that the weirs are working in that the percentage of hatchery spawners below the weirs is
significantly higher than above, which means wild fish are free to inhabit the spawning grounds
above the weirs.  *Id.* ¶ 27 ("This indicates that the weir is causing a disproportionate percentage
of hatchery fish to remain and spawn downstream, while allowing escapement of primarily
natural-origin Chinook above the weir to those important spawning areas.").  In other words, even
with 2011's limited implementation, they are working as predicted.

**b. NMFS' Use of a 10% Stray Rate is Reasonable.**

Plaintiffs argue that the Sandy programs are "segregated" and therefore should have a

performance standard of 5%. ECF 163 at 33. This is incorrect. Except for summer steelhead,

these programs were modified to use *local* broodstock in order to reduce genetic divergence

between hatchery and wild stocks (both of which are listed) and therefore a stray rate of 10% is

reasonable.

NMFS has determined that the fish produced from these hatchery programs are important

to the overall well-being of the entire species, and therefore they have been included as listed

species. 50 C.F.R § 223.102; 71 Fed. Reg. 834 (Jan. 5, 2006); AR 016934. This means NMFS

wants the hatchery fish and wild fish to remain genetically the same – they do not want a so-

called "segregated" or "isolated" hatchery program on the Sandy. Turner Decl. ¶¶ 22-26, Ex. 1

(Jones 2011) (examining the extent of divergence for these programs)).

Because both hatchery and wild stocks are listed, when NMFS determines the appropriate

stray rate, one of the most important factors is whether the program uses "local" broodstock:

> Generally speaking, effects range from beneficial to harmful for programs that use
> local fish for hatchery broodstock and from neutral to negligible to harmful when
> a program does not use local fish for broodstock. When hatchery programs use
> fish originating from a different population, MPG, or from a different ESU or
> DPS, including programs like the proposed Sandy River Summer Steelhead
> Program, NMFS is particularly interested in how effective the program will be at
> isolating hatchery fish and avoiding interactions that potentially disadvantage fish
> from natural populations.

AR 016947. NMFS explains "The analysis looks at whether broodstock are of local origin, the

proportion of natural origin fish used for broodstock, if the program selects for ESA-listed

natural origin or hatchery-origin fish, and if the program 'backfills' with fish from outside the

local or immediate area." AR 016948; AR 016955 (Table 8). With respect to the BiOp, NMFS

further explained: "The program continues to evolve and the new HGMP identifies when it

29

would be advisable (i.e. when the local natural population is more viable and at less risk) to infuse some natural origin fish into the hatchery broodstock and avoid a situation where hatchery fish diverge from the local Sandy River population. ODFW will resubmit an amended HGMP at that time". AR 016957. In fact, that was one of the reasons ODFW submitted new proposed HGMPs – to allow for the collection of native broodstock. AR 051869.

For programs that utilize local broodstock, like those on the Sandy, a 10% stray rate threshold is consistent with recommendations made by the HSRG and Interior Columbia Technical Recovery Team ("ICTRT"). AR 016834 (explaining why 5% applies only to non-local stocks); AR 2000 ("Based on the ICTRT risk criteria, the current population could have up to 15% hatchery spawners and still meet the low risk criteria."); AR 022037 (ICTRT risk assessments for local stock); Turner Decl. ¶ 22-25. NMFS carefully considered this issue (as reflected in the many emails) and fully discussed the use of this 10% threshold, as well as the 5% threshold for summer steelhead in the BiOp. AR 016958 ("The hatchery programs using broodstock derived from local populations (spring Chinook, coho, winter steelhead hatchery programs) require that pHOS may not exceed 0.10 . . . For comparison purposes, the HSRG recommendation for this situation is 0.30"); *see also* AR 016964. The threshold of 10% is not only consistent with best available science, but also reflects a conservative approach.[13] Turner

