UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

NATIVE FISH SOCIETY and
MCKENZIE FLYFISHERS,

        Plaintiffs,

        v.

NATIONAL MARINE FISHERIES
SERVICE; REBECCA BLANK, Acting
Secretary of the Department of Commerce;
WILLIAM STELLE, Regional
Administrator, NMFS; OREGON
DEPARTMENT OF FISH AND WILDLIFE;
BRUCE MCINTOSH, Assistant Fish
Division Administrator, ODFW; CHRIS
WHEATON, Northwest Region Manager,
ODFW; and ROY ELICKER, Director,
ODFW,

        Defendants.

Case No. 3:12-cv-00431-HA

OPINION AND ORDER

---

HAGGERTY, District Judge:

        Plaintiffs, the Native Fish Society and McKenzie Flyfishers, filed this action for

declaratory and injunctive relief against the National Marine Fisheries Service (NMFS); William

Stelle, Regional Administrator NMFS; Rebecca Blank, Acting Secretary of the Department of Commerce (collectively "federal defendants" or "NMFS"); the Oregon Department of Fish and Wildlife (ODFW); Bruce McIntosh, Assistant Fish Division Administrator, ODFW; Chris Wheaton, Northwest Region Manager, ODFW; and Roy Elicker, Director, ODFW (collectively "state defendants" or "ODFW"). Plaintiffs seek to compel defendants to comply with the Endangered Species Act (ESA), 16 U.S.C. § 1531 *et seq.*, the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 *et seq.*, and the Administrative Procedures Act (APA), 5 U.S.C. § 551 *et seq.*, in authorizing, funding, and managing the Sandy Hatchery. Following this court's ruling [120] on plaintiffs' Motion for Temporary Restraining Order/Preliminary Injunction [58], plaintiffs' only claim against state defendants, that state defendants' operation of the Sandy Hatchery causes "take" of threatened fish species in violation of § 9 of the ESA, was stayed. 16 U.S.C. § 1538(a)(1)(B). Thereafter, over the objections of federal defendants, the court determined [161] that it would consider certain materials outside the administrative record in evaluating plaintiff's claims pursuant to the APA in-so-far as those materials assist the court in determining whether NMFS considered all relevant factors and in understanding technical terms or complex subject matter. Plaintiffs and federal defendants have each moved for partial summary judgment. Plaintiffs also move to strike certain extra-record evidence submitted by defendants. The Association of Northwest Steelheaders, the Northwest Sportfishing Association, and the Northwest Guides and Anglers Association have filed an *amicus* brief in opposition to plaintiffs' Motion for Partial Summary Judgment. Oral argument was held on January 8, 2014. For the following reasons, plaintiffs' Motion to Strike [215] is denied, Motion for Partial Summary Judgment [162] is granted in part and denied in part, and federal defendants' Cross Motion for Partial Summary Judgment [179] is granted in part and denied in part.

2 - OPINION AND ORDER

**BACKGROUND**

Plaintiff Native Fish Society is an environmental nonprofit organization dedicated to the conservation of native, wild fish in the Pacific Northwest. Plaintiff McKenzie Flyfishers is a non-profit, membership-based, fishing conservation group located in Eugene, Oregon. Plaintiffs advance six claims for relief in the Second Amended Complaint alleging that state defendants' operation of the Sandy Hatchery causes "take" of threatened fish species in violation of § 9 of the ESA, and that NMFS' approval and funding of the Sandy Hatchery's operations violates the ESA, NEPA, and the APA. Plaintiffs and federal defendants each move for summary judgment on plaintiffs' Third, Fourth, Fifth, and Sixth Claims for relief. At this time, litigation concerning plaintiffs' First and Second Claims has been stayed.

A.    **Overview of the Endangered Species Act**

The purpose of the ESA is "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation" of such species. 16 U.S.C. § 1531(b). The Secretary of the Interior must list species that are endangered or threatened with extinction. *Id.* § 1533(a).

Section 9 of the ESA prohibits the "take" of any species listed as "endangered" under the ESA. 16 U.S.C. § 1538(a)(1). The ESA defines "take" to mean "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." *Id.* § 1532(19). The ESA's implementing regulations further define "harm" as an "act which actually kills or injures wildlife" and "may include significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering." 50 C.F.R. § 17.3; *Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*, 515 U.S. 687, 696-700 (1995) (upholding the regulatory definition of

3 - OPINION AND ORDER

"harm").

Section 9, on its face, does not provide a blanket protection from take to "threatened"

species. However, § 4(d) of the ESA provides that NMFS shall "issue such regulations . . .

necessary and advisable to provide for the conservation of such [threatened] species." 16 U.S.C.

§ 1533(d). Pursuant to § 4(d), § 9's take prohibition has been extended to threatened anadromous

fish, including the species at issue in this case. Endangered and Threatened Species; Final Rule

Governing Take of 14 Threatened Salmon and Steelhead Evolutionary Significant Units, 65 Fed.

Reg. 42,422, 47,475–81 (July 10, 2000); 70 Fed. Reg. at 37,194 (amending 2000 rule) (codified

at 50 C.F.R. § 223.203).

As a part of the 4(d) rule, NMFS established exceptions to § 9's take prohibition known

as "4(d) Limits." *Id.* Limit 5 creates an exemption from § 9's take prohibition for otherwise

unlawful take of anadromous fish caused by a hatchery's artificial propagation program so long as

the hatchery is operated pursuant to a hatchery genetic management plan (HGMP) approved by

NMFS. 50 C.F.R. § 223.203(b)(5). Among other things, a HGMP must have "clearly stated

goals, performance objectives, and performance indicators that indicate the purpose of the

program, its intended results, and measurements of its performance in meeting those results." *Id.*

at § 223.203(b)(5)(A). An approved HGMP must evaluate, minimize, and account "for the

propagation program's genetic and ecological effects on natural populations, including disease

transfer, competition, predation, and genetic introgression caused by the straying of hatchery

fish." *Id.* at § 223.203(b)(5)(E).

