UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

NATIVE FISH SOCIETY and
MCKENZIE FLYFISHERS,

      Plaintiffs,

v.

NATIONAL MARINE FISHERIES
SERVICE; REBECCA BLANK, Acting
Secretary of the Department of Commerce;
WILLIAM STELLE, Regional
Administrator, NMFS; OREGON
DEPARTMENT OF FISH AND WILDLIFE;
BRUCE MCINTOSH, Assistant Fish
Division Administrator, ODFW; CHRIS
WHEATON, Northwest Region Manager,
ODFW; and ROY ELICKER, Director,
ODFW,

      Defendants.

Case No. 3:12-cv-00431-HA

OPINION AND ORDER

HAGGERTY, District Judge:

      Plaintiffs, the Native Fish Society and McKenzie Flyfishers, filed this action for declaratory and injunctive relief against the National Marine Fisheries Service (NMFS); William Stelle, Regional Administrator, NMFS; Rebecca Blank, Acting Secretary of the Department of Commerce (collectively "federal defendants" or "NMFS"); the Oregon Department of Fish and

1 - OPINION AND ORDER

Wildlife (ODFW); Bruce McIntosh, Assistant Fish Division Administrator, ODFW; Chris Wheaton, Northwest Region Manager, ODFW; and Roy Elicker, Director, ODFW (collectively "state defendants" or "ODFW"). Plaintiffs seek to compel defendants to comply with the Endangered Species Act (ESA), 16 U.S.C. § 1531 *et seq.*, the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 *et seq.*, and the Administrative Procedures Act (APA), 5 U.S.C. § 551 *et seq.*, in authorizing, funding, and managing the Sandy Hatchery. On January 16, 2014, this court entered an Opinion and Order [241] resolving plaintiffs' and federal defendants' cross-motions for summary judgment, granting in part and denying in part each party's motion. In so ruling, the court concluded that NMFS had violated NEPA and the ESA in approving Hatchery Genetic Management Plans (HGMPs) for the Sandy Hatchery. Plaintiffs now advance a Motion for Remedy and Injunctive Relief [247] seeking vacatur of the decisions approving the HGMPs. Additionally, plaintiffs seek an injunction preventing the release of smolts from the Sandy Hatchery on the basis that state defendants' operation, and federal defendants' funding, of the Sandy Hatchery causes "take" of threatened fish species in violation of § 9 of the ESA. 16 U.S.C. § 1538(a)(1)(B). For the following reasons, plaintiffs' Motion for Remedy and Injunctive Relief is granted in part and denied in part.

## BACKGROUND

The parties and the court are more than familiar with the legal and factual background to this matter. It has been detailed in the parties briefing and in this court's prior opinions [120 and 241]. That history will not be repeated and only limited and newly developed background information will be relayed here.

In granting partial summary judgment to plaintiffs in this case, the court concluded that NMFS violated NEPA by failing to produce an environmental impact statement (EIS) and

2 - OPINION AND ORDER

violated the ESA by ignoring important aspects of the problems posed by the HGMPs, by improperly relying on uncertain mitigation measures, and by failing to create a lawful incidental take statement (ITS). By and large, NMFS' errors stemmed from its failure to adequately explain the basis for its decisions and expectations. In particular, NMFS failed to explain why certain mitigation measures (use of weirs and acclimation) were expected to result in dramatic decreases to the Sandy Hatchery's stray rates, why the use of a twenty percent change in spawning distribution trigger was an appropriate proxy for "take" in the ITS, and whether the hatchery fish released by the Sandy Hatchery are no more than moderately divergent from wild fish.

In the years preceding NMFS' approval of the HGMPs, stray rates at the Sandy Hatchery were excessively high. The removal of the Marmot Dam in 2007 and 2008 opened the upper Sandy River Basin to both wild and hatchery fish. The percentage of hatchery origin spawners (pHOS) for spring Chinook was 45% in 2008, 52% in 2009, 77% in 2010, and 60% in 2011. AR031745, AR031748. The pHOS for winter steelhead was 28.6% in 2010. Lewis Decl. [92] ¶ 55. In 2009, the pHOS for coho was 10.4% and in 2010 it was 24.2%. AR015626. Since implementation of the HGMPs, those numbers have, by and large, been reduced dramatically. In 2012, the pHOS for coho was 2.8%. Fifth Turner Decl. [267] at ¶ 12. In 2013, the pHOS for spring Chinook was 9.3%, and for winter steelhead it was 6%. *Id.* at ¶ 7; Ex. 1 to Weston Decl. [239-1] at 25.[1] The notable exception to this downward trend is the preliminary estimate for 2013 coho pHOS. Fourth Lewis Decl. [280] at ¶ 7. Because information concerning reduced stray rates was post-decisional, it was not considered by the court for purposes of summary

---

[1] Plaintiffs take issue with these numbers. Fifth Frissell Decl. [249] at ¶¶ 2-20. However, ODFW utilizes widely accepted methodologies for calculating these figures and the court finds no basis to second-guess the agency's scientists.