---

[13] Dr. Luikart's opinion regarding a supposed decline of the Sandy River populations over time neglects to address a number of factors and is incorrect. ECF 163 at 34-35; Declaration of Dr. Craig Busack ("Busack Decl.") ¶ 10. First, Dr. Luikart does not even acknowledge that ODFW already substantially reduced the number of juvenile releases, which has an immediate impact on pHOS. AR 051822. Second, his opinion regarding reduced fitness is based in the abstract (with no prior hatchery management experience, (*see* ECF 157 at 20, Ex.1) and does not take into account the reality of what actually happens on the spawning grounds. NMFS uses pHOS to represent gene flow, but while Dr. Luikart readily acknowledges a reduction in fitness in hatchery spawners, he inexplicably does not take this into account when opining on long-term reduction in population abundance. That is, he never takes into account that hatchery fish are not as successful on the spawning grounds as wild fish (commonly known as relative reproductive success ("RRS")). Busack Decl. ¶¶ 17-18. Recent research demonstrates that when RRS is

Decl. ¶ 25.

### 2. NMFS' Reliance on Mitigation is Reasonable.

ESA § 7 specifically contemplates relying on presumptive mitigation before and after consultation is complete. 16 U.S.C. § 1536 (d); 50 C.F.R. § 402.14(a).  For example, following § 7 consultation, the action agency has the discretion to "determine whether and in what manner to proceed with the action." 50 C.F.R. § 402.15(a). The consultation procedures are therefore employed to help assist the action agency in determining whether to take the action, or modify its action to address threats to the listed species (that is why it is called "consultation").  There is no requirement to have "binding plans" at the outset, and Ninth Circuit precedent confirms that NMFS may rely on reasonable assumptions and projections in conducting its analysis under the ESA, even when all or even the majority of the details are not defined or known.  *N. Alaska Envtl. Ctr. v. Kempthorne*, 457 F.3d 969, 981 (9th Cir. 2006) ("The BiOp, therefore, properly relied on a reasonable and foreseeable oil development scenario . . ."); *Wild Fish Conservancy v. Salazar*, 628 F.3d 513, 524 n.9 (9th Cir. 2010) (requiring consideration of effects until they become "too unpredictable"); *Jayne v. Sherman*, 706 F.3d 994, 1004 (9th Cir. 2013) (relying on future undefined commitments and clarifying that "[t]he 'immediate negative effects' on a listed species present in *National Wildlife* do not exist in the present case, however. Thus, there is no compelling reason here—as there was in that case—to require promises to be 'binding' or

---

taken into account, a pHOS of 10% translates to about a 5% gene flow rate, but Dr. Luikart does not even acknowledge this data. *Id.* Nor does he acknowledge that hatchery fish tend to segregate themselves on the spawning grounds leading to less wild/hatchery interaction.  *Id.* ¶ 17. Further, even without taking RRS into account, with a pHOS of 10%, the percentage of wild x. wild pairings will be approximately 81%.  *Id.*  With such a high rate of only wild pairings, hatchery introgression is minimal and any concerns about long-term reduced abundance are simply not compelling.  *Id.*, Ex. 2.  The point here is not that there is some bright line estimate of specific gene flow; rather it is that Dr. Luikart entirely neglects to address the reality of what actually happens on the spawning grounds.  Hatchery management is not an academic exercise and his notion of significant long-term reductions in fitness is not supported by the best available science.

'guaranteed.'").[14]  That is precisely why the consultation regulation provides that an action

agency must reinitiate consultation if the effects of the action do not occur as planned.  50 C.F.R.

§ 402.16 (regulatory standards requiring reinitiation of consultation, should assumptions prove to

be incorrect, or the nature of the action changes).