Section 7 of the ESA imposes affirmative duties on federal administrative agencies to

conserve listed species and to prevent violations of § 9. Section 7(a)(2) of the ESA requires

federal agencies to "insure that any action authorized, funded, or carried out by such agency . . .

is not likely to jeopardize the continued existence of any endangered or threatened species or result in the destruction or adverse modification" of such species' critical habitat. 16 U.S.C. § 1536(a)(2). Whenever a federal agency determines that a proposed action "may affect listed species or critical habitat," that agency must prepare a biological assessment on the effects of the action. 50 C.F.R. § 402.14(a); 16 U.S.C. § 1536(c). If the agency determines that the proposed action is likely to adversely affect a listed species or critical habitat, the agency must consult with a consultation agency (NMFS or the Fish and Wildlife Service) to determine whether the agency action is likely to jeopardize that species or adversely modify its critical habitat. *Id.*; 16 U.S.C. § 1536(c). In this case, NMFS is both the action agency and the consultation agency.

Once formal consultation is initiated, NMFS must review all relevant information and formulate a biological opinion (BiOp) regarding whether the action is likely to result in jeopardy to a listed species. 50 C.F.R. § 402.14(g). NMFS "shall use the best scientific and commercial data available" in determining whether an agency action is likely to result in jeopardy to a listed species. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(a). If NMFS determines that an agency action is likely to jeopardize the continued existence of a listed species, NMFS must suggest reasonable and prudent alternatives to the proposed action, if any exist, that would not result in such jeopardy. *Id.* § 1536(b)(3).

If NMFS concludes that a proposed action is not likely to jeopardize the continued existence of a listed species or result in the destruction or adverse modification of critical habitat, but determines that the action will nevertheless result in the take of listed species, NMFS must issue an incidental take statement (ITS). 16 U.S.C. § 1536(b)(4). An ITS authorizes the limited take of listed species that would otherwise violate § 9's "take" prohibition. *Id.*; 50 C.F.R. § 402.14(i). The ITS must specify measures to limit and measure take. *Id.* If during the course of

5 - OPINION AND ORDER

the subject action, the conditions of the ITS are exceeded, the action agency must reinitiate

formal consultation pursuant to § 7(a)(2).  50 C.F.R. § 402.16(a).

### B.    Overview of the National Environmental Policy Act

NEPA requires federal agencies to prepare a "detailed statement on . . . the environmental

impact" of "major Federal action significantly affecting the quality of the human environment."

42 U.S.C. § 4332(2)(C)(i); *see also* 40 C.F.R. § 1500.2.  The purpose of NEPA is: (1) to ensure

the agency "will have available, and will carefully consider, detailed information concerning

significant environmental impacts" of its decisions; and (2) to guarantee that this information will

be available to the public.  *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349

(1989).  NEPA is a procedural statute that does not mandate particular results, but simply

proscribes the process by which decisions affecting the environment must be made.  *Sierra Club*

*v. Espy*, 38 F.3d 792, 796 (5th Cir. 1994).

An agency must "integrate the NEPA process with other planning at the earliest possible

time to insure that planning and decisions reflect environmental values."  40 C.F.R. § 1501.2;

*Andrus v. Sierra Club*, 442 U.S. 347, 351 (1979).  The agency must prepare a detailed

environmental impact statement (EIS), "[i]f there is a substantial question whether an action may

have a significant effect on the environment." *Ctr. for Biological Diversity v. Nat'l Highway*

*Traffic Safety Admin.*, 538 F.3d 1172, 1185 (9th Cir. 2008) (quotation marks omitted).  To

determine whether an EIS must be prepared, the agency may prepare an environmental

assessment (EA).  40 C.F.R. § 1501.4(b).  An EA is a concise public document that briefly

describes the need for the proposed action, and examines the environmental impacts of the

proposed action and alternatives to that action.  40 C.F.R. § 1508.9.  If the agency makes a

finding of no significant impact ("FONSI") after completing the EA, then an EIS is not required.

*Salmon River Concerned Citizens v. Robertson*, 32 F.3d 1346, 1356 (9th Cir. 1994).

### C.    Factual Background

The Sandy River flows from its headwaters on the west side of Mt. Hood to the Columbia

River east of Portland, Oregon.  The Sandy River's watershed encompasses approximately 508

square miles and includes the Bull Run River, the Salmon River, the Little Sandy River, Cedar

Creek, and the Zigzag River among its tributaries.  In 2007 and 2008, the Marmot Dam on the

Sandy River and the Little Sandy Dam on the Little Sandy River were removed.  Prior to their

removal, they served as artificial barriers to normal fish migration and spawning for nearly 100

years.  The Sandy River Basin is divided between upper and lower basins delineated at the

former site of the Marmot Dam.  The upper Sandy River Basin has been designated as a wild fish

sanctuary.

In 2005 and 2006, NMFS issued final listing decisions designating four fish species that

use the Sandy River Basin as threatened: the Lower Columbia River Chinook Evolutionary

Significant Unit (ESU), Lower Columbia River coho ESU, Columbia River chum ESU, and

Lower Columbia River steelhead Distinct Population Segment (DPS).[1]  Endangered and

Threatened Species; Final Listing Determinations for 16 ESUs of West Coast Salmon, 70 Fed.

Reg. 37,160 (June 28, 2005); Endangered and Threatened Species; Final Listing Determinations

for 10 Distinct Population Segments of West Coast Steelhead, 71 Fed. Reg. 834 (Jan. 5, 2006).

Each of these fish species is at a moderate to very high risk of extinction.

The Sandy Hatchery utilizes an artificial fish propagation program and releases hatchery-

---

[1]  The ESA defines species to include subspecies and DPSs of species.  16 U.S.C. §
1532(16).  NMFS considers a Pacific salmonid subspecies to be a DPS if it is an ESU and the
term "ESU" is used in place of "DPS" for those species.  Policy on Applying the Definition of
Species Under the [ESA] to Pacific Salmon, 56 Fed. Reg. 58, 612 (Nov. 20, 1991).

bred smolts into the Sandy River Basin. The operations of the Hatchery are funded in part

through Mitchell Act funds from NMFS. Despite genetic differences, NMFS may include

hatchery-bred and wild fish in the same designated ESU. However, NMFS treats hatchery fish

and wild fish disparately for purposes of the ESA. 70 Fed. Reg. 37,160; *Trout Unlimited v.*

*Lohn*, 559 F.3d 946; (9th Cir. 2009); 50 C.F.R. § 223.203 (noting that § 9 only applies to listed

fish with an intact adipose fin (hatchery fish generally have their adipose fins clipped before they

are released)).