3 - OPINION AND ORDER

judgment.[2]

After this court issued its Opinion and Order resolving plaintiffs' first Motion for Preliminary Injunction [58], but prior to resolution of the parties' cross motions for summary judgment, ODFW submitted new HGMPs to NMFS for review. These 2013 HGMPs are still under consideration at this time and will not be acted upon before the 2014 scheduled release of smolts. State defendants propose releasing the same number of smolts this year as were released last year following briefing on plaintiffs' first Motion for Preliminary Injunction. These releases are substantially reduced from historic release levels.

## VACATUR AND REMAND

Plaintiffs seek an order from this court vacating NMFS' § 4(d) decisions approving the HGMPs and requiring NMFS to prepare an EIS when reviewing the new HGMPs submitted to NMFS last year.

### Standards for Vacatur and Remand

Under the APA, an agency action held to be unlawful is ordinarily set aside and remanded to the agency. 5 U.S.C. § 706(2); *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985) ("the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation"). However, a court "is not required to set aside every unlawful agency action." *National Wildlife Federation v. Espy*, 45 F.3d 1337, 1343 (9th Cir. 1995). Whether a court should grant injunctive relief under the APA is "controlled by principles of

---

[2] Plaintiffs also raise numerous factual issues pertaining to summer steelhead spawning. As plaintiffs did not prevail on these issues at summary judgment, it would be inappropriate to rely on that data here for purposes of vacatur. Additionally, that data is not relevant under this court's analysis of plaintiffs' § 9 claims. Accordingly, the court does not recite that data here. The court is confident that plaintiffs will highlight these facts in their comments to NMFS concerning the 2013 HGMPs.

4 - OPINION AND ORDER

equity." *Id.* (citing *Westlands Water Dist. v. Firebaugh Canal*, 10 F.3d 667, 673 (9th Cir.1993); *Sierra Pacific Industries v. Lyng*, 866 F.2d 1099, 1111 (9th Cir.1989)). "When equity demands, [a flawed action] can be left in place while the agency follows the necessary procedures to correct its action." *Cal. Cmtys. Against Toxics v. EPA*, 688 F.3d 989, 992 (9th Cir. 2012) (quoting *Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1405 (9th Cir.1995) (internal quotation marks ommitted)); *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 839 F. Supp. 2d 1117, 1128 (D. Or. 2011) ("District courts have 'broad latitude in fashioning equitable relief when necessary to remedy an established wrong,' and sometimes equity requires an invalid agency action to remain in place while the agency revisits the action"). "Whether agency action should be vacated depends on how serious the agency's errors are 'and the disruptive consequences of an interim change that may itself be changed.'" *Id.* (quoting *Allied–Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 150–51 (D.C. Cir.1993)).

**Discussion**

As discussed above, although vacatur is presumptively appropriate, this court has equitable discretion to tailor relief in response to an agency's errors. In this matter, plaintiffs request that the court vacate NMFS' § 4(d) decisions approving the HGMPs. In evaluating whether vacatur is appropriate, the court first determines how serious the agency's errors were, and second, what the disruptive consequences of vacatur would be. In weighing these issues, the court notes that in cases involving listed species, the scales are tipped in favor of the species through the ESA's "institutionalized caution" mandate. *Sierra Club v. Marsh*, 816 F.2d 1376, 1383 (9th Cir. 1987) (citation and quotation omitted).

First, NMFS' primary errors in approving the HGMPs stemmed from its failure to explain why the use of weirs and acclimation were expected to result in greatly improved stray rates.

5 - OPINION AND ORDER

While NMFS failed to adequately explain its decisions, it appears that the agency's predictions largely proved correct. In light of the dramatic reductions in stray rates realized by ODFW since implementation of the HGMPs, it appears that NMFS' failures were largely failures to explain, rather than failures to apprehend, the nature of the obstacles created by operation of the Sandy Hatchery. These errors can be corrected through additional explanation and were more procedural, than substantive, in nature. As such, the court finds NMFS' errors to have been relatively minor. The primary exception is the agency's approval of a ten percent stray rate based on the genetic similarity of hatchery and wild fish. Although it is possible that the fish are no more than moderately genetically divergent, the court has not seen a convincing explanation for that premise. This error is particularly troubling with respect to coho, as the Hatchery's coho broodstock has not incorporated wild broodstock since 1996. The 2013 HGMP for coho has reduced the target stray rate to five percent to account for the genetic divergence. The preliminary data tentatively suggests that the 2013 coho stray rate may very well be in excess of ten percent. As such the court cannot find NMFS' errors to be minor as they pertain to the coho HGMP.