      To the extent there was any ambiguity, the Ninth Circuit recently held that the relevant

inquiry is not whether the actions are "guaranteed" to occur, but rather whether the mitigation is

included as part of the proposed action, or as terms and conditions in the ITS, so as to insure they

are enforceable under the ESA.  *Center for Biological Diversity v. U.S. Bureau of Land

Management*, 698 F.3d 1101, 1117 (9th Cir. 2012) ("We now hold what was implicit in *Marsh*

and *Selkirk* and is dictated by the statutory scheme: a conservation agreement entered into by the

action agency to mitigate the impact of a contemplated action on listed species must be

enforceable under the ESA to factor into the . . . biological opinion . . . .").  Thus, NMFS may

reasonably rely on mitigation in its analysis if it is incorporated into the proposed action.  *Id.*

---

[14] In *NWF v. NMFS*, the agency action (operation and maintenance of a series of dams throughout the Pacific Northwest) directly and significantly affected 13 species of listed fish, and NMFS relied on proposed structural modification to several dams to offset immediate adverse effects to the species.  524 F.3d at 917, 923 & n.2, 936-37 (9th Cir. 2008).  There, in the context of a critical habitat argument, the court concluded that, "without more solid guarantees" that the dams will be structurally modified (such as through "specific and binding plans"), it was arbitrary for NMFS to conclude that this mitigation could be found to offset the "certain immediate negative effects" of the action.  *Id.* at 935-36.  While the *NWF* court addressed the reasonableness of NMFS' findings, it did not hold that the ESA limits NMFS' inquiry, in all consultations and regardless of context, to only "specific plans."  ECF 163 at 36.  In fact, the court found that the consulting agencies are not precluded from considering actions "in fact under agency control," such as the approval of the HGMPs here. 524 F.3d at 936 n.17; *see also* Final Rule on Interagency Consultation Regulations, 51 Fed. Reg. 19926, 19933 (June 3, 1986) ("'reasonably certain to occur' does not mean that there is a guarantee that an action will occur").  Moreover, Plaintiffs fail to address the overwhelming majority of Ninth Circuit cases.  *Southwest Ctr.*, 143 F.3d at 523 (upholding an RPA that "could be implemented," where FWS "rationally" concluded that the RPA would comply with the ESA); *Selkirk Conversation Alliance v. Forsgren*, 336 F.3d 944, 949-50 (9th Cir. 2003) (upholding reliance on mitigation measures that FWS "believed" and "assum[ed]" would sufficiently mitigate the adverse effects associated with the project).

The terms of the HGMPs, including mitigation, were incorporated into the proposed action. AR 16914-20. Thus, they are enforceable under the ESA. In addition, NMFS has a reasonable basis to conclude that the beneficial effects from the HGMPs will be achieved. For example, NMFS found that although there is some uncertainty with the effectiveness of weirs, "the *growing experience* with use of weirs in the region shows them *to be effective* overall." AR 016964 (emphasis added). This is based on previous consultations and NMFS' experience throughout the region. AR 028789; AR 028978 (analysis of weirs Grays, Elochoman, and Coweeman Rivers). With the required monitoring and annual reporting, there is more than a reasonable basis for NMFS, in its expertise, to conclude that this aspect of the HGMPs will aid ODFW to achieve a 10% threshold. *See, e.g., Ctr. for Biological Diversity v. Kempthorne*, 588 F.3d 701, 712 (9th Cir. 2009) (agency predictions entitled to "great deference" even where some uncertainty exists); *Ariz. Cattle Growers' Ass'n v. Salazar*, 606 F.3d 1160, 1164 (9th Cir. 2010) ("[T]he ESA accepts agency decisions in the face of uncertainty," as the statute "does not require that the [agency] act only when it can justify its decision with absolute confidence").[15]

### 3. NMFS' Incidental Take Statement is Reasonable and Employs the Best Available Science.

Where, as here, NMFS issues a "no jeopardy" opinion that may result in take, NMFS includes an ITS specifying the amount or extent of anticipated take, reasonable and prudent

---

[15] Plaintiffs vaguely demand that NMFS develop some kind of "binding adaptive management plan" if ODFW fails to meet performance standards. This is already contemplated in NMFS' 4(d) Rule. 50 C.F.R. § 223.203(b)(5)(vi). This regulation expressly governs how non-compliance with an HGMP will be addressed. *Id.* (providing for evaluation of effectiveness, identification of deficiencies, and possibly notice and comment before withdrawal). Plaintiffs may believe something more than a specific regulatory framework is required, but the Ninth Circuit has been clear that they are not free to impose additional obligations where none exist in the statute or regulations. *See Lands Council*, 537 F.3d at 993-94 (Courts may not "impose 'procedural requirements [not] explicitly enumerated in the pertinent statutes.'"); *League of Wilderness Defenders v. Forest Service*, 549 F.3d 1211 (9th Cir. 2008) (confirming this instruction in regulatory context).