      Plaintiffs allege that the operation of the Sandy Hatchery causes harm to Lower Columbia

River Chinook, Lower Columbia River coho, Columbia River chum, and Lower Columbia River

steelhead from a number of vectors, including competition from hatchery fish, introduction of

disease, and genetic introgression.

      Historically, the Sandy River Basin supported sizeable runs of native wild salmonids with

as many as 15,000 coho, 20,000 winter steelhead, 10,000 fall Chinook, and 10,000 spring

Chinook. AR032391. In 2010, there were an estimated 1,330 spring Chinook, 901 coho, and

969 winter steelhead spawners. AR016561. The Sandy Hatchery, which has been in operation

since 1951, is operated with "harvest" rather than "conservation" goals in mind. AR000681.

There is very little evidence to suggest a hatchery can restore a wild population of fish and the

Sandy Hatchery is generally not intended to achieve any recovery goals. Rather, it is undisputed

that hatchery operations can pose a host of risks to wild fish. *See generally*, AR016947-56

(describing factors impacting wild fish populations including interactions between hatchery fish

and wild fish that can result in hatchery fish out-competing wild fish and may alter behavioral

patterns, genetic introgression, and the installation and operation of weirs[2])

In 2008, in connection with litigation in a separate matter, Edward Bowles, the Fish Division Director for ODFW, has stated that "threats to wild populations caused by stray hatchery fish are well documented in the scientific literature." Am. Decl. of Edward Bowles at ¶ 127, *Nat'l Wildlife Fed'n v. NMFS*, 839 F. Supp. 2d 1117 (D. Or. 2011)((Case No. 3:01-cv-00640-SI) (ECF No. 1633)). "Among the impacts are substantial genetic risks that affect the fitness, productivity, and genetic diversity of wild populations." *Id.* (references omitted). Hatchery programs "also pose ecological risks to wild populations that can further decrease abundance." *Id.* Genetic risks increase "when the proportion of the adult population that is hatchery fish increases over 5%" and ecological risks "have been demonstrated when the proportion that is hatchery fish is over 10%." *Id.* (references omitted). The proportion of hatchery-origin spawners (pHOS or "stray rate") is a key metric in determining the effects of a hatchery's operations on wild populations. "Stray rates as low as one to two percent for a large, segregated harvest program may pose unacceptable risks to natural populations." AR021266. However, evidence suggests that higher stray rates, as much as fifteen percent, are acceptable where a hatchery's broodstock is derived from local natural populations, as it is for all species

---

[2] A weir is a fish trap that is installed and operated to collect broodstock and to prevent hatchery fish from spawning naturally. Ideally, hatchery fish would not travel into the upper reaches of the Sandy Basin where spawning conditions are favorable, but would instead "home" to specific stream and river reaches where wild fish are less likely to spawn. Weirs are supposed to operate in such a way as to limit the number of hatchery fish reaching spawning grounds. Fish swim into the trap where they are sorted by ODFW personnel. Wild fish are released above the weir, while hatchery fish are typically collected for broodstock or are euthanized. The physical presence and operation of weirs can cause a host of problems for wild fish including causing a delay in upstream migration, possibly inducing fish to spawn in less than ideal conditions below the weir, injuring fish that attempt to escape the weir, and harming fish as they are handled and released from the weir. AR016954.

released by the Sandy Hatchery except summer steelhead. AR016958. However, over time, hatchery fish will tend to genetically diverge from wild fish unless the broodstock is supplemented with wild genetics.

The removal of the Marmot Dam in 2007 and 2008 opened the upper Sandy River Basin to both wild and hatchery fish. Since the removal of the Marmot Dam, the pHOS for Chinook salmon has been excessively high with 45% in 2008, 52% in 2009, 77% in 2010, and 60% in 2011. AR031745, AR031748. In 2010, ODFW estimated the stray rate for winter steelhead to be 52%. AR017334. In 2009, the pHOS for coho was 10.4% and in 2010 it was 24.2%. AR015626.

For nearly all of its existence, the Sandy Hatchery has operated without an approved HGMP. In May 2011, the ODFW submitted draft HGMPs to NMFS for review and on September 26, 2012, NMFS issued its final EA and made a FONSI regarding the proposed HGMPs. AR016661-68. Therefore, NMFS did not prepare an EIS. On September 28, 2012, NMFS issued its BiOp concluding that the issuance of the HMGPs would not result in jeopardy to the continued existence of the listed species. AR016905-92. At the same time, NMFS issued an ITS for operation of the Sandy Hatchery and formally approved the HGMPs. AR016969-74; AR017007-13.

The HGMPs provide for the release of approximately 1,000,000 smolts into the Sandy River Basin each year: 300,000 spring Chinook, 500,000 coho, 160,000 winter steelhead, and 75,000 summer steelhead[3]. AR016535-50. The HGMPs contain binding implementation terms

---

[3] The summer steelhead run in the Sandy River Basin is made up entirely of non-local broodstock as summer run steelhead are not indigenous in the Basin. AR016550. Because of that, the Sandy Hatchery uses genetic stock sourced from outside the Basin for summer steelhead, whereas the broodstock for the remainder of the hatchery smolts at issue in this case

and the § 4(d) decision approving the HGMPs requires among other things, that the Sandy

Hatchery ensure that the pHOS is less than ten percent annually for spring Chinook, coho, and

winter steelhead, and less than five percent for summer steelhead; that the Hatchery conduct

spawning ground surveys; monitor and report on the effects of fish handling at weirs; and remove

all hatchery fish returning to the hatchery or caught in a weir unless recycled. AR017010-11. In

concluding that the HGMPs would not result in jeopardy to the species at issue, NMFS took into

account terms and conditions for implementation by ODFW including increased acclimation

periods for smolts before release that are expected to improve "homing" by returning spawners,

and monitoring efforts to gauge the impact of the Hatchery's operations. The ITS issued with

NMFS' BiOp concluded that take of listed species was likely to result from: "(1) broodstock

collection; (2) interactions on the spawning grounds; (3) interactions in juvenile rearing areas; (4)

construction, operation, and maintenance of hatchery facilities (e.g. weirs); and (5) [research

monitoring and evaluation]." AR016969. For each of these forms of take, NMFS set limits for

that take and metrics designed to measure the take. AR016969-71.

## STANDARDS

Summary judgment is appropriate if the "movant shows that there is no genuine dispute

as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ.