Second, the court has serious concerns that vacatur could result in disruptive consequences. Importantly, it is possible that some of these consequences would accrue to the detriment of listed species. As discussed in this court's prior Opinion and Order [120], the HGMPs approved by NMFS provide ODFW with an absolute defense to § 9 claims so long as the HGMPs are in effect and ODFW is in compliance with their terms. 50 C.F.R. § 223.203(c) (a person "shall have a defense where the person can demonstrate that the limit is applicable and was in force, and that the person fully complied with the limit at the time of the alleged violation . . . this defense will be an absolute defense to liability under [§ 9]"). Were this court to vacate

NMFS' approval of the HGMPs and the Biological Opinion, ODFW would no longer be under an obligation to operate weirs or conduct monitoring to protect wild fish and reduce stray rates for returning fish. While, as discussed below, plaintiffs request that this court require ODFW to implement mitigation measures even in the absence of approved HGMPs or hatchery releases, it is not at all clear that the court would be so-empowered. Without the protections afforded by HGMPs it would be more than reasonable for ODFW to cease all hatchery operations in order to avoid the severe penalties associated with § 9 liability. It is unclear then, how this court could order a state agency that has not been found to have previously violated the ESA and that has ceased all hatchery operations and is no longer at risk of violating the ESA, to nonetheless carry out certain hatchery operations that might subject it to liability. Vacatur "would remove beneficial measures which even plaintiffs acknowledge provide some protection for the species." *Nat'l Wildlife Fed'n*, 839 F. Supp. 2d at 1129. "Despite the APA's requirement that an invalid agency action be 'set aside,' equity can authorize the district court to keep an invalid biological opinion in place during any remand if it provides protection for listed species within the meaning of the ESA." *Id.* at 1128 (citations omitted).

In addition to the fact that vacatur would potentially cause serious harm to the species in the near term, vacatur would also be disruptive to the future operation of the Sandy Hatchery by potentially eliminating the possibility of collecting future broodstock, and to the short-term interests of amici in a sport and harvest fishery.[3] In light of the disruptive consequences of vacatur, and the nature of NMFS' errors, the court concludes that full vacatur of the decisions

---

[3] In light of the fact that the Sandy Hatchery is a harvest based hatchery that is not intended to, and does not, benefit these listed species, the court does not share defendants' concerns regarding long term impacts to the species that might result from the cessation of hatchery releases.

7 - OPINION AND ORDER

approving the HGMSs is inappropriate in this case.

However, the court does find partial vacatur of the decision approving the coho HGMP to be appropriate in light of the fact that it appears hatchery and wild coho are genetically divergent and preliminary estimates for 2013 suggest the stray rate may be in excess of both the current HGMP's target of ten percent and the 2013 HGMP's target of five percent. The court had hoped the parties could reach agreement regarding the 2014 releases or at least could compromise their respective positions through briefing. That did not occur. As such, the court has very little guidance from the parties in determining an appropriate smolt release number for coho. However, it is clear that full vacatur of the coho HGMP is inappropriate for the reasons outlined above and equally clear that allowing the release of 300,000 smolts would violate the ESA's institutionalized caution mandate. For the 2013 return year, the preliminary pHOS estimate is 11.7%.[4] In the corresponding release year, 462,950 coho smolts were released. Alsbury Decl. [269] at ¶ 45. In order to reduce the pHOS to roughly five percent, assuming all else is equal, the court finds, pursuant to the ESA's "institutionalized caution" mandate, that no more than 200,000 coho smolts should be released. Such a reduction would allow the Hatchery to continue operations and allow for hatchery fish broodstock collection while leaving in place the Hatchery's mitigation obligations. Accordingly, the court is partially vacating the 2012 coho HGMP such that the Sandy Hatchery may not release more than 200,000 coho smolts this year without violating the terms of the HGMP.

The court declines to require NMFS to prepare an EIS when evaluating the 2013 HGMPs.

---

[4] The court is wary of utilizing preliminary data, however, the court does not believe it can ignore this data while also fulfilling its obligations to balance the equities in favor of the listed species.

8 - OPINION AND ORDER

Those HGMPs are different than the ones reviewed by this court and NMFS has additional information to inform its decisionmaking. Were NMFS to reconsider the 2012 HGMPs, this court would have no trouble in remanding with instructions to prepare an EIS. However, this court is not in the business of mandating particular procedures to control an agency's distinct future decisions. NMFS is an expert agency that is entitled to utilize procedures for its future decisions in the manner it sees fit. In making those decisions, NMFS must weigh many factors, including the potential legal consequences of failing to adequately explain its decisions, analyze important aspects of the problem, or explore its options.