measures to minimize the impact of the take, and the terms and conditions to implement the reasonable and prudent measures. 50 C.F.R. § 402.14(i). Although Congress expressed a preference for quantifying take numerically, NMFS may use a surrogate if no number may be practicably obtained. *Ariz. Cattle Growers*, 273 F.3d at 1249-50; *ONRC v. Allen*, 476 F.3d 1031, 1038 (9th Cir. 2007); 50 C.F.R. § 402.16(a).

Plaintiffs first contend that NMFS' "blindly adopted" a 10% hatchery origin spawning threshold as a surrogate in the ITS. ECF 163 at 38. As discussed previously, NMFS based this 10% surrogate on the best available science. *Supra* at 28-29; AR 016834 (explaining why 5% applies only to non-local stocks). In addition, to the extent there was any ambiguity, NMFS has clarified with ODFW that one year of excessive stray rates may trigger reinitiation of consultation. *See* Turner Decl. ¶ 34.[16]

Plaintiffs still confuse the "take" surrogate of spawning distribution above and below the weirs and pre-spawning mortality. AR 016971. The 20% threshold reflects a change in the absolute percentage of "spawning *distribution* above *and* below the weirs" based on "spawning ground surveys prior to installation and operation of the weirs in 2011." AR 016971 (emphasis added); Turner Decl. ¶ 33. This surrogate is causally related to take and the threshold is clear

---

[16] These declarations and NMFS' clarifications are offered in rebuttal to Plaintiffs' extra-record evidence and under exceptions to record review principles; namely to explain all relevant factors and to explain technical terms or complex subject matter. *Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 450 F.3d 930, 943 (9th Cir. 2006); *see, e.g., Earth Island Inst. V. USFS.*, 442 F.3d 1147, 1163-64, 1168, 1170 (9th Cir. 2006) (where one party introduced extra-record declarations, other party allowed to introduce responsive declarations in rebuttal), *abrogated on other grounds by Winter v. NRDC*, 555 U.S. 7 (2008); *Border Power Plant Working Grp. v. Dep't of Energy*, 467 F. Supp. 2d 1040, 1051 (S.D. Cal. 2006) (same); *Friends of the Payette v. Horseshoe Bend Hydroelectric Co*., 988 F.2d 989, 997 (9th Cir. 1993) ("When a failure to explain action frustrates judicial review, the reviewing court may obtain *from the agency*, through affidavit or testimony, additional explanations for the agency's decisions.") (emphasis added)). In the alternative, and without waiving our prior objections, because Plaintiffs have not made it clear whether they are challenging NMFS as an action or consulting agency (or both), these declarations are admissible evidence offered under ESA § 7(a)(2) in accordance with the Court's order. ECF 161 at 6.

from the language. AR 016971 ("These have a rational connection to the amount of take because they reflect pre-weir circumstances [based on previous spawning ground surveys]."); *Nw. Envtl. Def. Ctr v. U.S. Army Corps of Engineers*, 817 F.Supp.2d 1290, 1306 (D. Or. 2011) (deferring to NMFS when plaintiff had "not presented any evidence that the agency ignored available data, or that there is a better methodology for measuring take."). To the extent there is any ambiguity, NMFS has clarified this surrogate with ODFW to ensure a clear trigger for reinitiating consultation. Turner Decl. ¶ 31-33. The Court should defer to NMFS' expertise. *Nw. Envtl. Def, Ctr. v. NMFS*, 647 F. Supp. 2d 1221, 1240 (D. Or. 2009).

### C. NMFS' Approval of ODFW's HGMPs is Not Arbitrary and Capricious.

Plaintiffs contend that NMFS' approval of ODFW's HGMPs does not "provide for the conservation" of listed species and therefore is unlawful under the ESA. ECF 163 at 39-43. Plaintiffs either confuse the agency action they are challenging or are attempting to insert their own regulatory criteria into 50 C.F.R. § 223.203(b)(5). Neither approach has merit.