P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

All of plaintiffs' claims at issue in the present motions are governed by the APA's

"arbitrary and capricious" standard. 5 U.S.C. § 706(2)(A) (2006). Under this standard of review,

the court may set aside an agency action that is "arbitrary, capricious, an abuse of discretion, or

---

was, at some point, taken from wild fish in the Basin.

otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

To determine whether an agency decision is arbitrary and capricious, the court should "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 378 (1989). After considering the relevant factors, the agency must articulate a satisfactory explanation for its action, including a rational connection between the facts found and the agency's conclusions. *Ctr. for Biological Diversity*, 538 F.3d at 1193. Review under this standard is narrow, and the court may not substitute its judgment for the judgment of the agency. *Lands Council v. McNair*, 629 F.3d 1070, 1074 (9th Cir. 2011). For all these claims except plaintiffs' reinitiation claim, the scope of review is limited to the administrative record before NMFS at the time the challenged decisions were made. *Citizens to Pres. Overton Park v. Volpe*, 401 U.S. 402, 419 (1971).

Plaintiffs' § 7(a)(2) claim, that the ITS was abrogated and that NMFS should have reinitiated formal consultation is evaluated with any admissible evidence and is not limited to the administrative record. *See Wash. Toxics Coal. v. EPA*, 413 F.3d 1024, 1034 (9th Cir. 2007) (holding that the "ESA citizen suit provision creates an express, adequate remedy" rendering the APA's scope of review inapplicable to the "substantive provisions of the ESA"); *Western Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 481 (9th Cir. 2011) (holding that courts should "review claims brought under the ESA under the citizen-suit provision of the ESA or, when the citizen-suit provision is unavailable, under the APA"). In accordance with the Ninth Circuit's ruling in *Kraayenbrink*, the APA's standard of review will be applied to plaintiffs' claim and plaintiffs must prove that NMFS' failure to reinitiate consultation was "arbitrary, capricious, an abuse of discretion, or *otherwise not in accordance with law*." 5 U.S.C. § 706(2)(A)

(emphasis added); 632 F.3d at 481 (holding that "[i]rrespective of whether an ESA claim is brought under the APA or the citizen-suit provision, the APA's" standard of review applies). Accordingly, if plaintiffs prove that the ITS was abrogated and that NMFS failed to reinitiate consultation, the court will evaluate whether that failure was "not in accordance with law." 5 U.S.C. § 706(2)(A).

**MOTION TO STRIKE**

Plaintiffs advance a Motion to Strike extra-record evidence submitted by state and federal defendants. In large part, plaintiffs' Motion to Strike rests on the fact that defendants did not seek approval from the court prior to submitting extra-record evidence. However, federal defendants opposed plaintiff's initial motion to submit extra-record evidence and requested that this court limit its review to the administrative record. In light of the fact that the court permitted plaintiffs to submit extra record evidence, it is only fair that the court consider defendants' materials for the same purposes that the court is considering plaintiffs' extra-record materials. Accordingly, the court has considered the extra-record evidence submitted by all parties in evaluating plaintiffs' claims brought pursuant to the APA in-so-far as those materials assist the court in determining whether NMFS considered all relevant factors and in understanding technical terms or complex subject matter. The court is not considering extra-record evidence in evaluating the claims raised under the APA for any other purpose as no party requested consideration of such evidence for any other purpose in a timely manner. The court has considered all relevant evidence in evaluating plaintiffs' reinitiation claim.

**DISCUSSION**

Plaintiffs contend that NMFS violated both NEPA and the ESA in approving the HGMPs and has failed to reinitiate formal consultation in accordance with the ESA and its implementing

regulations.

### A.    NEPA Claims

Plaintiffs contend that NMFS violated NEPA in approving the HGMPs without preparing

an EIS, by failing to consider a reasonable range of alternatives, and by failing to properly

analyze mitigation.

### 2.    Requirement to Prepare an EIS

Whether a proposed action requires the preparation of an EIS because it "may have a

significant effect on the environment," depends on the "context and intensity" of the

environmental impacts. *Ctr. for Biological Diversity*, 538 F.3d at 1220.  In order to evaluate the

"context and intensity" of a proposed action, federal regulations set forth a number of factors that

should be considered, including: the beneficial and adverse impacts of the action; unique

characteristics of the geographic area such as ecologically critical areas; the degree to which the

effects are likely to be controversial; the degree of uncertainty associated with the impacts or the

degree to which the project has unknown risks; the cumulative effects of the project; and whether

the action "may adversely affect an endangered or threatened species or its habitat that has been

determined to be critical under the [ESA]." 40 C.F.R. § 1508.27.  "An action may be 'significant'

if one of these factors is met." *Ctr. for Biological Diversity*, 538 F.3d at 1220.

An agency deciding not to prepare an EIS "must supply a convincing statement of reasons

to explain why a project's impacts are insignificant.  The statement of reasons is crucial to

determining whether the agency took a 'hard look' at the potential environmental impact of a

project." *Ctr. for Biological Diversity*, 538 F.3d at 1220 (quotation marks and citation omitted).

The agency must have "adequately considered and elaborated the possible consequences of the

proposed agency action when concluding that it will have no significant impact on the

environment, and whether its determination that no EIS is required is a reasonable conclusion."
*Id.* at 1215. If a project raises "substantial questions" as to "whether a project *may* cause
significant degradation" of the environment, an EIS is required. *Id.* at 1219 (citation and
quotations omitted).

Federal defendants contend that the context of the HGMPs must be analyzed in light of
the history of hatchery operations in the Sandy River Basin. The first hatchery program in the
Sandy River Basin began in 1896, and for most of the past century there have been hatchery
operations in the basin in one form or another. AR016253. For the vast majority of this time, the
various hatcheries in the basin used out-of-basin genetic broodstock. AR016263; AR016353;
AR016169; AR01835. Prior to 1999, ODFW did not sort and remove hatchery fish from the
wild spawning populations, leading to very high stray rates. AR016365. The pHOS for spring
Chinook was in excess of 70% from 1996-2000. AR016270. Federal defendants argue that this
long history of straying hatchery origin fish in the Sandy River Basin undermines plaintiffs'
claims regarding the impacts of hatchery operations and demonstrates that the HGMPs will result
in a continued trend of decreasing effects on listed fish. This may or may not be the case
(another interpretation would be that because of historical harm caused by hatcheries, it is all the
more important to protect wild fish now). More importantly, the FONSI does not discuss this
context or, in any way, *analyze* the impacts of the current action in that context. While the
FONSI, states that the HGMPs are "designed to minimize known impacts on ESA-listed fish" the
FONSI does not evaluate the impacts of the HGMPs in the historical context of the basin. While
this court is prepared to accept a "decision of less than ideal clarity, if the agency's path may be
reasonably discerned" the court is unable to defer to the agency's reasoning without some analysis

of this historical context. *Motor Vehicle Mfrs. Ass'n. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S.