## INJUNCTION

Following this court's ruling [120] on plaintiffs' first Motion for Temporary Restraining Order/Preliminary Injunction [58], plaintiffs' § 9 claim, that state defendants' operation and federal defendants' funding of the Sandy Hatchery causes "take" of threatened fish species in violation of the ESA, was stayed. 16 U.S.C. § 1538(a)(1)(B). Plaintiffs now seek to enjoin state defendants from releasing hatchery smolts on the basis of that previously stayed claim. Plaintiffs also seek an order requiring ODFW to continue operating the weirs and conducting monitoring and reporting.

### Standards for Injunctive Relief

The issuance of a preliminary injunction is an "extraordinary remedy." *Monsanto Co. v. Geertson Seed Farms*, 130 S. Ct. 2743, 2761 (2010). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. NRDC*, 555 U.S. 7, 20 (2008); *see also Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134-35 (9th Cir. 2011) (holding that a

9 - OPINION AND ORDER

plaintiff need not establish likelihood of success on the merits if the plaintiff can demonstrate "serious questions" going to the merits combined with a balance of hardships that tips strongly in their favor). Where injury to the environment is "sufficiently likely . . . the balance of harms will usually favor the issuance of an injunction to protect the environment." *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987).

In cases involving the ESA, the balance of hardships is skewed in favor of injunctive relief even further than in other matters involving environmental harm. *Nat'l Wildlife Fed'n v. Burlington N. R.R., Inc.*, 23 F.3d 1508, 1510-11 (9th Cir. 1994). "In cases involving the ESA, Congress removed from the courts their traditional equitable discretion in injunction proceedings of balancing the parties' competing interests." *Id.* at 1511(citations omitted). "In Congress's view, projects that jeopardize the continued existence of endangered species threaten incalculable harm; accordingly, it decided that the balance of hardships and the public interest tip heavily in favor of endangered species" and this court "may not use equity's scales to strike a different balance." *Sierra Club,* 816 F.2d at 1383. However, mere allegations of ESA violations are insufficient and a plaintiff must make a showing that such violations are likely. *Nat'l Wildlife Fed'n,* 23 F.3d at 1511.

**Discussion**

    1.    Section 9 claim against state defendants

Plaintiffs contend that state defendants' operation of the Sandy Hatchery causes take of listed species in violation of § 9 of the ESA. To obtain relief on this claim, plaintiffs must prove by a preponderance of the evidence that the Sandy Hatchery's operations results in a violation of the ESA by causing take of listed species. *Defenders of Wildlife v. Bernal*, 204 F.3d 920, 925 (9th Cir. 2000); *Palila v. Hawaii Dept. of Land and Nat'l Resources,* 639 F.2d 495, 496 (9th Cir.

10 - OPINION AND ORDER

1981). As discussed in the court's Opinion and Order [120], so long as the HGMPs are in place (and the court is not vacating them) the state is immunized from § 9 liability for all actions allowed under the HGMPs. Accordingly, there is no basis for injunctive relief at this time as there is no indication that state defendants are out of compliance with the terms of Limit 5. Without a meritorious claim, or at least serious questions regarding the merits, the court will not enjoin ODFW from releasing smolts on this basis. Because ODFW is required to employ mitigation measures such as weirs and monitoring while the HGMPs are in place, there is no need for a court order requiring such action even if this court were empowered to do so.

       3.     Section 9 claim against federal defendants

The claim against federal defendants for § 9 liability rests on the fact that NMFS funds the Hatchery's operations through the Mitchell Act. To prove take in violation of § 9 of the ESA, plaintiffs would need to prove that NMFS' funding causes "take" beyond that allowed in the ITS. *Sweet Home*, 515 U.S. at 696 n.9 & 700 n.13 (noting "harm" is subject to "ordinary requirements of proximate causation and foreseeability"). At this time, plaintiffs have not met their burden of persuasion in demonstrating that Mitchell Act funding has been used to raise hatchery smolts at the Sandy Hatchery or otherwise resulted in "take." Rather, it is unclear whether Mitchell Act funding contributes to the release of smolts, rather than to monitoring and research, and it appears that the Sandy Hatchery's core functions are financed through the sale of licenses and tags to hunters and fishermen in Oregon. Accordingly, this claim does not provide a basis for injunctive relief at this time. *Cold Mountain v. Garber*, 375 F.3d 884, 890 (9th Cir. 2004).

## **CONCLUSION**

For the reasons provided, plaintiffs' Motion for Remedy and Injunctive Relief [247] is GRANTED IN PART and DENIED IN PART. The court will address issues concerning

11 - OPINION AND ORDER

attorney fees when a separate motion for attorney fees has been filed. The parties are ordered to confer regarding whether the parties wish to litigate plaintiffs' § 9 claims or whether entry of judgment is appropriate at this time.

IT IS SO ORDERED.

DATED this 14 day of March, 2014.

/s/ Ancer L. Haggerty
Ancer L. Haggerty
United States District Judge

12 - OPINION AND ORDER