Under ESA § 4(d), NMFS "shall issue such regulations as [she] deems necessary and advisable to provide for the conservation of such species." 16 U.S.C. § 1533(d). Plaintiffs do not dispute, nor could they, that NMFS has broad discretion when promulgating a regulation under ESA § 4(d).[17] ECF 163 at 40. In 2000, NMFS exercised this discretion and discharged its duty by promulgating 50 C.F.R. § 223.203. As explained in the preamble to this regulation, NMFS found that extending the take prohibition to these particular threatened salmon and steelhead would provide for the species' conservation. 65 Fed. Reg. 42422, 42423 (July 10, 200)) ("It is necessary and advisable then to apply the ESA section 9(a)(1) prohibitions to these

---

[17] As the Ninth Circuit explained in an analogous context, where "Congress has not directly said what 'necessary or appropriate' means," Congress "left the complex policy decision about how far [the agency] should extend its regulatory tentacles up to [the agency] itself." *Bear Lake Watch, Inc. v. FERC*, 324 F.3d 1071, 1074 (9th Cir. 2003); *Navellier v. Sletten*, 262 F.3d 923, 945 (9th Cir. 2001).

listed ESUs, in order to provide for their conservation."). But NMFS also found that it was "necessary and advisable" to create 13 specific programs that if implemented, would "limit" the ESA § 9 prohibitions, *i.e.,* if an entity was approved under one of the 13 programs its actions would not constitute unlawful "take" in violation of ESA § 9. *Id.* ("When such a program provides sufficient conservation for listed salmonids, NMFS does not find it necessary and advisable to apply ESA section 9(a)(1) take prohibitions to activities governed by those programs."). NMFS further explained that the conservation of the species would be *promoted* by limiting the take prohibition in certain circumstances because it would encourage parties to participate in these programs, which are designed to provide comprehensive protections for listed salmonids. *Id.* ("declining to apply take prohibitions to such programs likely will result in greater conservation gains for a listed ESU than would blanket application of section 9(a)(1) prohibitions, through the program itself and by demonstrating to similarly situated entities that practical and realistic salmonid protection measures exist.").

Limit 5, 50 C.F.R. § 223.203(b)(5), is one of the 13 programs NMFS found that would provide for the conservation of the listed salmonids. NMFS carefully constructed this regulatory program and provided specific requirements to obtain an approved HGMP. *Id.* § 223.203(b). One of these requirements is that the proposed HGMP "utilizes the concepts of viable and critical salmonid population threshold, consistent with the concepts contained in the technical document entitled 'Viable Salmonid Populations' (NMFS 2000b)."). *Id.* § 223.203(b)(5)(i)(B). While these concepts, (commonly known as the "VSP criteria") are related to recovery planning and delisting, they are not synonymous. AR 022054-55. Indeed, during the rulemaking process commenters urged NMFS to adopt a more stringent recovery standard, such as embedding recovery planning, than just the consideration of VSP criteria. 65 Fed. Reg. 42430. NMFS

declined this suggestion and responded: "The VSP concept attempts to describe the population

level attributes of viable salmonid populations; it does not prescribe *how to recover*

*populations*." *Id.* (emphasis added); *id.* at 42439 ("[recovery plans] may provide a more

specific framework for future 4(d) rules or amendments, but the essential protective function of

4(d) rules is independent of recovery plans. . . ."); *id.* ("by applying the VSP and PFC concepts it

is possible to make judgments about the contributions certain programs make to recovery. These

judgments will not prejudice the comprehensive recovery planning process."). Thus, NMFS

must take into account issues related to conservation through consideration of the VSP criteria

requirement in Limit 5, but it chose, in its discretion and expertise, to not require that a proposed

HGMP must demonstrate that it will recover the species or include aspects of recovery planning.