29, 43 (1983) (quoting *Bowman Transp. Inc. v. Arkansas-Best Freight System*, 419 U.S. 281, 285

(1974)).

Additionally, simply because a proposed action is expected to decrease the negative

impacts in comparison to a much worse historical practice does not mean that the action will not

have a significant negative impact itself, only that it will have a less harmful impact than prior

actions. Where a project, or its mitigation, is expected to improve ecological conditions, it may

be acceptable to produce only an EA. *Bering Strait Citizens for Responsible Res. Dev. v. U.S.

Army Corps of Engineers*, 524 F.3d 938, 957 (9th Cir. 2008) ("[w]e cannot avoid perceiving that

the project in its required mitigation favorably affects parts of the Nome area that suffered

environmental damage from previously unconstrained resource development"); *Umpqua

Watersheds v. United States*, 725 F. Supp. 2d 1232, 1240-41 (D. Or. 2010) (upholding FONSI

where agency determined that the project "would improve resource conditions rather than

degrade resources"). However, an agency may not decline to produce an EIS on the basis that the

negative impacts of the proposed action are not as bad as prior unregulated actions, the question

is whether the action at issue will have significant impacts.

Even if NMFS had offered a cogent analysis of the context for the HGMPs, it still appears

that an EIS should have been produced in accordance with the intensity factors set forth in 40

C.F.R. § 1508.27. The parties disagree regarding whether ODFW's designation of the Sandy

River Basin above Cedar Creek as a "wild fish sanctuary" makes it an "ecologically critical area"

and therefore "unique" in accordance with 40 C.F.R. § 1508.27(b)(3).[4]  Although the exact

definition of a "wild fish sanctuary" is not given, it appears the ODFW intended the designation

to describe areas where straying of hatchery fish is meant to be minimal.  AR017260-61.

Regardless of what the exact parameters are for a "wild fish sanctuary" designation, it is clear

that the Sandy River Basin is of particular importance to the recovery of the four listed species

and is an ecologically critical area.  *See, e.g.,* AR037590, 037700, 377736 (determinations by

Hatchery Scientific Review Group that wild fish in Sandy River are "primary populations"

important to the species as a whole); AR019551-70 (discussing relative importance of the Sandy

River basin populations to the listed species).  However, such a finding does not necessitate the

production of an EIS alone.  *Presidio Golf Club v. Nat. Park Serv.*, 155 F.3d 1153, 1162 (9th Cir.

1998) (EIS is not required if EA adequately addresses unique characteristics of the project area).

Here, the EA addresses the unique characteristics of the Upper Sandy River Basin to a degree

that the court cannot conclude that the agency overlooked the unique characteristics of the project

area.  However, this is not the only intensity factor present in this case.

Of particular importance is the issue of uncertainty, a factor that is inadequately addressed

in the EA.[5]  There are repeated references in the administrative record to the uncertainty attendant

to the HGMPs.  *See, e.g.,* AR016538 ("[I]t is unknown if the operation of the weir/traps will be

successful in removing enough hatchery spring Chinook salmon adults to meet the 10 percent

---

[4] The Sandy, Salmon, and Zigzag Rivers are also designated as a Wild and Scenic Rivers. http://www.rivers.gov/rivers/salmon-or.php; http://www.rivers.gov/rivers/sandy.php; http://www.rivers.gov/rivers/zigzag.php.

[5] In finding that the effects of the HGMPs are "uncertain," the court is not relying on any extra-record evidence.  The court is declining to find that the HGMPs are "highly controversial" in light of the fact that the administrative record does not support such a finding and the use of extra-record evidence to make such a finding would be inappropriate.

17 - OPINION AND ORDER

goal"); AR016615 (unclear if acclimation to Bull Run River will be successful for a number of years). However, in making the FONSI, NMFS very nearly ignores this uncertainty and then treats the success of the programs as a given, an issue called into doubt by the ODFW's miserable track record of containing stray rates.[6] The "purpose of an EIS is to obviate the need for speculation." *Sierra Club v. U.S. Forest Serv.*, 843 F.2d 1190, 1195 (9th Cir. 1988). Lastly, and most importantly, this uncertainty relates to adverse affects on four listed species (another intensity factor). NMFS acted arbitrarily in concluding that the HMGPs would have no significant impact while failing to reduce the uncertainty of the success of the HGMPs through the production of an EIS.[7]

   2.    Reasonable Range of Alternatives

NEPA requires NMFS to "study, develop, and describe" a reasonable range of alternatives to the proposed project. 42 U.S.C. § 4332(2)(E); 40 C.F.R. § 1502.14(d). This consideration must include consideration of a "no action" alternative. In reviewing a challenge under NEPA the court must determine whether the agency's "selection and discussion of

_____

[6] Although stray rates for spring Chinook have been higher than those for the other species at issue, the record reflects that stray rates for the remaining species were high enough in the years preceding approval of the HGMPs that attainment of stray rates was uncertain for those species as well. AR016928.

[7] The court declines to adopt NMFS' argument that any failure on its part to properly explain its decisions results in a violation of the APA rather than NEPA or the ESA. *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985). The APA merely provides the standard of review in this case by which the court evaluates plaintiffs' claims brought pursuant to NEPA and the ESA. Plaintiffs have not alleged any substantive violations of the APA. It is a hallmark of administrative law that "a reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency." *S.E.C. v. Chenery Corp.*, 332 U.S. 194, 196 (1947).

18 - OPINION AND ORDER

alternatives fosters informed decision-making and informed public participation." *Westlands Water Dist. v. U.S. Dep't of Interior*, 376 F.3d 853, 872 (9th Cir. 2004) (citation omitted). "Although an agency's obligation to consider alternatives under an EA is a lesser one than under an EIS, . . . NEPA requires that alternatives . . . be given full and meaningful consideration, whether the agency prepares an EA or an EIS." *Ctr. for Biological Diversity*, 538 F.3d at 1217 (quotation and citation omitted).