     The first problem with Plaintiffs' argument is that they are belatedly attempting to

challenge the criteria in Limit 5. They argue that Limit 5 should provide an "express obligation"

to affirmatively "contribute to the recovery" of the species and that such a program is only lawful

"if it contributes to the self-sustainability of the species in the wild such that it may be delisted."

ECF 163 at 31, 33. Putting aside NMFS' well-reasoned explanation when developing Limit 5

and the broad discretion and deference it is afforded in promulgating its own regulation, 50

C.F.R. § 223.203 went through notice and comment and was issued on July 10, 2000. 65 Fed.

Reg. 42422. Plaintiffs' argument, that Limit 5 should have included a requirement that HGMPs

must "affirmatively 'provide for' recovery" or "contribute to self- sustainability of the species in

the wild", is clearly time barred. 28 U.S.C. § 2401(a) (six-year statute of limitations for

challenges to agency action).

     The second problem with Plaintiffs' argument is that it confuses the statutory language.

NMFS must only provide for the conservation of the species "[w]henever any species is listed as

a threatened species" and it issues "such regulations as he deems necessary and advisable . . . ."

16 U.S.C. § 1533(d).  NMFS did precisely that when it promulgated 50 C.F.R. § 223.203.  This

regulation, in total, provides for the conservation of salmonids by creating a general prohibition

of take of threatened salmonids, while exempting the 13 enumerated programs including Limit 5.

65 Fed. Reg. 42423.  The statutory requirement is thus reflected in the regulation and the specific

conditions set forth the Limit 5 regulatory framework.  Plaintiffs are inserting an additional

consideration into Limit 5, that a proposed HGMP must "affirmatively provide for recovery" or

result in "self-sustainability," but no such requirement exists and would undermine the overall

conservation purpose of encouraging hatchery operators to develop HGMPs.  Plaintiffs are not

free to insert their own notion of what should be required under Limit 5.  *Lands Council*, 537

F.3d at 993 ("[w]e are not free to 'impose on the agency [our] own notion of which procedures

are 'best' or most likely to further some vague, undefined public good.'");  *League of Wilderness*

*Defenders,* 549 F.3d at 1218 ("It is not for this court to tell the Forest Service what *specific*

evidence to include, nor how *specifically* to present it.");  *Wild Fish Conservancy*, 628 F.3d at

524.[18]  Moreover, NMFS must follow its own regulations.  *United States v. Nixon*, 418 U.S. 683,

695-96 (1974) ("So long as this regulation remains in force the Executive Branch is bound by it,

and indeed the United States as the sovereign composed of the three branches is bound to respect

and to enforce it.").  The ODFW HGMPs met the regulatory criteria in Limit 5, and despite

---

[18] On a more practical level, Plaintiffs failure to even acknowledge the requirement that HGMPs must discuss the VSP criteria is unexplainable.  This alone distinguishes our case from *Defenders of Wildlife v. Tuggle*, 607 F. Supp. 2d 1095, 1116-17 (D. Ariz. 2009). Similarly, Plaintiffs have entirely ignored NMFS' explanation of how development and implementation of HGMPs is harmonized with the ESA's overriding purpose of delisting imperiled species.  65 Fed. Reg. 42445 ("By developing and implementing HGMPs under the ESA, these programs will address wild population conservation and recovery . . . Reforming hatchery practices is advisable, but discontinuing all artificial propagation is not necessary to restore natural fish under all circumstances.").

Plaintiffs desire for a different outcome, NMFS cannot insert additional criteria in order to deny the approval of the HGMP.

### D.  NMFS Did Not Violate ESA § 7(a)(2).

Plaintiffs allege that NMFS violated ESA § 7(a)(2) by failing to reinitiate consultation. ECF 163 at 42.  As a result of ODFW's decision to submit new HGMPs, NMFS reinitiated consultation and is currently preparing a new biological opinion.  Jones Decl. ¶¶ 8-9.  Thus, Plaintiffs' claim fails as a factual and legal matter.[19]  Nor is declaratory relief warranted under these circumstances.  *U.S. v. Washington*, 759 F.2d 1353, 1357 (9th Cir. 1985) (reserving declaratory relief for matters of public import like defining a treaty fishing right). Because there is no dispute as to material fact over whether NMFS has reinitiated consultation, summary judgment in favor of Federal Defendants is appropriate.