Here, NMFS considered both the "preferred action" alternative and a "no action" alternative as well as raising, but not analyzing, five additional alternatives. AR016534-35, AR016552-53. NMFS dismissed the five alternatives not analyzed because they were "less likely to provide the intended benefit of providing fishing opportunities." AR016552. One of these dismissed alternatives was an alternative with the release of fewer fish from the hatchery. This alternative was summarily dismissed because "any incrementally different level of production between no production and the proposed levels would not provide a large enough range to allow meaningful evaluation." AR016553. Given the obvious difference between the release of approximately 1,000,000 smolts and zero smolts, it is not clear why it would not be meaningful to analyze a number somewhere in the middle or why such a number would preclude the provision of fishing opportunities. Where a feasible alternative would meet the project's purpose and need, it should be considered. *Western Watersheds Project v. Abbey*, 719 F.3d 1035, 1052 (9th Cir. 2013). NMFS erred in failing to consider a reasonable range of alternatives.

　　　3.　　Mitigation

Plaintiffs contend that mitigation will not avoid significant effects, and that production of an EIS was required. In "evaluating the sufficiency of mitigation measures, we consider whether

they constitute an adequate buffer against the negative impacts that may result from the authorized activity.  Specifically, we examine whether the mitigation measures will render such impacts so minor as to not warrant an EIS." *National Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 734 (9th Cir. 2001).  As discussed above and below, there was significant uncertainty regarding the efficacy of the HGMPs in achieving their goals and much of this uncertainty is tied to the mitigation measures.  AR031747 (ODFW scientist noting that effectiveness of acclimation and alternate release site would not be known for four to five years).  Because the use of weirs and acclimation was uncertain to reduce stray rates below targets and because excessive stray rates are harmful to these threatened fish species, it was arbitrary and capricious to conclude that the HGMPs would have no significant impact without first producing an EIS.[8]

**B.    ESA Claims**

Plaintiffs contend that NMFS' BiOp violates § 7 of the ESA because NMFS failed to consider important aspects of the problem, because NMFS inappropriately relied on mitigation that is not reasonably certain to occur, because portions of the ITS are unlawful, because the §4(d) decision failed to account for recovery of the threatened species, and because NMFS failed to reinitiate formal consultation in a timely manner.

1.    Important aspects of the problem

In determining whether an agency decision is arbitrary and capricious, courts "consider

---

[8] The court is not concluding, at this juncture, that NMFS must produce an EIS when evaluating the newly submitted HGMPs.  Those HGMPs are likely to be different from the HGMPs at issue in this case, and NMFS has obtained additional information regarding the impacts of the current HGMPs since the inception of this lawsuit.

whether the decision was based on a consideration of the relevant factors and whether there has

been a clear error of judgment." *Marsh*, 490 U.S. at 378.  A decision is arbitrary and capricious

if the agency:

> [H]as relied on factors which Congress has not intended it to consider, entirely
> failed to consider an important aspect of the problem, offered an explanation for
> its decision that runs counter to the evidence before the agency, or is so
> implausible that it could not be ascribed to a difference in view or the product of
> agency expertise.

*O'Keeffe's, Inc. v. U.S. Consumer Product Safety Comm.*, 92 F.3d 940, 942 (9th Cir. 1996)

(quoting *Motor Vehicle Mfrs. Ass'n.*, 463 U.S. at 43).

In the context of the ESA, the "problem" is whether a proposed project will cause

jeopardy to a listed species and "any effect that is likely to adversely affect the species is plainly

an important aspect of this problem." *S. Yuba River Citizens League v. NMFS*, 723 F. Supp. 2d

1247, 1270 (E.D. Cal. 2010) (citing 50 C.F.R. §§ 402.13(a), 402.14(b)(1)).

Plaintiffs contend that the BiOp fails to consider significant data regarding spring

Chinook and winter steelhead, fails to consider whether the Bull Run acclimation facility and the

weirs will limit stray rates, and that NMFS's endorsement of a ten percent stray rate for spring

Chinook, winter steelhead, and coho is arbitrary and capricious.

### a.    Chinook and Winter Steelhead Data

Plaintiffs contend that the BiOp does not take into account data regarding Chinook and

winter steelhead that is important to a consideration of the environmental baseline for this

project.  In particular, plaintiffs fault NMFS for failing to analyze the harm that the Hatchery's

operations have already caused, including declining abundance and high stray rates in recent

years, data regarding summer steelhead spawning, and data from the Bull Run River.

Much of the evidence offered in support of plaintiffs' arguments on these subjects is extra-record evidence that was unavailable to federal defendants prior to the issuance of the BiOp, such as data regarding winter steelhead stray rates and abundance in years immediately preceding the agency decision. Unlike in NEPA, the ESA does not require NMFS to develop information, only to consider the best evidence available. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(a); *Connor v. Burford,* 848 F.2d 1441, 1454 (9th Cir. 1988) (an agency "cannot ignore available biological information"). As much of the evidence cited by plaintiffs was not available to NMFS, the agency cannot be faulted for having ignored it.

With respect to summer steelhead, plaintiffs contend that NMFS ignored overlap between out-of-basin hatchery origin summer steelhead and wild winter steelhead on the spawning grounds and during rearing. Because the summer steelhead are not native to the Sandy River Basin, plaintiffs contend that any spawning between summer steelhead and winter steelhead is particularly problematic. The BiOp cites a study in the Clackamas River Basin that concluded that "interactions between hatchery and natural-origin steelhead . . . have resulted in reduced productivity for the winter steelhead population." AR016936. The BiOp also acknowledges that there is uncertainty regarding the level of interaction between hatchery steelhead and wild steelhead. *Id.* The extra-record evidence cited by plaintiffs does not demonstrate that hatchery summer steelhead and wild steelhead are in fact spawning together or that there are other unacknowledged impacts on wild winter steelhead caused by summer steelhead in the Sandy River Basin. On this record, the court cannot conclude that this is an important problem that NMFS ignored and the court must defer to the agency's expertise in this matter. *Ctr. for*

*Biological Diversity*, 588 F.3d at 712.