Moreover, Plaintiffs invoke the wrong statutory provision by asserting violations of ESA § 7(a)(2). Once an agency reinitiates consultation, the operative statutory provision is ESA § 7(d).  16 U.S.C. § 1536(d).  Unlike ESA § 7(a)(2), this provision provides that "[A]fter initiation of consultation" an agency "shall not make any irreversible or irretrievable commitment of resources" that would foreclose "the formulation or implementation of any reasonable and prudent alternative measures which would not violate subsection (a)(2) . . . ." *Id.*  This is a different statutory obligation than § 7(a)(2), and it carries separate and distinct responsibilities.

---

[19] The ESA citizen suit provision does not provide for declaratory relief. *Center for Biological Diversity v. Marina Point Development Co*., 566 F.3d 794, 804 (9th Cir. 2009). Even if it did, this claim is moot. *Defenders of Wildlife v. Martin*, 454 F.Supp.2d 1085, 1103 (E.D. Wash. 2006) ("Clearly Plaintiffs' third claim regarding reinitiation of consultation is now moot. Defendants have reinitiated consultation."). Moreover, as a factual matter, Plaintiffs' allegations are simply wrong.  The trigger for reinitiating consultation is a three year average, and Plaintiffs have not demonstrated that ODFW failed to meet this three year requirement.  Turner Decl. ¶ 34.  Nor have they demonstrated that the 20% weir threshold has been exceeded.  *Id.* ¶ 33. Finally, winter steelhead abundance did not remain low in 2013. *Id.* ¶ 42.

*Id.* Plaintiffs have not advanced any argument, much less carried their burden, that this Federal agency's actions are arbitrary and capricious under the operative statutory provision of ESA § 7(d); namely whether it has irreversibly and irretrievably committed resources that would foreclose the formulation of reasonable a prudent measures that may be designed in the course of the on-going consultation. *Del Norte County v. United States*, 732 F.2d 1462, 1468 (9th Cir. 1984) ("In the absence of clear evidence to the contrary, courts presume that public officers properly discharge their duties"). Nor could Plaintiffs make this showing. Jones Decl. ¶ 9 (explaining that Mitchell Act funding is being withheld until completion of the administrative process). Summary judgment should be granted in favor of Federal Defendants.

## IV.    CONCLUSION

For the reasons set forth above, the Court should grant Federal Defendants cross motion for partial summary judgment and deny Plaintiffs' motion for partial summary judgment. To the extent the Court is inclined to grant Plaintiffs any relief, Federal Defendants respectfully request an opportunity to brief the issue of remedy. As this Court previously found, potential remedies may, on balance, adversely affect the listed species at issue in this case. ECF 120 (May 16, 2013 Order) at 34.

Dated: September 16, 2013.

S. AMANDA MARSHALL
United States Attorney
STEPHEN J. ODELL, OSB #90353
Assistant United States Attorney
District of Oregon
600 United States Courthouse
1000 S.W. Third Avenue
Portland, OR  97204-2902
Tel:  (503) 727-1000

ROBERT G. DREHER, Acting Assistant Attorney General
SETH M. BARSKY, Section Chief

*/s/ Coby Howell*

COBY HOWELL, Senior Trial Attorney
Wildlife & Marine Resources Section
ROMNEY S. PHILPOTT
Natural Resources Section
Environment & Natural Resources Division
U.S. Department of Justice
c/o U.S. Attorney's Office
600 United States Courthouse
1000 S.W. Third Avenue
Portland, OR   97204-2902
(503) 727-1000 (Tel.); (503) 727-1117 (Fax)
Email:  coby.howell@usdoj.gov

*Attorneys for Federal Defendants*

**CERTIFICATE OF SERVICE**

I certify that on September 16, 2013, the foregoing will be electronically filed with the Court's electronic filing system, which will generate automatic service upon on all Parties enrolled to receive such notice.

*/s/ Coby Howell*
Coby Howell