However, the BiOp's analysis of historical stray rates, and the problems posed by stray rates was arbitrary and capricous. The BiOp contains a table outlining the number of wild and hatchery spawners and NMFS cannot be said to have ignored the problem entirely. AR016928 (providing numerical estimates of total vs. wild Chinook, coho, and steelhead from 1992-2011); AR 016835. However, the BiOp minimizes the Sandy Hatchery's terrible track record with respect to stray rates and makes little effort to address how or why NMFS expected a dramatic reduction in stray rates. The BiOp states that "[g]ene-flow and competition on the spawning grounds is not a threat because the HGMPs impose strict limits on pHOS." AR016955; AR016955 ("Interactions on the spawning grounds are not a threat because these programs must comply with strict standards for limiting [pHOS]"). While it is correct that the HGMPs impose limits on straying, it is entirely unclear why NMFS expected that the stray rates would actually be attained, especially in light of uncertainty regarding the efficacy of mitigation measures. *Chenery*, 332 U.S. 194, 196 (1947) ("If the administrative action is to be tested by the basis upon which it purports to rest, that basis must be set forth with such clarity as to be understandable"). Accordingly, the court must conclude that NMFS ignored this important problem.

                    b.    Acclimation and Weirs

Plaintiffs contend that the BiOp fails to consider whether moving the acclimation facility from Cedar Creek to the Bull Run River and using weirs will reduce stray rates and prevent harm to wild fish.

The BiOp discusses weirs and acknowledges that there is uncertainty regarding their operation. *See, e.g.*, AR016953-54 (discussing adverse effects and best management practices);

AR016961 (discussing adverse effects caused by weirs, uncertainty, and learning curve for their use); AR01694 (discussing benefits of weirs). Although there is uncertainty associated with weir use, NMFS cannot be said to have ignored that uncertainty or the potential downsides to weir use entirely. Similarly, there is some discussion in the BiOp regarding why Bull Run River acclimation is expected to be more effective than acclimation to Cedar Creek. AR016890-91 (noting that flows from the Bull Run River are expected to provide enough volume and cooler temperatures that will attract spring Chinook); *but see*, AR031747 (ODFW scientist noting that effectiveness of acclimation and alternate release site would not be known for four to five years). While the BiOp discusses weirs and acclimation, it does not provide a reasoned explanation for why the use of weirs and the move to the Bull Run River for acclimation would yield the needed improvements in stray rates. Given the stray rates in recent years, the fact that acclimation and weirs are key to reducing stray rates, and the fact that the success of weirs and acclimation at the Bull Run River are uncertain, it is unclear why NMFS believed ODFW could bring about the needed changes. While NMFS did not ignore weirs and acclimation, it ignored the challenges facing ODFW in reducing stray rates. This is clearly an important part of the problem and the success of those strategies cannot be taken as a given. *Burlington Truck Lines v. United States*, 371 U.S. 156, 158 (1962) (an agency must consider "relevant factors" and articulate "a rational connection between the facts found and the choices made").

c.    Ten Percent Stray Rate

Plaintiffs contend that NMFS' approval of a ten percent stray rate for spring Chinook, winter steelhead, and coho was arbitrary and capricious. In large part, this dispute centers on whether the hatchery programs are isolated or integrated and on whether the hatchery fish are

genetically similar to or divergent from wild fish. There is sufficient evidence in the record, and cited in the BiOp, to support NMFS' determination that a ten percent stray rate is protective of the species where a hatchery uses local origin broodstock that is not genetically divergent from the wild population. AR01696548. Additionally, the BiOp, which relies on the use of "local fish" for brookstock defines that term to mean "fish that are no more than moderately divergent from the local natural population." AR016947. Unfortunately, there is no analysis in the BiOp regarding whether the broodstock utilized in the HGMPs are "no more than moderately divergent from the local natural population" or defining what "moderately divergent" means. Without a reasoned determination that the Sandy Hatchery's fish are "local fish" as defined in the BiOp, the court cannot conclude that the use of a ten percent stray rate was a rational decision.

2.    Mitigation measures

NMFS may rely on mitigation or conservation measures in issuing a no jeopardy BiOp. However, those measures must be "reasonably specific, certain to occur, and capable of implementation; they must be subject to deadlines or otherwise-enforceable obligations; and most important, they must address the threats to the species in a way that satisfies the jeopardy and adverse modification standards." *Ctr. for Biol. Diversity v. Rumsfeld*, 198 F. Supp. 2d 1139, 1152 (D. Ariz. 2002) (citing *Sierra Club v. Marsh*, 816 F.2d 1376, 1379-80 (9th Cir. 1987)); *see also Nat'l Wildlife Fed'n v. NMFS*, 524 F.3d 917, 936 (9th Cir. 2008) ("even a sincere general commitment to" implement conservation measures is insufficient "absent specific and binding plans").

In this matter, the mitigation measures can be roughly divided into two categories: those that are certain to be implemented such as weirs and acclimatization periods and those that may

be implemented if the goals set forth in the HGMPs are not met. This latter category of mitigation measures can be referred to as "adaptive management." Plaintiffs contend that NMFS erred in relying on both varieties of mitigation.

As discussed at length above, the court finds that NMFS failed to provide a reasoned analysis of why weirs and acclimation would mitigate the problems caused by stray rates. Without reasonable certainty that these mitigation measures would reduce stray rates, it was arbitrary for NMFS to rely upon them. *Natural Res. Def. Council v. Kempthorne*, 506 F. Supp. 2d 322, 350–57 (E.D. Cal 2007).

With respect to the "adaptive management" approach taken by NMFS in the BiOp, plaintiffs contend that specific management responses should be tied to specific triggering criteria. *Greater Yellowstone Coal., Inc. v. Servheen*, 665 F.3d 1015, 1029 (9th Cir. 2011). However, the court finds that NMFS' decision, when viewed through the context of Limit 5, takes a reasonable approach to adaptive management. *See,* 50 C.F.R. § 223.203(b)(5)(vi) (providing that NMFS will evaluate effectiveness, identify deficiencies, and possibly withdraw approval of HGMPs after providing notice and comment). With annual monitoring and reporting, the court cannot conclude that the adaptive management approach was unreasonable as the ESA permits some flexibility in planning for an uncertain future. *Center for Biological Diversity v. Kempthorne*, 588 F.3d 701, 712 (9th Cir. 2009) (agency predictions are entitled to "great deference" even where some uncertainty exists); *Arizona Cattle Growers' Ass'n v. Salazar*, 606 F.3d 1160, 1164 (9th Cir. 2010).

3.    Incidental Take Statement

Section 9 of the ESA prohibits the "take" of listed species. 16 U.S.C. § 1538(a)(1)(B).

The term "take" means "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." *Id.* § 1532(19). Where, as here, NMFS issues a "no jeopardy" opinion for a proposed action that nevertheless may result in a "take" under the ESA, NMFS must include an ITS specifying the amount or extent of anticipated take, reasonable and prudent measures to minimize the impact of the take, and mandatory terms and conditions to implement the reasonable and prudent measures. 50 C.F.R. § 402.14(i). The ITS provides an exemption from liability for "take" under the ESA. 16 U.S.C. § 1536(o)(7). "Incidental take statements set forth a 'trigger' that, when reached, results in an unacceptable level of incidental take, invalidating the safe harbor provision [of the ESA], and requiring the parties to re-initiate consultation." *Ariz. Cattle Growers' Ass'n v. FWS*, 273 F.3d 1229, 1249 (9th Cir. 2001); 50 C.F.R. § 402.16(a).

Although it is preferable to quantify take with a number of members of a listed species, NMFS may use a surrogate if it is not practicable to utilize such a number. *Ariz. Cattle Growers*, 273 F.3d at 1249-50; *Wild Fish Conservancy v. Salazar*, 628 F.3d 513, 531(9th Cir. 2010); 50 C.F.R. § 402.16(a). Where NMFS uses a non-numerical surrogate, it must "articulate a rational connection between the surrogate and the taking of the species." *Wild Fish Conservancy*, 628 F.3d at 531. The surrogate must "contain measurable guidelines to determine when incidental take would be exceeded," and "must not be so general that the applicant or the action agency cannot gauge its level of compliance." *Or. Natural Res. Council ("ONRC") v. Allen,* 476 F.3d 1031, 1038-39 (9th Cir. 2007).

NMFS found five forms of take were likely to occur from the proposed action and created surrogates for each of those five forms of take. Plaintiffs take issue with two of the surrogates:

the five and ten percent stray rates and the twenty percent change in spawning distribution caused by operation of the weirs.

First, as discussed above, plaintiffs contend that the ten percent stray rate is unlawful. Without a finding that the hatchery fish are "no more than moderately divergent," this court agrees. Second, plaintiffs contend that the use of a three-year moving mean beginning in 2013 to calculate stray rates is arbitrary and capricious. AR016974. Though counsel for NMFS has assured the court that NMFS would take immediate action if stray rates were measured in year one at a rate that precluded, or called into question, attainment of the three-year average, the ITS does not appear to require such action. More importantly, the use of a three-year average did not begin until 2013, making this ITS trigger for the first year of the HGMPs "coextensive with the project's own scope." *ONRC*, 476 F.3d at 1039. Accordingly, the court finds that NMFS' use of this stray rate surrogate is unlawful.

To account for take caused by changes in spawning distribution resulting from the use of weirs, the ITS uses a trigger of "any change greater than 20 percent in spawning distribution above and below the weirs and in pre-spawning mortality from what was measured during previous spawning ground survey prior to the installation and operation of the weirs in 2011." AR016971. The use of a twenty percent trigger is entirely unexplained. There is precisely nothing in the record that explains why twenty percent, rather than ten or thirty or forty percent, is an appropriate target. Without some justification for the use of twenty percent as the target, the court must find that NMFS' decision was arbitrary as the court "cannot defer to a void." *Or. Natural Desert Ass'n v. Bureau of Land Mgmt.*, 531 F.3d 1114, 1142 (9th Cir. 2008).

4.     NMFS Section 4(d) Decision Approving HGMPs

Plaintiffs contend that NMFS' approval of the HGMPs violates the 4(d) Rule by failing to consider the impacts of the HGMPs on the recovery of the species at issue.  Plaintiffs seek to impose an additional requirement on NMFS that is not found in the statute or regulations.  Rule 4(d) provides that "[w]henever any species is listed as a threatened species . . . the Secretary shall issue such regulations as he deems necessary and advisable to provide for the conservation of such species." 16 U.S.C. § 1533(d).  NMFS promulgated Limit 5 as part of the 4(d) Rule.  Limit 5 creates an exemption from § 9's take prohibition for otherwise unlawful take of anadromous fish caused by a hatchery's artificial propagation program so long as the hatchery is operated pursuant to an approved HGMP.  50 C.F.R. § 223.203(b)(5).  Plaintiffs do not contend that the HGMPs do not meet the regulatory criteria of Limit 5, but that NMFS' approval of the HGMPs violates the statute because NMFS failed to consider recovery.  The statute requires NMFS to provide for the conservation of species, which includes recovery, when promulgating regulations in accordance with Rule 4(d).  NMFS did that when developing Limit 5.  The HGMPs in turn comply with the strictures of Limit 5.  Nothing more is required and this court is not free to impose additional requirements. *Lands Council*, 537 F.3d at 993-94.

5.     Reinitiation of Consultation

Plaintiffs contend that NMFS erred in failing to reinitiate formal consultation in accordance with § 7(a)(2) in response to violations of the ITS.  At this time, NMFS has reinitiated consultation, but plaintiffs contend that the reinitiation was untimely and request declaratory relief.  The court concludes that this claim is moot as the court cannot provide plaintiffs with any meaningful relief. *Ctr. for Biological Diversity v. Lohn*, 511 F.3d 960, 964

(9th Cir. 2007).

**CONCLUSION**

For the reasons provided, plaintiffs' Motion to Strike [215] is DENIED, plaintiffs' Motion

for Partial Summary Judgment [162] is GRANTED IN PART and DENIED IN PART, and

federal defendants' Cross Motion for Partial Summary Judgment [179] is GRANTED IN PART

and DENIED IN PART. Plaintiffs are awarded summary judgment on the Fourth and Fifth

Claims for Relief in the Second Amended Complaint, federal defendants are awarded summary

judgment on the Third Claim, and plaintiffs' Sixth Claim is denied as moot. The parties are

ordered to confer regarding remedies. If the parties are unable to reach agreement, the parties

must propose a briefing and discovery schedule that will allow this court to resolve any remedies

disputes prior to the 2014 release of hatchery smolts. A joint status report or briefing schedule is

due January 22, 2014.

IT IS SO ORDERED.

DATED this 16 day of January, 2014.

Ancer L. Haggerty
United States District Judge